IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
Case No.: 1:23-CV-158

JASON H. KLOEPFER and ALISON M. MAHLER,　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　Plaintiffs,　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　vs.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
CHEROKEE COUNTY SHERIFF'S DEPARTMENT;　)
EASTERN BAND OF CHEROKEE INDIANS; OHIO　)　　　COMPLAINT
CASUALTY INSURANCE COMPANY; (individual　　)　JURY TRIAL DEMAND
and official capacity for the following individuals)　)
DUSTIN SMITH, Sheriff Of Cherokee County;　　)
JUSTIN JACOBS, Chief Deputy CCSD; DAVID　　)
WILLIAMS, Captain CCSD; MILTON TEASDALE,　)
Lieutenant CCSD; MITCHELL MORGAN,　　　　)
Lieutenant CCSD; DREW PAYNE, Lieutenant CCSD;　)
DENNIS DORE, Sergeant CCSD; CODY WILLIAMS,　)
Sergeant CCSD; NOLAN QUEEN, Detective  CCSD;　)
JESSICA STILES, Deputy CCSD; J.T. GRAY, Deputy　)
CCSD; JASON HALL, Deputy CCSD; DON　　　　)
LATULIPE, Deputy CCSD; ADAM ERICKSON,　　)
Deputy CCSD; PAUL FRY, Deputy CCSD; CARLA　)
NEADEAU, Chief EBCIPD; JOSHUA TAYLOR,　　)
Assistant Chief EBCIPD; ROGER NEADEAU, JR.,　　)
Lieutenant Detective EBCIPD; NEIL FERGUSON,　　)
Patrol Lieutenant EBCIPD; SCOTT BUTTERY,　　)
SWAT Commander EBCIPD; JESSE RAMIREZ,　　)
Detective Sergeant EBCIPD; JEFF SMITH, Special　)
Operations Sergeant EBCIPD; DUSTIN WOLFE,　　)
Detective EBCIPD; CODY MCKINNEY, Detective　)
EBCIPD; NATHAN MESSER, Special Operations　　)
Officer EBCIPD; ANDREW SAMPSON, Special　　)
Operations Officer EBCIPD; CHRIS HARRIS, Patrol　)
Officer EBCIPD; and DARRYL BROWN, CCSD　　)
Attorney,　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　Defendants.　　　　　　　　　　　　　)

## STATEMENT OF THE CASE

Cherokee County Sheriff's (CCSD) deputies and the Eastern Band of Cherokee Indian (EBCI) police tried to kill Jason Kloepfer and Alison Mahler in their own home without provocation or justification at 4:57 a.m. on December 13, 2022. Jason and Ali have their own independent video footage that shows the officers illegally shot at both of them and then lied to frame Jason. They tried to cover it up. Without independent video footage, these officers would have gotten away with it.

Around 11:00 p.m. on December 12, 2022, a neighbor calls 911 and reports hearing noises from Jason's home. She claims she has video proof to support her complaints. Around 11:17 p.m., 3 Cherokee County Sheriff deputies enter Jason and Ali's Property. The deputies do not bother to even ask her to see it. The deputies fail to investigate the neighbor's allegations for hours. She has no proof.

When they arrive, these deputies grab assault rifles and patrol the yard. They see no signs of any ongoing or past criminal activity. The lights are off. The blinds are pulled down. They cannot see inside. Nobody comes outside. They have no idea if Jason and Ali are home. Jason and Ali sleep through the night, inside their home.

The deputies prop up a ladder and peep into the garage. They try looking through windows of the home and test the doors. They have no basis to remain there after a few minutes. Instead of leaving immediately when they have no legal authority to trespass, they inexplicably escalate the situation, patrolling the yard with long guns for hours. Despite seeing no evidence of crimes, they fabricate baseless stories of hostages and standoffs. They call their leadership and relay these stories.

When Sheriff Smith and his leadership team hear about his deputies loitering in Jason and Ali's yard without permission, they do not order them to leave. Instead, they double down on the errors and call the Eastern Band of Cherokee Indian SWAT team to leave the reservation and occupy Jason and Ali's property in Cherokee County. Internal communications confirm that they have no idea if there is a hostage or barricaded subject situation.

Over the next 4 hours, midnight to 4:00 a.m., several other deputies, including most of the leadership, join the original 3 deputies in the yard, as Jason and Ali sleep inside. If they really think Jason hurt Ali, they should find her immediately and get her medical attention. The video shows that they take no action to find Ali and ensure that she is not hurt or bleeding to death.

Finally, around 2:00 a.m., the first deputy on the scene walks the approximately 5 minutes it takes to go speak to the neighbor to try to verify her report. The neighbor shows him video footage that does not support her allegations she made to 911. At that point, the Sheriff's Department knows that the neighbor has no proof. Her original claims are false.

As soon as the officers know that the neighbor's allegations are false, all the officers should immediately leave. While their siege was inappropriate —actually unlawful— up to that point, at least nobody has illegally shot at Jason and Ali by then. The story should end here with no lasting harm.

Instead of fixing the mistakes, after learning the neighbor's claims are devoid of the proof the neighbor claims, Lt. Teasdale presents the original, now disproved,

allegations to a magistrate. Lt. Teasdale swears an oath saying the neighbor's story is true and video evidence exists to prove it. That is false.

Lt. Teasdale is at the Sheriff's Department in Murphy. He never visits the scene or speaks to the neighbor. He never even speaks with the deputy who views her video. Based on this false information, provided under oath by Lt. Teasdale who has not verified the truth, the magistrate issues a search warrant at 2:14 a.m.

As the EBCI SWAT team assembles in the Cherokee County Sheriff's office around 3:00 a.m., Lt. Teasdale briefs them about the situation. The Sheriff participates, too. They describe Jason as having mental health problems. No law enforcement officer has so much as spoken to either Jason or Ali at this point. They do not even know if Jason and Ali are home. Yet they prime the SWAT team for an attack.

Around 4:00 a.m., the Sheriff and Lt. Teasdale ride out to the scene with the SWAT team in an armored vehicle. Shortly after arriving, the SWAT team illegally breaks into Jason and Ali's home, without knocking or announcing or seeking permission, and throws a robot drone inside. That drone provides real-time, streaming audio and video footage to the SWAT team outside. The drone rolls around for a few minutes, shining a light and streaming footage to the SWAT team from inside the home. Then the drone rolls towards the bedroom, waking up Jason and Ali.

The video footage the SWAT team sees on their monitor outside shows, unequivocally and in real time, that Ali is not only alive, but unharmed. Jason and Ali are sleeping peacefully in the same bed until the drone disrupts them. Even

ignoring everything leading up to this point, as soon as Jason and Ali arise from their slumber together out of the same bed, this is — unquestionably— not a hostage situation. A couple sleeping together in their own bed in their own home at 4:57 a.m. is not a crime. As soon as those images are seen on the drone's video stream, the throng of 25 or so officers assembled in the yard has no basis to invade the home, much less shoot at Ali, the purported hostage, and Jason, an unarmed citizen.

Any pretextual claim of a hostage situation, unfounded from the start, evaporates when the SWAT team sees this live streaming video. Instead of immediately apologizing and leaving the private property, Sgt. Dore speaks on a PA system outside after they wake Jason and Ali up. Sgt. Dore does not introduce who he is or announce any affiliation with the Sheriff. Instead, he instructs Jason to walk outside and talk to the people in the yard.

Jason and Ali walk from the bedroom towards the front door inside their home, cutting lights on as they go. Jason picks up the drone in his right hand when he gets near it. He expresses confusion about what it is. It is not his and should not be in his home. He carries it in his hand as he opens the door. The drone sends a live stream of video footage and the SWAT team watches the video monitor outside as Jason picks up the drone and walks to the front door inside his home.

The SWAT team members wear intercom devices on their helmets. They use the intercom to talk with each other during the raid. Jason opens the front door, walks out, and holds both hands up in the air above his head, as instructed. The SWAT team knows that Jason does not have a gun in his hands when he opens the front

door because they see Jason holding the drone as they watch the streaming video and talk to each other on their intercom. The SWAT team also see he does not have a gun because he is directly in front of them with his hands held up in the air.

Despite knowing all of this, about 4 seconds later, after Jason walks out with his hands held high in the air above his head, at least 3, and possibly more, SWAT team members open fire on Jason. The SWAT team fires at least 12, maybe more, bullets from their assault rifles from about 65 to 80 feet away. These bullets rip through the occupied home with reckless abandon, slamming through walls and curtains to the back of the bedroom. At least one EBCI SWAT team member admits that Jason did not have a gun in his hands when they open fire on Ali and Jason.

At least 2 bullets slash through Jason's body, tearing through his chest and his left arm. Jason collapses in pain and confusion, falling back into Ali, who stands directly behind him. Bullets hiss past Ali's head and body, even after Jason collapses to the ground. The SWAT team claims that they think Ali is a hostage, yet they shoot at her, too, missing by mere inches.

The SWAT team rushes the home as Ali cowers near the door with her hands up, protecting Jason with her body, begging them not to shoot her or Jason any more. The SWAT team steps over Jason in the doorway as he lays gasping and crying out. Jason asks them repeatedly "why did you shoot me, I don't have a gun." They do not answer. The SWAT team pushes into the house and bedroom looking for any excuse to justify their onslaught. They find nothing to excuse their unprovoked, illegal use of deadly force.

Miraculously, Jason survives the ambush. After poking around Jason and Ali's home as Jason bleeds on the ground in the doorway, the SWAT team finally renders him aid. One of them grabs Jason's arm and drags him on his back down the plank to the cold ground. They arrest Ali, the alleged victim, handcuff her, and force her to march away and sit in the back of a patrol car in the cold without proper clothing. Ali worries Jason is dying, but they block her from offering him comfort and care. She has no idea what happens to Jason for hours.

After the shooting, the Sheriff finally walks up from lurking off in the shadows. In the Sheriff's press release the next day, he falsely claims he is not present at the scene, and only obtained information after the fact from the SWAT team. He also falsely accuses Jason of arguing with the officers, in an attempt to rationalize the illegal shooting. Only later, after Jason's video footage from inside his home proves the truth, does the Sheriff recant his original, false story in which he blames Jason.

The officers on the scene eventually call EMS to provide medical care to Jason. After delays, EMS drives Jason to a Tennessee hospital for treatment. The bullets lacerate his liver, cut through his stomach and the lining of his heart, crack ribs, and scatter shrapnel in his chest. He requires immediate trauma surgery, almost dies, and spends several days in the hospital for more treatment.

Ali remains in the Sheriff's custody for hours. They remove her from her home to the Sheriff's office, in custody as if she is under arrest. They do not provide her with any information about Jason, leaving her to fear that he is dead. Hours later, they take her back to the property, but refuse to give her access to her home or her

things inside. She only gets her phone to check on Jason after several hours pass.

Even though it is obvious after the shooting that Jason has not committed any crimes, 2 different deputies swear out 2 arrest warrants for Jason a few hours after they try to kill him. These 2 deputies provide demonstrably false information to the magistrate to obtain these arrest warrants. When Jason leaves the hospital days later, the Sheriff forces him to go to the jail and arrests Jason on those warrants.

On January 18, 2023, Jason releases the video from inside his home. This video proves indisputably that he and Ali did nothing wrong leading up to the surprise attack on his front steps. The video proves that the Sheriff's press release is not true. The video proves that the arrest warrants are false accusations, obtained by sworn testimony given under oath by law enforcement officers to a judicial officer.

The Sheriff releases a second press release a few days after Jason's video proves the first press release is false. In his second press release, the Sheriff admits that the first press release contains false, defamatory stories about Jason. Even after releasing this second press release, the false criminal charges against Jason remain for another 6 weeks. Not until Jason serves subpoenas seeking information to expose the cover up do they finally dismiss the false charges against him.

Neither the Sheriff nor the EBCI have taken required actions to appropriately investigate the shooting and other illegal actions by the officers under their control. No internal reprimand or suspension, or even just policy changes or retraining, has occurred in either agency related to these officers' illegal actions. No criminal charges have been brought against any of the officers related to their illegal actions. The

8

ongoing cover up continues to occur right now.

Jason and Ali lives are forever upended by these events. They live in fear that the powerful government forces will finish the job, and murder them, to complete the cover up. The physical scars on Jason's body are obvious, but the mental and emotional scars cut even deeper, and have not begun to heal.

COMES NOW, Plaintiffs Jason H. Kloepfer and Alison M. Mahler, by and through their undersigned attorneys, and in this Complaint against Defendants Sheriff Dustin Smith; Chief Deputy Justin Jacobs; Captain David Williams; Lieutenant Milton Teasdale; Lieutenant Mitchell Morgan; Lieutenant Drew Payne; Sergeant Dennis Dore; Sergeant Cody Williams; Detective Nolan Queen; Deputy Jessica Stiles; Deputy J.T. Gray; Deputy Jason Hall; Deputy Don Latulipe; Deputy Adam Erickson; Deputy Paul Fry; Attorney Darrell Brown (individually and in their official capacity as officers with the CCSD); the CCSD; the EBCI; Chief Carla Neadeau; Assistant Chief Joshua Taylor; Lieutenant Detective Roger Neadeau, Jr.; SWAT Commander Scott Buttery; Special Operations Nathan Messer; Patrol Lieutenant Neil Ferguson; Special Operations Andrew Sampson; Patrol Officer Chris Harris; Detective Dustin Wolfe; Detective Cody McKinney; Detective Sergeant Jesse Ramirez; and Special Operations Sergeant Jeff Smith (individually and in their official capacity as officers with the EBCI Police Department; and the Ohio Casualty Insurance Company, as Surety, alleges as follows:

9

## PARTIES

1. Plaintiffs Jason Kloepfer and Ali Mahler are residents of Cherokee County, North Carolina.

2. Neither Jason nor Ali are enrolled in the EBCI nor claim any tribal status.

3. Defendant CCSD is a subdivision of Cherokee County, and is authorized by the North Carolina Constitution and organized under the laws of the State of North Carolina.

4. The Sheriff of Cherokee County is the final policymaker for Cherokee County and the CCSD for all purposes relevant to this Complaint.

5. At all relevant times, Defendant Dustin Smith was a resident of Cherokee County, North Carolina and was the elected Sheriff of Cherokee County pursuant to Article VII, Section 2 of the North Carolina Constitution and N.C. Gen. Stat. § 162-1. Plaintiffs sue Sheriff Smith in his individual capacity and official capacity. On December 13, 2022, Sheriff Smith was:

   a. In control of his deputies, employees and agents, (including any non-CCSD law enforcement officers who were acting under a Mutual Aid Agreement ("MAA"), to include the EBCIPD officers);

   b. The final decision-making authority over law enforcement policies and personnel who worked for the CCSD and acted as his agents pursuant to a MAA;

   c. Directly responsible for the appointment, retention, supervision,

training, and conduct of his officers, deputies, employees, and agents of the CCSD;

    d.    Acting in the course and scope of his official duties as Sheriff of Cherokee County and under color of state law;

    e.    Vicariously liable for the actions of his agents, employees, officers, deputies, supervisors, managers, and anyone else who worked for the CCSD.

6.    At all relevant times, Defendant Chief Deputy Justin Jacobs was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff as the Chief Deputy with the CCSD. Plaintiffs sue Chief Deputy Jacobs in his individual capacity and official capacity.  On December 13, 2022, Chief Deputy Jacobs was:

    a.    An agent and employee of Sheriff Smith;

    b.    Charged with the supervision of all of the officers, deputies, employees, and agents who worked for the CCSD (including all of those involved with the shooting of Jason and Ali which included the EBCIPD officers who were acting under a MAA);

    c.    The final decision-making authority over law enforcement policies and personnel who worked for the CCSD and acted as his agents pursuant to a MAA;

    d.    Directly responsible for the appointment, retention, supervision, training, and conduct of any Sheriff's officers, deputies,

employees, and agents who worked for the CCSD;

    e.    Acting in the course and scope of his official duties as an employee of the CCSD and under color of state law;

    f.    Vicariously liable for the actions of the agents, employees, officers, deputies, supervisors, managers, and anyone else who worked for the CCSD that he was supervising.

7.    At all relevant times, Defendant David Williams was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff as a Captain with the CCSD. Plaintiffs sue Cpt. Williams in his individual capacity and official capacity. On December 13, 2022, Cpt. Williams was:

    a.    An agent and employee of Sheriff Smith;

    b.    Charged with the supervision of any officers, deputies, employees, and agents who worked for the CCSD (including all of those involved with the shooting of Jason and Ali which included the EBCIPD officers who were acting under a MAA) assigned to his supervision;

    c.    The final decision-making authority over law enforcement policies and personnel who worked for the CCSD and acted as his agents pursuant to a MAA;

d. Directly responsible for the appointment, retention, supervision, training, and conduct of any Sheriff's officers, deputies, employees, and agents who worked for him at the CCSD;

e. Acting in the course and scope of his official duties as an employee of the CCSD and under color of state law;

f. Vicariously liable for the actions of the agents, employees, officers, deputies, supervisors, managers, and anyone else who worked for the CCSD that he was supervising.

8. At all relevant times, Defendant Lieutenant Milton Teasdale was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff as a supervisor with the CCSD. Plaintiffs sue Lt. Teasdale in his individual capacity and official capacity. On December 13, 2022, Lt. Teasdale was:

a. An agent and employee of Sheriff Smith;

b. Charged with the supervision of any officers, deputies, employees, and agents who worked for the CCSD (including all of those involved with the shooting of Jason and Ali which included the EBCIPD officers who were acting under a MAA) assigned to his supervision;

c. The final decision-making authority over law enforcement policies and personnel who worked for the CCSD and acted as his agents pursuant to a MAA;

d.  Directly responsible for the appointment, retention, supervision, training, and conduct of any Sheriff's officers, deputies, employees, and agents who worked for him at the CCSD;

e.  Acting in the course and scope of his official duties as an employee of the CCSD and under color of state law;

f.  Vicariously liable for the actions of the agents, employees, officers, deputies, supervisors, managers, and anyone else who worked for the CCSD that he was supervising.

9.  At all relevant times, Defendant Lieutenant Mitchell Morgan was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff as a supervisor with the CCSD. Plaintiffs sue Lt. Morgan in his individual capacity and official capacity.  On December 13, 2022, Lt. Morgan was:

a.  An agent and employee of Sheriff Smith;

b.  Charged with the supervision of any officers, deputies, employees, and agents who worked for the CCSD (including all of those involved with the shooting of Jason and Ali which included the EBCIPD officers who were acting under a MAA) assigned to his supervision;

c.  The final decision-making authority over law enforcement policies and personnel who worked for the CCSD and acted as his agents pursuant to a MAA;

14

d. Directly responsible for the appointment, retention, supervision, training, and conduct of any Sheriff's officers, deputies, employees, and agents who worked for him at the CCSD;

e. Acting in the course and scope of his official duties as an employee of the CCSD and under color of state law;

f. Vicariously liable for the actions of the agents, employees, officers, deputies, supervisors, managers, and anyone else who worked for the CCSD that he was supervising.

10. At all relevant times, Defendant Lieutenant Drew Payne was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff as a supervisor with the CCSD. Plaintiffs sue Lt. Payne in his individual capacity and official capacity. On December 13, 2022, Lt. Payne was:

a. An agent and employee of Sheriff Smith;

b. Charged with the supervision of any officers, deputies, employees, and agents who worked for the CCSD (including all of those involved with the shooting of Jason and Ali which included the EBCIPD officers who were acting under a MAA) assigned to his supervision;

c. The final decision-making authority over law enforcement policies and personnel who worked for the CCSD and acted as his agents pursuant to a MAA;

d.   Directly responsible for the appointment, retention, supervision, training, and conduct of any Sheriff's officers, deputies, employees, and agents who worked for him at the CCSD;

e.   Acting in the course and scope of his official duties as an employee of the CCSD and under color of state law;

f.   Vicariously liable for the actions of the agents, employees, officers, deputies, supervisors, managers, and anyone else who worked for the CCSD that he was supervising.

11.   At all relevant times, Defendant Sergeant Dennis Dore was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff as a supervisor with the CCSD. Plaintiffs sue Sgt. Dore in his individual capacity and official capacity. On December 13, 2022, Sgt. Dore was:

a.   An agent and employee of Sheriff Smith;

b.   Charged with the supervision of any officers, deputies, employees, and agents who worked for the CCSD (including all of those involved with the shooting of Jason and Ali which included the EBCIPD officers who were acting under a MAA) assigned to his supervision;

c.   The final decision-making authority over law enforcement policies and personnel who worked for the CCSD and acted as his agents pursuant to a MAA;

d.   Directly responsible for the appointment, retention, supervision,

training, and conduct of any Sheriff's officers, deputies, employees, and agents who worked for him at the CCSD;

e.    Acting in the course and scope of his official duties as an employee of the CCSD and under color of state law;

f.    Vicariously liable for the actions of the agents, employees, officers, deputies, supervisors, managers, and anyone else who worked for the CCSD that he was supervising.

12.    At all relevant times, Defendant Sergeant Cody Williams was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff as a supervisor with the CCSD. Plaintiffs sue Sgt. Williams in his individual capacity and official capacity. On December 13, 2022, Sgt. Williams was:

a.    An agent and employee of Sheriff Smith;

b.    Charged with the supervision of any officers, deputies, employees, and agents who worked for the CCSD (including all of those involved with the shooting of Jason and Ali which included the EBCIPD officers who were acting under a MAA) assigned to his supervision;

c.    The final decision-making authority over law enforcement policies and personnel who worked for the CCSD and acted as his agents pursuant to a MAA;

d.    Directly responsible for the appointment, retention, supervision, training, and conduct of any Sheriff's officers, deputies,

employees, and agents who worked for him at the CCSD;

    e.    Acting in the course and scope of his official duties as an employee of the CCSD and under color of state law;

    f.    Vicariously liable for the actions of the agents, employees, officers, deputies, supervisors, managers, and anyone else who worked for the CCSD that he was supervising.

13.    At all relevant times, Defendant Nolan Queen was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff as a deputy with the CCSD. Plaintiffs sue Deputy Queen in his individual capacity and official capacity. On December 13, 2022, Deputy Queen was:

    a.    An agent and employee of Sheriff Smith;

    b.    Acting in the course and scope of his official duties as an employee of the Sheriff of Cherokee County and under color of state law.

14.    At all relevant times, Defendant Jessica Stiles was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff as a deputy with the CCSD. Plaintiff sues Deputy Stiles in her individual capacity and official capacity. On December 13, 2022, Deputy Stiles was:

    a.    An agent and employee of Sheriff Smith;

    b.    Acting in the course and scope of her official duties as an employee of the CCSD and under color of state law.

15.    At all relevant times, Defendant J.T. Gray was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff as a

deputy with the CCSD. Plaintiffs sue Deputy Gray in his individual capacity and official capacity. On December 13, 2022, Deputy Gray was:

    a.    An agent and employee of Sheriff Smith;

    b.    Acting in the course and scope of his official duties as an employee of the CCSD and under color of state law.

16.    At all relevant times, Defendant Jason Hall was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff as a deputy with the CCSD. Plaintiffs sue Deputy Hall in his individual capacity and official capacity. On December 13, 2022, Deputy Hall was:

    a.    An agent and employee of Sheriff Smith;

    b.    Acting in the course and scope of his official duties as an employee of the CCSD and under color of state law.

17.    At all relevant times, Defendant Don Latulipe was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff as a deputy with the CCSD. Plaintiffs sue Deputy Latulipe in his individual capacity and official capacity. On December 13, 2022, Deputy Latulipe was:

    a.    An agent and employee of Sheriff Smith;

    b.    Acting in the course and scope of his official duties as an employee of the CCSD and under color of state law.

18.    At all relevant times, Defendant Adam Erickson was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff as a deputy with the CCSD. Plaintiffs sue Deputy Erickson in his individual

capacity and official capacity. On December 13, 2022, Deputy Erickson was:

      a.     An agent and employee of Sheriff Smith;

      b.     Acting in the course and scope of his official duties as an employee of the CCSD and under color of state law.

19.    At all relevant times, Defendant Paul Fry was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff as a deputy with the CCSD. Plaintiffs sue Deputy Fry in his individual capacity and official capacity. On December 13, 2022, Deputy Fry was:

      a.     An agent and employee of Sheriff Smith;

      b.     Acting in the course and scope of his official duties as an employee of the CCSD and under color of state law.

20.    At all relevant times, Darrell Brown was a resident of Cherokee County and was the lawyer for Sheriff Smith and the CCSD. Plaintiffs sue Mr. Brown in his individual capacity and official capacity. He resigned that position at some point in January 2023, after Sheriff Smith issued his second press release.

21.    At all relevant times, the EBCI was a federally recognized Indian tribe that exists on a reservation within the territorial bounds of North Carolina. The EBCI is not a municipality or county under the laws of North Carolina. The EBCI officials have limited jurisdiction to perform official or governmental acts on behalf of the tribe outside the reservation. The only law enforcement authority given to any EBCI official to exercise off the reservation exists strictly by statutory authority from the North Carolina General Assembly.

22.     At all relevant times, the EBCI contracted with the Bureau of Indian Affairs ("BIA"), U.S. Department of Interior, to establish a police department pursuant to 25 U.S.C. 450f, et seq. under the Indian Self Determination Act. The EBCI has a "638 contract" with the BIA for the creation and payment of these police officers. This contract makes EBCIPD officers employees of the United States.

23.     At all relevant times, Defendant Carla Neadeau was Chief of the EBCIPD and was a resident of the reservation. Plaintiffs sue Chief Neadeau in her individual capacity and official capacity. On December 13, 2022, Chief Neadeau was:

   a.   In control of her officers and employees and agents, (including EBCIPD and any SWAT team who were acting under a MAA with the CCSD);

   b.   The final decision-making authority over law enforcement policies and personnel who worked for the EBCIPD and any SWAT team who acted as Sheriff Smith's agents pursuant to a MAA;

   c.   Directly responsible for the appointment, retention, supervision, training, and conduct of her EBCIPD and any SWAT team officers, employees, and agents;

   d.   Acting in the course and scope of her official duties as Chief of the EBCIPD and under color of state and federal law;

   e.   An agent of Sheriff Smith pursuant to the MAA;

   f.   Vicariously liable for the actions of her agents, employees,

officers, supervisors, managers, and anyone else who worked for the EBCIPD and any SWAT team.

24.     At all relevant times, Defendant Assistant Chief Joshua Taylor, was a resident of the reservation and was Assistant Chief of the EBCIPD. Plaintiff sues Assistant Chief Taylor in his individual capacity and official capacity. On December 13, 2022, Assistant Chief Taylor was:

a.      An agent and employee of Sheriff Smith pursuant to the MAA;

b.      An agent and employee of Chief Neadeau and the EBCIPD;

c.      Charged with the supervision of all of the officers and employees and agents of the EBCIPD, (including the SWAT team who were acting under a MAA with the CCSD);

d.      The final decision-making authority over law enforcement policies and personnel who worked for the EBCIPD and any SWAT team who acted as Sheriff Smith's agents pursuant to a MAA;

e.      Directly responsible for the appointment, retention, supervision, training, and conduct of the EBCIPD and any SWAT team officers, employees, and agents;

f.      Acting in the course and scope of his official duties as an employee of the EBCIPD and under color of state and federal law;

g.      Vicariously liable for the actions of the agents, employees, officers, supervisors, managers, and anyone else who worked for

the EBCIPD and any SWAT team he was supervising.

25.     At all relevant times, Defendant Lieutenant Detective Roger Neadeau, Jr., was a resident of the reservation and was Lieutenant Detective of the EBCIPD. Plaintiff sues Lt. Detective Neadeau in his individual capacity and official capacity. On December 13, 2022, Lt. Detective Neadeau was:

a.      An agent and employee of Sheriff Smith pursuant to the MAA;

b.      An agent and employee of Chief Neadeau and the EBCIPD;

c.      Charged with the supervision of all of the officers and employees and agents of the EBCIPD, (including the SWAT team who were acting under a MAA with the CCSD);

d.      The final decision-making authority over law enforcement policies and personnel who worked for the EBCIPD and any SWAT team who acted as Sheriff Smith's agents pursuant to a MAA;

e.      Directly responsible for the appointment, retention, supervision, training, and conduct of the EBCIPD and any SWAT team officers, employees, and agents;

f.      Acting in the course and scope of his official duties as an employee of the EBCIPD and under color of state and federal law;

g.      Vicariously liable for the actions of the agents, employees, officers, supervisors, managers, and anyone else who worked for the EBCIPD and any SWAT team he was supervising.

26. At all relevant times, Defendant Scott Buttery was a resident of the reservation and was SWAT Commander of the EBCIPD. Plaintiff sues Cmdr. Buttery in his individual capacity and official capacity. On December 13, 2022, Cmdr. Buttery was:

    a.    An agent and employee of Sheriff Smith pursuant to the MAA;

    b.    An agent and employee of Chief Neadeau and the EBCIPD;

    c.    Charged with the supervision of all of the officers and employees and agents of the EBCIPD, (including the SWAT team who were acting under a MAA with the Cherokee County Sheriff's Department);

    d.    The final decision-making authority over law enforcement policies and personnel who worked for the EBCIPD and any SWAT team who acted as Sheriff Smith's agents pursuant to a MAA;

    e.    Directly responsible for the appointment, retention, supervision, training, and conduct of the EBCIPD and any SWAT team officers, employees, and agents;

    f.    Acting in the course and scope of his official duties as an employee of the EBCIPD and under color of state and federal law;

    g.    Vicariously liable for the actions of the agents, employees, officers, supervisors, managers, and anyone else who worked for the EBCIPD and any SWAT team he was supervising;

27.    At all relevant times, Defendant Dustin Wolfe, was a resident of the reservation and was a Detective of the EBCIPD. Plaintiff sues Det. Wolfe in his individual capacity and official capacity.  On December 13, 2022, Det. Wolfe was:

a.    An agent and employee of Sheriff Smith pursuant to the MAA;

b.    An agent and employee of Chief Neadeau and the EBCIPD;

c.    Charged with the supervision of all of the officers and employees and agents of the EBCIPD, (including the SWAT team who were acting under a MAA with the Cherokee County Sheriff's Department);

d.    The final decision-making authority over law enforcement policies and personnel who worked for the EBCIPD and any SWAT team who acted as Sheriff Smith's agents pursuant to a MAA;

e.    Directly responsible for the appointment, retention, supervision, training, and conduct of the EBCIPD and any SWAT team officers, employees, and agents;

f.    Acting in the course and scope of his official duties as an employee of the EBCIPD and under color of state and federal law;

g.    Vicariously liable for the actions of the agents, employees, officers, supervisors, managers, and anyone else who worked for the EBCIPD and any SWAT team he was supervising;

28.    At all relevant times, Defendant Cody McKinney, was a resident of the

reservation and was a Detective of the EBCIPD. Plaintiff sues Det. McKinney in his individual capacity and official capacity. On December 13, 2022, Det. McKinney was:

a. An agent and employee of Sheriff Smith pursuant to the MAA;

b. An agent and employee of Chief Neadeau and the EBCIPD;

c. Charged with the supervision of all of the officers and employees and agents of the EBCIPD, (including the SWAT team who were acting under a MAA with the Cherokee County Sheriff's Department);

d. The final decision-making authority over law enforcement policies and personnel who worked for the EBCIPD and any SWAT team who acted as Sheriff Smith's agents pursuant to a MAA;

e. Directly responsible for the appointment, retention, supervision, training, and conduct of the EBCIPD and any SWAT team officers, employees, and agents;

f. Acting in the course and scope of his official duties as an employee of the EBCIPD and under color of state and federal law;

g. Vicariously liable for the actions of the agents, employees, officers, supervisors, managers, and anyone else who worked for the EBCIPD and any SWAT team he was supervising;

29. At all relevant times, Defendant Jesse Ramirez, was a resident of the reservation and was a Detective Sergeant of the EBCIPD. Plaintiff sues Det. Sgt.

Ramirez in his individual capacity and official capacity. On December 13, 2022, Det. Sgt. Ramirez was:

   a.   An agent and employee of Sheriff Smith pursuant to the MAA;

   b.   An agent and employee of Chief Neadeau and the EBCIPD;

   c.   Charged with the supervision of all of the officers and employees and agents of the EBCIPD, (including the SWAT team who were acting under a MAA with the Cherokee County Sheriff's Department);

   d.   The final decision-making authority over law enforcement policies and personnel who worked for the EBCIPD and any SWAT team who acted as Sheriff Smith's agents pursuant to a MAA;

   e.   Directly responsible for the appointment, retention, supervision, training, and conduct of the EBCIPD and any SWAT team officers, employees, and agents;

   f.   Acting in the course and scope of his official duties as an employee of the EBCIPD and under color of state and federal law;

   g.   Vicariously liable for the actions of the agents, employees, officers, supervisors, managers, and anyone else who worked for the EBCIPD and any SWAT team he was supervising;

   30.   At all relevant times, Defendant Neil Ferguson was a resident of the reservation and was Patrol Lieutenant and SWAT team member of the EBCIPD.

Plaintiff sues Lt. Ferguson in his individual capacity and official capacity. On December 13, 2022, Lt. Ferguson was:

a.    An agent and employee of Sheriff Smith pursuant to the MAA;

b.    An agent and employee of Chief Neadeau and the EBCIPD;

c.    Charged with the supervision of all of the officers and employees and agents of the EBCIPD, (including the SWAT team who were acting under a MAA with the Cherokee County Sheriff's Department);

d.    The final decision-making authority over law enforcement policies and personnel who worked for the EBCIPD and any SWAT team who acted as Sheriff Smith's agents pursuant to a MAA;

e.    Directly responsible for the appointment, retention, supervision, training, and conduct of the EBCIPD and any SWAT team officers, employees, and agents;

f.    Acting in the course and scope of his official duties as an employee of the EBCIPD and under color of state and federal law;

g.    Vicariously liable for the actions of the agents, employees, officers, supervisors, managers, and anyone else who worked for the EBCIPD and any SWAT team he was supervising.

31.    At all relevant times, Defendant Jeff Smith, was a resident of the reservation and was a Special Operations Sergeant of the EBCIPD. Plaintiff sues Sgt.

Smith in his individual capacity and official capacity. On December 13, 2022, Sgt. Smith was:

   a.   An agent and employee of Sheriff Smith pursuant to the MAA;

   b.   An agent and employee of Chief Neadeau and the EBCIPD;

   c.   Charged with the supervision of all of the officers and employees and agents of the EBCIPD, (including the SWAT team who were acting under a MAA with the Cherokee County Sheriff's Department);

   d.   The final decision-making authority over law enforcement policies and personnel who worked for the EBCIPD and any SWAT team who acted as Sheriff Smith's agents pursuant to a MAA;

   e.   Directly responsible for the appointment, retention, supervision, training, and conduct of the EBCIPD and any SWAT team officers, employees, and agents;

   f.   Acting in the course and scope of his official duties as an employee of the EBCIPD and under color of state and federal law;

   g.   Vicariously liable for the actions of the agents, employees, officers, supervisors, managers, and anyone else who worked for the EBCIPD and any SWAT team he was supervising.

   32.   At all relevant times, Defendant Nathan Messer was a resident of the reservation and was a Special Operations and SWAT team member of the EBCIPD.

Plaintiff sues Officer Messer in his individual capacity and official capacity. On December 13, 2022, Officer Messer was:

      a. An agent and employee of Sheriff Smith pursuant to the MAA;

      b. An agent and employee of Chief Neadeau and the EBCIPD;

      c. Acting in the course and scope of his official duties as an employee of the EBCIPD and under color of state and federal law.

33. At all relevant times, Defendant Andrew Sampson was a resident of the reservation and was Special Operations and SWAT team member of the EBCIPD. Plaintiff sues Officer Sampson in his individual capacity and official capacity. On December 13, 2022, Officer Sampson was:

      a. An agent and employee of Sheriff Smith pursuant to the MAA;

      b. An agent and employee of Chief Neadeau and the EBCIPD;

      c. Acting in the course and scope of his official duties as an employee of the EBCIPD and under color of state and federal law.

34. At all relevant times, Defendant Chris Harris was a resident of the reservation and was a Patrol Officer and SWAT team member of the EBCIPD. Plaintiff sues Officer Harris in his individual capacity and official capacity. On December 13, 2022, Officer Harris was:

      a. An agent and employee of Sheriff Smith pursuant to the MAA;

      b. An agent and employee of Chief Neadeau and the EBCIPD;

c. Acting in the course and scope of his official duties as an employee of the EBCIPD and under color of state and federal law.

35. At all relevant times, Ohio Casualty Insurance Company (the "Surety"), or its parent or subsequent successor company either Ohio Casualty Corporation or Liberty Mutual Insurance Company, was a corporation organized and existing under the laws of the State of Ohio, Indiana, New Hampshire, or Massachusetts. The Surety provided a Bond, No. 018233578, that covered Sheriff Smith as Sheriff of Cherokee County and his employees and agents for at least $25,000.00 as required by N.C. Gen. Stat. §§ 162-8, 58-76-5 and 58-72-1, *et seq.*

## WAIVER OF IMMUNITY

36. The allegations in the Paragraphs above are incorporated by reference.

37. All individual Defendants are specifically sued in their individual capacity and in their official capacity.

38. At all relevant times, to the extent that any or all Defendants claim they are a municipal or government or county-owned, operated, or funded entity or an employee or agent of such entity, all such Defendants waived any potential governmental immunity or sovereign immunity defense for any of the acts or omissions alleged in this Complaint.

39. At all relevant times, CCSD, Sheriff Smith, and any and all agents, employees, officers, deputies, EBCIPD Officers, SWAT team members, or other persons who worked for him directly or under a MAA as sworn law enforcement officers, waived any potential governmental immunity or sovereign immunity defense to the extent that any bonds or insurance or any local governmental risk pool

pursuant to N.C. Gen. Stat. §§ 153A-435 and 58-23 or any other means of insurance or risk adjustment exists that might cover any of these individuals' or entities' acts or omissions alleged in this Complaint. Cherokee County has waived any potential immunity defense for these Defendants under at least the law enforcement liability coverage and excess liability coverage claims made portions of the applicable risk-pool insurance policy.

40. For the EBCIPD Officers, SWAT team members, or other persons who worked for Sheriff Smith under a MAA, Cherokee County has waived any potential immunity defense for them under at least the general liability coverage and excess liability coverage occurrence portions of the applicable risk-pool insurance policy.

41. For Darrell Brown, Cherokee County has waived any potential immunity defense for him under at least the public official's liability coverage and excess liability coverage claims made portions of the applicable risk-pool insurance policy.

42. The Surety furnished a bond or bonds pursuant to N.C. Gen. Stat. § 162-8 and additional bonds covering Sheriff Smith, so the Surety is named as a Defendant to this action, pursuant to N.C. Gen. Stat. § 58-72-1, *et seq*.

43. At all relevant times, CCSD, Sheriff Smith, and any and all agents, employees, officers, deputies, EBCIPD Officers, SWAT team members, or other persons who worked for him directly or under a MAA as sworn law enforcement officers, including all of the named individual Defendants, waived any potential governmental immunity or sovereign immunity defense that could have been raised

to the Complaint by virtue of the Surety's bonds and liability insurance policies to the extent of such bonds or policies.

44. At all relevant times, Sheriff Smith, and any and all agents, employees, officers, deputies, EBCIPD Officers, SWAT team members, or other persons who worked for him directly or under a MAA as sworn law enforcement officers, including all of the named individual Defendants, waived any potential qualified immunity defense. To the extent that Defendants have not expressly waived any qualified immunity defense, no such defense can apply given the overt negligent, negligent per se, and grossly negligent violations of Jason and Ali's constitutionally protected rights while they were peacefully living in their home.

    a.    It was already well-established in December 2022 that employees and agents of a sheriff had no right to linger for hours, without any reason or justification, in the yard of citizens who were sleeping inside their home.

    b.    It was already well-established in December 2022 that employees and agents of a sheriff cannot pretend that there is a hostage situation, based on no facts or evidence, especially once the drone robot that they illegally threw into citizens' home showed conclusively that the occupants were under no distress, and had been sleeping together in the same bed without any problems.

    c.    It was already well-established in December 2022 that employees and agents of a sheriff cannot shoot an unarmed man whose

hands were held up high above his head for four seconds while they looked at him, after the illegally thrown drone robot showed them he was unarmed.

d. It was already well-established in December 2022 that employees and agents of a sheriff cannot shoot at an unarmed woman whose hands were held up high above her head for four seconds while she remained inside an occupied dwelling, after the illegally thrown drone robot showed them she was unarmed.

e. It was already well-established in December 2022 that employees and agents of a sheriff cannot shoot at an occupied residence, especially if they thought a possible hostage was inside, although the live streamed drone robot footage unequivocally ruled that out prior to them shooting at "the hostage."

f. The Sheriff had actual policies directly on point about not using deadly force when executing a search warrant or arrest warrant under those conditions, but Defendants chose to deliberately ignore or willfully violate those policies.

g. Or, equally troubling, they were so poorly trained or supervised that they did not know what the policies were or how to apply these policies when confronted with an obvious example that precluded the use of deadly force.

All of this, individually but especially in the aggregate, showed intentional and

reckless disregard for Jason and Ali's safety that shocks the conscious, waiving any claim of qualified immunity.

45.     Upon information and belief and at all relevant times, Sheriff Smith, and any and all agents, employees, officers, deputies, EBCIPD, SWAT team members, or other persons who worked for him directly or under a MAA as sworn law enforcement officers, including all of the named individual Defendants, waived any potential public official immunity defense. To the extent that Defendants have not expressly waived any public official immunity defense, no such defense can apply. Defendants' overt, grossly negligent violations of Sheriff Smith's policies, North Carolina and federal law, and clearly established constitutional and common law precedent led directly to and were at least a cause of Jason's and Ali's injuries. If they had complied with the policies, at any point along the chain of mistakes from arriving around 11:17 p.m., December 12, until the point of the barrage of gun fire at 4:57 a.m., December 13, 2022, it would have prevented this illegal attempted murder. Defendants deliberately ignored relevant, safety policies, obvious police training and legal precedent, and basic common sense information provided in real time on their own streaming video footage that screamed against going in guns blazing. Their callous actions showed that they did not care about reality, and acted with malice, willfulness, and reckless disregard of Jason's and Ali's safety. While they demonstrated this before the shooting occurred, Defendants' shameful conduct to cover up and blame Jason for their criminal and egregious behavior after the fact and arrest of Ali when she tried to provide comfort to her dying family member further

demonstrates their depraved actions that waived any possible claim for public official immunity under these circumstances. Defendants' conduct was willful and wanton, malicious, and a reckless and egregious disregard of the easily applied policy that would have unquestionably prevented Jason and Ali from being targeted by a hail of bullets, and their ensuing efforts to cover it all up and avoid responsibility by blaming the victims shocks the conscious.

46.    The EBCI has waived any tribal immunity by acting outside of the territorial bounds of the reservation and engaging in law enforcement activities against non-Indians that have nothing to do with internal tribal affairs. When they left the reservation and performed acts not associated with internal tribal affairs against non-Indians, they stripped themselves of any claim of acting under color of tribal law.

47.    Even if EBCI had not affirmatively waived sovereign immunity by their extraterritorial actions, it did so by purchasing liability insurance in accordance with its own laws. The EBCI code states that the tribe waives any tribal immunity for a tort claim based on negligence up to the amount of any insurance it purchases for that purpose. Upon information and belief, EBCI has purchased millions of dollars' worth of insurance coverage to protect it against negligence claims.[1] That means it also has waived any immunity up to that amount, at least.

---

[1] While Plaintiffs asked repeatedly for EBCI to produce its insurance policies pre-suit, EBCI refused.

48.     To the extent that the EBCIPD was acting under color of state law at the request of Sheriff Smith, it is not in the same footing as a county, sheriff, or municipality under North Carolina law. Thus, EBCI has no statutory or common law governmental or sovereign immunity available to it for state law claims under the laws or precedent of North Carolina. So, to the extent that EBCI or its officials or officers attempt to claim some type of governmental immunity based on North Carolina state law or judicially created protection, they cannot.

49.     Even if the EBCIPD could have acted under color of state law and availed itself of similar protections or immunities as the CCSD when EBCIPD officers went to the Property, far off the reservation, that could only possibly exist if they acted under a legal MAA. While the Sheriff signed the MAA on behalf of the CCSD, upon information and belief, the signer for the EBCIPD lacked the requisite authority. That means that the MAA could bestow no protections to the EBCI SWAT team and other employees who purported to act under its authority. Thus, for this additional reason, the EBCIPD did not act under color of state law, and cannot claim immunities that may have otherwise been available.

50.     To the extent that the EBCIPD was acting under color of federal law, it means that Jason and Ali can pursue an administrative claim against the BIA, and if not resolved after at least six months, file a claim under the Federal Torts Claim Act. Such a course of action is not ripe for filing in federal court at this time. However, under the color of federal law rubric, Jason and Ali can pursue a *Bivens* claim against the individual EBCIPD officers and the EBCI, which they include in the alternative

to the 1983 direct claims.

**JURISDICTION AND VENUE**

51.     The allegations in the Paragraphs above are incorporated by reference.

52.     This Court has original jurisdiction over the subject matter and parties of this action pursuant to 42 U.S.C. §§ 1983 and 1988, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 397, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), 28 U.S.C. § 1331, and under the United States Constitution, including the Fourth, Fifth, Eighth, and Fourteenth Amendments.

53.     This Court has pendant and supplemental jurisdiction over any state-law based claims in this action pursuant to 28 U.S.C. § 1367.

54.     All events that form the basis of this Complaint took place in Cherokee County, North Carolina which is in the United States District Court for the Western District of North Carolina. This Court has venue pursuant to 28 U.S.C. § 1391.

**FACTS**

55.     Jason is 44 years old, and is disabled, having issues with mobility in both legs since he was shot several times in 2014.

56.     Ali is 42 years old.

57.     In December 2022, Jason and Ali had lived at a home located on property owned by Jason at 1790 Upper Bear Paw Road, Murphy, North Carolina (the "Property") for approximately four years.

58.     Neither Jason nor Ali ever acted in a violent or threatening manner to any law enforcement officer, from CCSD or EBCIPD, at the Property.

59.     At about 10:58 p.m. on December 12, 2022, Jason and Ali entered their

home on the Property for the evening and went to sleep.

**A.    The Neighbor calls 911 around 11:00 p.m.**

60.    At approximately 10:59 p.m., a neighbor, Ms. Floyd, called 911 and told the dispatcher that "Ok my neighbor about an hour ago started shooting off fireworks screaming and yelling gonna kill the whole neighborhood yada yada yada he's discharging a firearm uhm I've been videoing all of this but I was just going to let it go but I just heard his wife screaming stop it and then a bunch of shots went off and now I can't hear her over there at all."

61.    The 911 dispatcher asked Ms. Floyd "you heard him say he was going to kill everybody in the neighborhood?"

62.    Ms. Floyd answered "yes, I even have on the video saying send the police I'll get them too."

63.    Ms. Floyd never told the 911 dispatcher that she was near Jason or Ali.

64.    Ms. Floyd, lives in a home over 400 yards from Jason and Ali, down a big slope on the far side of a creek, through some trees.

65.    Ms. Floyd was hundreds of yards away down the hill through the trees at her house. She was not anywhere near Jason or Ali at the time she spoke to the 911 dispatcher or purportedly recorded any video footage of the Property.

66.    Ms. Floyd never told the 911 dispatcher that she actually thought Jason or Ali might take some action to harm any specific person.

67.    Ms. Floyd never told the 911 dispatcher that Jason or Ali was speaking to her directly, or was in close proximity to her, or that Jason or Ali had any idea that Ms. Floyd was even listening to and watching them from down the slope hundreds of

yards away at her home.

68.     Ms. Floyd never told the 911 dispatcher that Jason or Ali made any direct threats to her or that she feared Jason or Ali was directly threatening her or anyone else.

69.     Ms. Floyd could not and did not see anything that happened around the garage and the home on the Property that night because she was too far away, it was dark, and there were trees and other obstructions between her house and the home and garage up the hill on the Property.

70.     The video that Ms. Floyd recorded is not time stamped and could have been taken at any point after dark on December 12 or on any other night after sunset.

71.     Even if Ms. Floyd recorded those videos at some point on December 12, 2022, no person can be seen or identified. It is just a series of dark video screens with a few floating lights far off in the distance. These videos could have been taken anywhere and do not self-authenticate as depicting the Property.

72.     There is not even any background video footage to show where the person holding the camera was located at the time any recordings were made. They simply have nothing to allow the location of the camera to be verified because all the videos show is an almost completely black screen with a few floating lights off in the distance.

73.     Even if Ms. Floyd recorded videos that night from her house, she could have directed the camera at some place other than the Property while making the recordings. Again, the videos do not clearly depict anything, other than an almost

entirely black screen with a few floating lights in the distance that look to be blocked by several trees between the camera's location and wherever the lights were. It is impossible to tell where the camera was and where it was pointed from these videos. The videos do not clearly depict that they were taken by Ms. Floyd pointing the camera at the Property while standing on or near her home.

74. To the extent that there is audio recorded with the video, it is a series of loud noises and loud music, with some very faint, intermittent human voices. It is hard, if not impossible, to make out any words spoken. It is not clear if those voices belong to Jason or Ali. The audio lack any clarity for the voices (other than what appears to be a woman's voice screaming stop a few times for a few seconds at one point) and certainly is not enough to make out what actual words are spoken.

75. On January 27, 2023, when the Sheriff's lawyer listened to the audio recording from Ms. Floyd's videos purportedly recorded on the night of December 12, 2022, the lawyer admitted she could faintly hear Jason's voice at certain points but could not hear exactly what was being said.

76. Indeed, it does not appear that anyone from the CCSD other than Deputy Erickson had ever bothered to look at this video and audio Ms. Floyd had allegedly recorded on the evening of December 12, 2022, until it was given to the CCSD lawyer on January 27, 2023. So when the CCSD lawyers finally gathered the information that one deputy possessed since before the shooting, they realized there was no evidence to support the original accusations. Even when the CCSD became aware of that fact on January 27, six weeks later, the CCSD maintained the

demonstrably unsupported and false criminal charges against Jason for another 6 weeks until early March.

77. Ms. Floyd told the 911 dispatcher that she heard Jason fire 10 rounds from a gun.

78. The video Ms. Floyd purportedly took does not show any images of Jason or Ali at all.

79. Ms. Floyd could not see anyone fire a single round from a gun.

80. To the extent that the video has audio recording of a gun being fired, there is no corresponding video footage to corroborate it. There is no flash of light or any indication that the video depicts a gun being fired.

81. Ms. Floyd could not and did not see Jason fire 10 rounds from a gun, and the video proves that.

82. Ms. Floyd could not and did not see Ali fire 10 rounds from a gun, and the video proves that.

83. Ms. Floyd could not and did not see 10 people each fire 1 round from a gun or several guns, or 2 people shoot 2 rounds from 5 guns between them, or any other random combination of people and guns being shot for a total of 10 shots, and the video proves that.

84. Ms. Floyd did not see anyone shoot any guns, she just thought she heard a gun being fired but, if the video recording was actually from a camera pointed at the Property, the video footage showed no visual evidence at the Property to suggest that any guns were fired there.

85.     If the video is actually pointed from Ms. Floyd's home up the hill to the Property and the sounds recorded are of gun shots, those gun shots likely did not come from the Property because there is no visual evidence like a flash of light to show a gun was fired when the sounds are heard.

86.     To the extent that other video Ms. Floyd purported to film on the evening of December 12, 2022, is actually from a camera at her house pointed at the Property, there is some video that shows fireworks being shot into the sky. This fireworks video lays out what should have been seen on similar video taken if guns were shot at the same location. Since the fireworks video shows those fireworks lighting up and can be easily seen on the black screen (although the fireworks do reveal the presence of several trees between the camera and the spot where the fireworks are lit), similar video of gun shots should show corresponding visual evidence of a light from the gun when it is firing. Ms. Floyd's videos that she claimed were from someone shooting a gun at the Property contain no such visual evidence of light from any gun shots.

87.     Based on the video Ms. Floyd allegedly recorded with the camera pointed at the Property, it is likely that the gun shots that she claimed to hear were fired some other place, not at the Property. No gun flashes were seen on the video footage she allegedly recorded that was pointed at the Property.

88.     Ms. Floyd has several other neighbors who live close enough to her that if she was recording video from her house on the night of December 12, 2022, and one of those other neighbors shot a gun (or several shot several guns around the same time), that could have been the noises that are recorded on the video footage

Ms. Floyd purportedly took that night.

89.     To the extent that Ms. Floyd claimed that she felt like Jason was dangerous based on what she claims she heard him say and that she heard gun shots, she did not act like she was scared of him. She did not act like she considered him to threaten her or her family. She did not go inside and hide from him. Instead, she apparently stayed outside and recorded video footage and had conversation with 911 dispatch. She also claimed that she would stay outside and continue to shoot video footage after the call with the 911 dispatch ended. Ms. Floyd did not feel threatened by anything that may have occurred through the woods and up the hill at the Property on the night of December 12, 2022. Her actions spoke the truth of her actual feelings.

**B.     The First 3 Deputies Arrive at 11:17 p.m. and the first half hour.**

90.     Three CCSD deputies were dispatched to the Property after that 911 call to conduct a simple welfare check based on a noise complaint.

91.     Around 11:18 p.m., Deputies Dennis Dore, Adam Erickson and Cody Williams had parked on the main road and entered the Property on foot.

92.     They did not drive up the drive way on the Property. They did not cut on their flashing lights or sirens on their patrol cars. They parked far away, out of sight from the home and garage, and hid their presence as they crept up to the home.

93.     Each deputy carried an AR-15 assault rifle as they entered the Property to conduct a simple welfare check.

94.     The 3 deputies did not have a search warrant to legally permit them to enter the Property.

95.     According to the CCSD policy, a deputy will not enter the private

premises of any person unless: A. The owner gives consent to search; B. Deputies are in possession of a valid search warrant; C. Exigent circumstances exists that require deputies to enter the premises/vehicle without a search warrant; or D. They are in possession of an arrest warrant for the individual who normally resides in the building to be entered and have reason to believe the person is inside the building.

96.　None of these 3 deputies had consent from Jason or Ali to be on, much less search, the Property when they entered it around 11:18 p.m.

97.　None of these 3 deputies possessed a valid search warrant to be on, much less search, the Property when they entered it around 11:18 pm.

98.　None of these 3 deputies possessed a valid arrest warrant for Jason or Ali when they entered the Property around 11:18 p.m. They did not even know if Jason or Ali were in the home at that time.

99.　No exigent circumstances existed that required the deputies to enter the Property without a search warrant when they entered it around 11:18 p.m.

100.　According to the CCSD policy, a deputy may enter private premises without a warrant or consent if it appears to be urgently necessary, such as;

　　1. To prevent death or serious injury;
　　2. To provide emergency medical assistance;
　　3. To guard against the imminent threat of substantial property damage;
　　4. Applicable instances of domestic violence; or
　　5. When the deputy is in hot pursuit of a violator.

101.　None of these 3 deputies thought that it was urgently necessary to enter the Property without a valid search warrant around 11:18 p.m. to prevent death or serious injury. Even if one of these deputies claimed to have thought that before they

entered, it quickly became obvious that there was no death or serious injury situation. Indeed, they just walked around outside for the next 5 hours.

102.     None of these 3 deputies thought that it was urgently necessary to enter the Property without a valid search warrant around 11:18 pm to provide emergency medical assistance. Even if one of these deputies claimed to have thought that before they entered, it quickly became obvious that there was no emergency medical assistance situation. Indeed, they just walked around outside for the next 5 hours. If they really thought that Jason or Ali needed emergency medical assistance at 11:18 p.m. when they entered the property without permission or warrant, letting 5 and a half hours pass without taking any action to assist would be unconscionable.

103.     None of these 3 deputies thought that it was urgently necessary to enter the Property without a valid search warrant around 11:18 p.m. to guard against the imminent threat of substantial property damage. Even if one of these deputies claimed to have thought that before they entered, it quickly became obvious that there was no imminent threat of substantial property damage situation. Indeed, they just walked around outside for the next 5 hours doing nothing.

104.     None of these 3 deputies thought that it was urgently necessary to enter the Property without a valid search warrant around 11:18 p.m. based on an applicable instance of domestic violence. Even if one of these deputies claimed to have thought that before they entered, it quickly became obvious that there was no imminent or ongoing domestic violence situation. Indeed, they just walked around outside for the next 5 hours. The lights were off, the blinds were down, and they did not even know

if Jason or Ali were inside the home.

105. None of these 3 deputies thought that it was urgently necessary to enter the Property without a valid search warrant around 11:18 p.m. because the deputy was in hot pursuit of a violator.

106. None of the 3 deputies stopped at Ms. Floyd's house to ask her about her accusations or review the video evidence she claimed to possess before they entered the Property.

107. None of the 3 deputies called or made any effort to contact Ms. Floyd to ask her about her accusations or review the video evidence she claimed to possess before they entered the Property.

108. According to Ms. Floyd, she had already sent direct messages or text messages to Deputy Erickson and Deputy Daniels that contained the video evidence she claimed to possess.

109. Apparently Ms. Floyd and Deputy Erickson had an ongoing, preexisting familiar relationship before that night such that she felt comfortable sending him a text or direct message, and readily had his phone number to do so.

110. Upon information and belief, Ms. Floyd and Deputy Erickson had a relationship prior to December 12, 2022, that made him have a preexisting animosity towards Jason and Ali.

111. Upon information and belief, Ms. Floyd and Deputy Erickson had a relationship prior to December 12, 2022, that made him have a bias in favor of believing and protecting Ms. Floyd, without regard to the actual evidence available.

112. Upon information and belief, Deputy Erickson knew, before he entered the Property, that the video evidence Ms. Floyd claimed to possess did not show any evidence of any crime or communication of threats by Jason because Deputy Erickson had already seen it when Ms. Floyd sent it to him in a text or direct message.

113. Upon information and belief, Deputy Erickson knew, before he entered the Property, that Ms. Floyd had no evidence to support any claims she made on her 911 call because Deputy Erickson had already seen it when Ms. Floyd sent it to him in a text or direct message, but he entered the Property without a search warrant, carrying an assault rifle, and stayed there for hours without any legal basis, anyway.

114. Deputy Erickson reported that when he arrived at the Property, he was informed that the male had been setting off fireworks and discharging a firearm, and had then been in an argument with a female. The male had stated he would kill everyone in the neighborhood, and had then stated "send the cops I'll get them too." During the argument between the male and female, the female was screaming stop it multiple times, and then a firearm was discharged multiple times. After the firearm was discharged, no more voices could be heard and the loud music on scene had been turned down.

115. Sgt. Williams understood that he was responding to a disturbance from a neighbor who called 911 to report her neighbor had been shooting off fireworks and also she heard gunfire. The neighbor stated that the male and his wife had been arguing and after the gun shots that the neighbor heard, the neighbor did not hear anyone anymore.

116. Sgt. Dore understood that he was responding to a disturbance. A neighbor stated that it involved a domestic dispute between a man and his girlfriend/wife, that the neighbor heard the woman screaming at the man to "stop it," and that the neighbor heard gunshots. The neighbor reported that she saw the male enter the home, however, she did not see the female after the gunshots.

117. These 3 deputies' stories about why they entered the Property without permission or a warrant, recorded days and weeks later, show that they did not have any legal grounds to be there at all, much less to stick around after a cursory inspection of the grounds.

118. The 3 deputies walked around the Property for several minutes, aiming their assault rifles at the home and the garage.

119. The 3 deputies did not see Jason or Ali outside of the home or the separate garage that is about 65 feet away from the home.

120. None of the law enforcement officers who milled around outside at the Property for hours laid eyes on or spoke with Jason or Ali until about 4:57 a.m. when Jason came out the front door of his home with his hands held up high above his head.

121. The 3 deputies saw that the blinds were down on the windows in the home, and it appeared that the lights were off inside.

122. The 3 deputies saw that the garage door was shut, but there were windows about 7 feet up on the garage door. The lights were off in the garage.

123. At about 11:20 p.m., a deputy knocked on a door of the home, but did not announce that they were with the CCSD or the purpose of their visit.

124. At about 11:30 p.m., a deputy knocked on a door of the home, but, again, did not announce that they were with the CCSD or the purpose of their visit.

125. At about 11:32 p.m., a deputy knocked on a door of the home, but, yet again, did not announce that they were with the CCSD or the purpose of their visit.

126. At about 11:33 p.m., a deputy knocked on the door of the separate garage, but did not announce that they were with the CCSD or the purpose of their visit.

127. At about 11:34 p.m., a deputy knocked on the door of the garage, but, again, did not announce that they were with the CCSD or the purpose of their visit.

128. Upon information and belief, at about 11:36 p.m. a deputy who patrolled the Property found one shell casing for an undetermined caliber of an unknown gun type in the driveway near the garage, more than sixty feet from the home.

129. If there was a bullet casing on the ground that a deputy found, it provided no context or evidence to suggest that there was some recent or ongoing criminal act occurring at the Property. It could have been old, covered in mud, rusted. There was no description of it to suggest that it was from a recently fired bullet. There was no way for these deputies to know anything about that bullet casing unless they had some independent knowledge of what type of gun had allegedly been fired at the Property and the bullet casing was still hot, as if recently fired. They did not know anything about any type of gun Jason or Ali (or someone else) may have had at the Property at some point, that night or days or months or years earlier.

130. A random, non-smoking, cool bullet casing on the ground does not even

correspond to Ms. Floyd's 911 call where she described hearing 10 shots in total. If anything, finding only one shell casing should have suggested that it had nothing to do with the information Ms. Floyd reported in her 911 call.

131. The deputies discovered no blood nor any other signs of someone being shot or having some type of struggle. (Later, when they shot Jason and dragged him on his back down the plank to the ground, there was a big pool of blood on the ground under his body after they finally placed him on the EMS gurney.)

132. The deputies did not think that finding 1 shell casing was any evidence of a recent or ongoing crime or domestic violence situation. They took no action to suggest that they suspected that anyone was in danger and needed to be rescued or needed immediate medical attention. They just kept walking around outside on the Property with their assault rifles for hours doing nothing.

133. At about 11:38 p.m., a deputy knocked on a door of the home, but, for the fourth time, did not announce that they were with the CCSD or the purpose of their visit

134. At about 11:40 p.m., a deputy knocked on a door of the home, and, for the fifth time, did not announce that they were with the CCSD or the purpose of their visit

135. During this initial 20 minutes that the 3 deputies patrolled the Property with assault rifles, they did not pull a patrol car up into the driveway to announce their presence. They did not turn on any flashing lights or sirens or use any type of light or signal to announce that they were law enforcement officers. They just walked

around outside with assault rifles and flickering flashlights.

136. According to the CCSD policy, the Deputy in charge or his designee will loudly announce to the persons inside the premises that Sheriff's officials have a search warrant and are requesting entry to the premises at once. This announcement should be made loud enough so that persons inside can easily hear the announcement.

137. None of the 3 deputies ever loudly announced to any person inside the home that they were Sheriff's officials, had a search warrant, and were requesting entry to the home at once.

138. According to the CCSD policy, if no response is given and deputies believe admittance is being denied or unreasonably delayed, the premises may be forcibly entered.

139. None of the 3 deputies ever believed admittance was being denied or unreasonably delayed. None of the 3 deputies forcibly entered the home, or even tried to, under some belief that they were being improperly delayed or denied admittance.

140. At this point, finding absolutely no evidence of any crime or possible crime, and having taken no action to verify the phone call of a purported neighbor about a noise complaint, these 3 deputies should have left immediately. They had little justification to be sneaking around the Property for 20 minutes leading up to this point, but by 11:45 p.m. any pretext was completely gone.

141. At about 11:46 p.m., Sgt. Williams took a ladder off of the front porch of the home and used it to look into the door window of the garage and saw two motorcycles and an ATV inside.

142. Sgt. Williams did not see any signs of a crime, like a body or blood or any signs of a struggle or bullet casings.

143. Sgt. Williams admitted that he had a prior history with Jason. He had a bias against Jason that explained why he participated in fabricating a story to justify the SWAT team's ambush against Jason.

144. At about 11:55 p.m., the deputies at the Property contacted Lt. Morgan by calling 911 dispatch on their radio and described what they were doing and what they had seen.

145. At about 11:56 p.m., a deputy knocked on a door of the home, but, yet again for the sixth time, did not announce that they were with the CCSD or the purpose of their visit.

146. At about 11:56 p.m., Deputy Dore, began obstructing the closed circuit surveillance cameras that Jason and Ali had on the Property by "bagging" them with cloth or some other material or turning the cameras so Jason and Ali could not see who was on the Property and what the deputies were doing.

147. At about 11:57 p.m., a deputy again looked into the garage window using a flashlight.

**C.    CCSD Leadership gets involved around midnight.**

148. At about 11:58 p.m., Lt. Morgan told the 911 dispatch on a phone call that "we got a barricaded subject I would imagine and we need to go ahead and let me see if I can get ahold of Cherokee to bring up a SWAT team."

149. Nobody, not Ms. Floyd nor the 3 deputies who had trespassed on the Property for a half hour at that point, had told Lt. Morgan that Jason or Ali was

53

barricaded in the home. Lt. Morgan just made that up.

150. Jason and Ali were asleep in their home around midnight when Lt. Morgan fabricated this story about a barricaded subject. Lt. Morgan had not spoken to Ms. Floyd, or even to the 3 deputies who had been walking around the Property without permission for about 40 minutes. Nobody had spoken to Jason or Ali or even seen them that night. Not even Ms. Floyd, who was down the hill several football fields away through the woods in the dark, had seen either of them.

151. Lt. Morgan also told the 911 dispatch that "he's probably barricaded in there with her. He's crazy." Lt. Morgan was talking about Jason.

152. Lt. Morgan had an obvious bias and dislike for Jason, so much so that he called Jason crazy and accused him of a heinous crime, without a shred of evidence to support such an accusation, on a recorded telephone transmission that he knew would be available to the public.

153. Upon information and belief, Lt. Morgan is a certified hostage negotiator and has been for over 10 years.

154. Lt. Morgan arrived on the scene after midnight on December 13, but he never even attempted to provide any assistance as a certified hostage negotiator. Instead, he let the SWAT team shoot Jason 4 hours later without ever establishing contact with Jason or Ali.

155. According to the CCSD policy, a deputy confronting Hostages or Barricaded Subjects must:

A.    Officers confronting situations involving hostages or barricaded subjects shall not initiate any type of tactical action other than what is necessary to protect the lives and safety of themselves or others. A Supervisor will be contacted and at least two officers will respond. 1. Upon arrival at the scene, officers will: a. Attempt to contain the situation at the present location. b. Safely remove all innocent persons from the danger area. Persons that cannot be removed immediately shall be instructed to take cover and seek protection where they are. c. Carefully evaluate the situation and obtain as much information as possible. d. The shift supervisor shall be in command until relieved by a superior. The shift supervisor shall: i. Obtain all pertinent information from the officers on the scene. ii. Notify the sheriff, and activate special response teams and or other law enforcement agencies and a hostage negotiator. iii. Secure the area as soon as possible. iv. Establish lines of communication with the tactical team, negotiator, press liaison, and any other necessary parties. v. Develop and supervise a communication/negotiation process. vi. Make sure a method of traffic and crowd control is in place and emergency vehicles routes are in place. vii. Make provisions for recording personnel assignments and developing a chronological record of events at command and tactical operations center. viii. Ensure all necessary equipment is available at the staging area such as canine, emergency vehicles etc. m. Obtain pertinent information about the subjects, hostages, hostage site and other barricaded subjects. ix. Designate a location to interview witnesses, released hostages and others. x. Have some place to debrief hostages upon their release. III. The Tactical Response Team Commander Will: A. Assist the shift supervisor in determining tactical alternatives should communications with the subject fail to resolve the incident. B. Determine equipment needs and assign personnel to control and contain the inner perimeter. C. Designate marksmen and entry teams as necessary. D. Ensure that personnel manning the inner perimeter maintain firearms discipline and are provided with periodic relief by tactical response team members. E. Maintain contact with the command center and keep them informed. F. Establish an emergency command center for communications if needed. G. After the incident has been resolved, sheriff's administrative staff will be notified. H. Ensure that the subjects, hostages, and officers receive medical care and/or assistance as needed. J. Secure the scene so Detectives can collect any evidence and; K. Restore order to the vicinity as soon as possible.

156.    Lt. Morgan did not act as a hostage negotiator for Jason or Ali or follow

any of the Sheriff's policy related to barricaded subjects as he sat in an SUV on the

Property for hours that morning. None of the deputies or other Sheriff's agents like the SWAT team followed this policy. None of them had any idea if there was a hostage situation or barricaded subject inside the home, but if they really thought that might be true, they failed to comply with the policies.

157. According to the CCSD policy, the Emergency Response Team must be called out to respond when:

> Call Out Responsibilities It is the policy of the Cherokee County Office of the Sheriff to call out supervisors, detectives, technicians, special teams, and other employees of the Office for certain serious crimes and circumstances, outside of normal duty hours. D. Sheriff's Emergency Response Team (SERT) 1. The SERT team shall be activated in the following circumstances: a. A contained person who is holding others against their will and is threatening the lives or safety of others b. A contained person who is believed to be or claims to be armed and refuses to surrender c. A contained person who is armed and is threatening to take his/her own life, and has the apparent ability to do so, and refuses to surrender d. A sniper or terrorist is involved in any incident e. Anytime a command officer believes a SERT or crisis negotiation response is in the public's or the Office's best interest E. Crisis Negotiation Team (CNT) 1. The CNT shall be activated in situations which cannot be immediately resolved involving the following circumstances: a. A contained person who is holding others against their will and is threatening the lives or safety of others b. A contained person who is believed to be or claims to be armed and refuses to surrender c. A contained person who is armed and is threatening to take his/her own life, and has the apparent ability to do so, and refuses to surrender.

158. Neither the Sheriff, nor any of his subordinates followed this policy. Nobody called out the Emergency Response Team or the crisis negotiation team for Jason or Ali as if they were barricaded subjects. None of the deputies or other Sheriff's agents like the SWAT team followed this policy. They just sat around on the Property for hours that morning. None of them had any idea if there was a hostage situation or barricaded subject inside the home, but if they really thought that might be true,

they failed to comply with the policies.

159.    Lt. Morgan also instructed the 911 dispatcher to get the on-call investigator to start a search warrant to justify CCSD presence on the Property, an hour into their occupation.

160.    Lt. Morgan also instructed the 911 dispatcher to send out an admin text to all of the CCSD leadership about the situation.

161.    At 12:19, a.m., 911 ADMIN PAGE was sent that stated: "HAVE UNITS AT 1790 UPPER BEAR PAW POSSIBLE BARRICADED SUBJECT SHOTS WERE FIRED PRIOR TO LEO ARRIVAL SWAT IS 17 FRM CHEROKEE."

162.    At 12:19 a.m. on December 13, 2022, no CCSD deputy or even Ms. Floyd, had seen Jason or Ali that morning, or the night before. There was no evidence to support Lt. Morgan's accusation of a barricaded subject situation, or that shots had been fired on the Property before the 3 deputies arrived. Again, the video evidence suggests otherwise, and finding 1 cold bullet casing on the ground without any way to determine when it was fired, when Ms. Floyd reported hearing 10 shots total, suggests that any shooting occurred somewhere else, not at the Property.

163.    At around midnight, Lt. Morgan called Cpt. Williams and told him that deputies were out at a shots fired call at the Property and the suspect had barricaded himself at the scene. This was not true, and Lt. Morgan had no evidence to support what he said.

164.    Cpt. Williams called the Sheriff and asked if they should get the EBCI SWAT team to assist. The Sheriff said yes, so Cpt. Williams set that into motion.

165. At about 12:12 a.m. on December 13, 2022, CCSD instructed the Cherokee County 911 dispatcher to call the EBCIPD and request that they send the SWAT team to assist CCSD under a MAA.

166. At 12:13 a.m., Lt. Morgan wrote a text to Cpt. Williams and said: "The only thing is its uncertain if we actually have a barricaded subject who shot his wife or hasnt shot his wife or just a passed out drunk?"

167. This shows that they knew that there was no reason for the deputies to remain or for any more to arrive, but they escalated the situation and pushed it towards a life or death confrontation with reckless abandon.

168. At 12:17 a.m. Sgt. Dore reported to the 911 Dispatcher that "there are multiple security cameras around the exterior of the property. I was able to look in a crack in one of the windows of the camper and there is a TV monitor, monitoring the cameras." Later, he said that he covered Jason and Ali's surveillance cameras because "I don't want that fucker watching me."

169. The CCSD deputies, by their actions described above, violated Jason and Ali's Fourth Amendment rights to be free from unlawful search and seizure of the surveillance cameras and video system on the Property and to film officers when they entered and occupied the Property. This is an important right because, later on, the Defendants lied about the events and even brought false criminal charges against Jason blaming him for them trying to kill Jason and Ali. If not for Jason's additional surveillance camera inside the home, the only one that the Defendants did not cover up or disable, then the truth never would have come to light and the Defendants

would have gotten away with attempted murder and convicted Jason on false criminal charges.

170. At 12:20 a.m., Sheriff Smith sent Cpt. Williams a text message that said: "Is the wife still in the house or do we know".

171. At 12:21 a.m., Cpt. Williams responded by text to the Sheriff saying: "Yes I think so hold on".

172. At 12:21 a.m., Cpt. Williams sent another text to the Sheriff saying: "The only thing is its uncertain if we actually have a barricaded subject who shot his wife or hasn't shot his wife or just a passed out drunk? From. Mitch". That was Cpt. Williams cutting and pasting the text message Lt. Morgan sent him at 12:13 a.m. and sending it to the Sheriff.

173. At 12:20 a.m., Sheriff Smith sent Cpt. Williams a text message saying: "OK The call didn't come from inside the house I guess just a neighbor".

174. At 12:24 a.m., Cpt. Williams responded by text: "I think so".

175. At 12:24 a.m., Cpt. Williams sent the Sheriff another text saying: "Mitch [Lt. Morgan] had said something about killing all law enforcement. not sure where that came from".

176. Again, this shows blatant disregard of the actual facts presented at the Property for over an hour as seen by the 3 deputies patrolling with assault rifles. Instead of leaving these citizens alone in their home as they slept at night, the Sheriff and his leadership team wished a confrontation into existence. They had no credible information to support any theory of a hostage situation, and they did not bother to

speak to the person making the false accusations. They just amped up the situation and called SWAT.

177. Lt. Payne and an SBI agent arrived at the Property around 12:45 a.m. Sgt. Williams showed them the opening to the upper portion of the garage, and Lt. Payne entered it and searched it. Nobody had a search warrant or permission to do any searches on the Property.

178. Lt. Morgan arrived at the Property around 1:03 a.m. Sgt. Williams informed Lt. Morgan that he had accessed and searched the upper portion of the garage and looked through the garage door window for the lower portion before Lt. Morgan's arrival. Sgt. Dore reported that he had looked through a window in the home and saw a TV screen with video footage of the surveillance cameras from around the yard. Sgt. Dore had also opened the front door, and it was unlocked. Sgt. Dore reported that he did not see anyone moving around in the home when he peeked in. Neither Jason nor Ali had given any of them permission to snoop around inside or outside of their home or Property. None of them had a search warrant before 2:14 a.m. All of this was illegal.

**D. CCSD calls EBCI SWAT around 12:30 a.m.**

179. At about 12:33 a.m., SWAT commander Scott Buttery from the EBCIPD had a call with the 911 dispatcher. The dispatcher told him: "we have a situation out here possible barricaded individual at the beginning of the night at approximately 2259 we got a call that neighbor had fired 10 gun shots. We sent 3 deputies up there. The deputies have not been able to make contact with anyone on the scene. All their vehicles are at the residence. We can see TV security camera. There is music playing.

Nobody is coming to the doors. It will be in a trailer with a detached garage and we are just wondering if you can help us make entry to make sure everyone is OK in there?"

180. By this point, the story about Jason holding Ali hostage had now passed from Lt. Morgan's imagination to the SWAT team through the 911 dispatch. Not only was none of this true, they had no reason to think any of it could possibly be true.

181. Despite hearing this misrepresentation, SWAT commander Buttery had the sense to parse at least part of the truth, saying to the 911 dispatcher: "So it's not like somebody who is barricaded up from a warrant or something like that? It's just more of a check to make sure they are okay to make sure she's not killed in there?"

182. The 911 dispatcher unwittingly told the truth, responding: "Yeah, exactly. We have had no contact with the suspects at all. They could be in there, they could not, we honestly don't know. We just don't know what is going on?" This should have stopped everyone immediately in their tracks. It did not.

183. Lt. Teasdale called the 911 dispatcher and discussed getting a search warrant. He admitted his prior knowledge and animosity towards Jason, too: "I'm being around the office so I can get some information on this guy and everything that name sounds familiar. I think we've dealt with him before?"

184. The 911 dispatcher fed into the situation, responding: "Yeah, multiple times."

185. The 911 dispatcher also called SBI agent Mahoney to ask about the possibility of the SWAT team borrowing a drone robot from the SBI, again repeating

Lt. Morgan's version of reality: "We received a call around 11:00 p.m. Where in a neighbor called about another neighbor. It was a male and female fighting and there was 10 gun shots and we sent officers there. They were unable to make contact with anyone on the scene. Nobody would come to the door. That led us to having tribal SWAT to come this way to Cherokee County and the tribal SWAT commandeer asked if we could give you a call and see if you could provide a larger robot that what they had because apparently their robot is small and they were thinking they would need a robot to go around the house."

186. At 1:03 a.m., SWAT commander Buttery spoke with the 911 dispatcher and asked about getting a new MAA because the only one that they had on file was with the previous sheriff. He advised that the SWAT team could not operate without a new MAA in place.

187. SWAT commander Buttery also asked the 911 dispatcher: "can you get us a call box of the residence, the name and information and all that? And how many times that law enforcement has actually been called to this residence you know to see if this guy is a shithead or a hold my beer and shoot out in the backyard kind of thing."

188. The 911 dispatcher added fuel to the bonfire already burning in the CCSD against Jason by responding: "Um yeah so I can give you that. There's a pretty big lot of neighbor arguments and he's fairly well known as being crazy "73" so…"

189. SWAT commander Buttery replied: "Oh, gotcha. He's a well-known 10-73?"

190. In police code, 10-73 means mental health. They did not actually think

that this was a mental health situation, because they did not call any mental health providers or take any measures to deescalate the situation. They were calling Jason crazy and making plans to deal with him violently.

191. So now the CCSD leadership and SWAT leadership have documented discussions about their opinions that Jason is crazy and a problem. The fuse is lit for the explosion that happens at 4:57 a.m.

192. At about 1:09 a.m., Cpt. Williams arrived at the Property and walked up to sit with Lt. Morgan in an SUV next to the garage.

193. By 1:19 a.m., even the deputies at the Property discussed the obvious fact that they had found no blood outside the home or the garage so it was very unlikely that anyone had been shot.

194. Regardless of the obvious lack of any evidence to suggest any violent shooting had occurred, Cpt. Williams reported that:

> The situation was described as a domestic situation where the male subject at the scene was in an argument with a female subject at the scene. The male subject had fired several shots and screamed out that he would kill everyone in the neighborhood that that he would kill the police too.

195. At about 1:41 a.m., Lt. Morgan sat in his SUV up near the garage and stated over a PA system: "This is Lt. Morgan with the Cherokee County Sheriff's office come out and talk to us" and "we need to make sure everyone is safe" and "not in any kind of trouble" and "make sure everyone else is safe." He repeated those statements immediately after he finished saying it the first time.

196. The SUV was about 70 feet away from the home. The SUV did not have

any police lights or blue lights or flashing lights activated on it while parked near the garage. The SUV did not have any sirens activated.

197. This was the first time any CCSD employee had even attempted to announce their presence on the Property.

198. However, he did not make this announcement while loudly knocking on the door as Sheriff's policy requires to try to make sure any occupant is aware and can hear the announcement.

199. Jason and Ali were asleep inside. They did not hear him.

**E.  CCSD finally talks to the neighbor around 2:00 a.m.**

200. At about 1:54 a.m., Lt. Morgan asked questions about Ms. Floyd's accusations that led up to the police invasion of the Property. He learned nobody had bothered to speak with her, by phone or in person, even though she was less than half a mile away, presumably within sight range of the Property.

201. Lt. Morgan or Cpt. Williams asked Sgt. Williams "Will she [Ms. Floyd] take a Warrant?"

202. Sgt. Williams replied: "I am not sure about that. I don't know is she directly communicated threats to him she just called because he was yelling and screaming." Again, the truth comes out when they unwittingly admit that there was no underlying threat to any person that could even possibly justify the original noise complaint or welfare check.

203. Then either Lt. Payne or Cpt. Williams said "she [Ms. Floyd] said he threatened to kill everyone in the neighborhood and she is in the neighborhood could we stretch that?

204.   Sgt. Williams said: "Yes, we could probably stretch that."

205.   Lt. Morgan said: "That would really help us out right there." That shows the insidious intent by the officers to frame up whatever they needed to justify their actions against Jason and Ali. They knew there was no justification, so they decided to "stretch" things to let them do what they wanted. They had no idea that Jason had an independent video system that would expose the truth.

206.   At about 1:55 a.m., Lt. Morgan instructed Deputy Erickson to walk down to Ms. Floyd's house and verify the accusations she made to the 911 dispatcher earlier. He told Deputy Erickson to "video the video she had" with his bodycam.

207.   Deputy Erickson walked down to Ms. Floyd's house. It took him about 5 minutes and he arrived at about 1:59 a.m. He had to walk past his patrol car from where he originally parked to get to her house, so he could have just as easily made that trip at the outset, around 11:18 p.m. the night before, instead of pulling out an assault rifle and barging into private property without permission or valid reason.

208.   Ms. Floyd's husband answered the door at their house as soon as Deputy Erickson arrived. The husband did not look surprised or require any explanation as to why a deputy walked up on his porch around 2:00 a.m., he just stepped back and let Ms. Floyd walk outside and huddle with Deputy Erickson on their porch. It appeared very obvious that Ms. Floyd's husband knew what was happening and that Deputy Erickson had already announced his approach before he walked onto their porch. Ms. Floyd had texted or messaged with Deputy Erickson earlier.

209.   At about 1:59 a.m., Ms. Floyd played a video on her phone for Deputy

Erickson to watch. She claimed that this was one of the videos she had taken earlier that supported her accusations made in the first phone call to the 911 dispatcher around 11:00 p.m. the night before.

210. None of the video clips that Ms. Floyd played for Deputy Erickson included video footage of Jason or Ali. It was just black screen with a few floating lights.

211. None of the video clips that Ms. Floyd played for Deputy Erickson showed Jason or Ali shooting a gun.

212. None of the video clips that Ms. Floyd played for Deputy Erickson showed Jason threatening anyone at all, much less Ms. Floyd. The video clips showed, if anything, that Ms. Floyd was nowhere near the Property.

213. None of the video clips that Ms. Floyd played for Deputy Erickson showed Jason threatening to kill law enforcement. When Deputy Erickson asked Ms. Floyd to specifically show him video to support that accusation, she told him that she did not get that part on video.

214. Ms. Floyd told Deputy Erickson that she saw Jason go in the home on the Property, but did not see Ali go in the home after Ms. Floyd heard gun shots. The video shows conclusively that if Ms. Floyd was pointing that camera on her phone at the Property when Jason and Ali went in the home for the evening, Ms. Floyd could not see any of that from her position down the hill, several football fields away, through the trees, in the pitch black dark.

215. As he left her porch, Ms. Floyd told Deputy Erickson that she was

sending the videos to his "Messenger." Upon information and belief, Ms. Floyd and Deputy Erickson had exchanged correspondence between each other in the past, beyond just sending text messages related to the noise complaint on December 12.

216.    Upon information and belief, Deputy Erickson deleted several of the text messages and other communications between him and Ms. Floyd after Jason's video from inside the home came to light on January 18, 2023.

217.    As soon as Deputy Erickson saw Ms. Floyd's videos that she had claimed supported her accusations in the 911 call at 11:00 p.m. on December 12, 2022, he knew that she did not have any video to support a claim that Jason had threatened his neighbors or threatened to harm any law enforcement officers. There was no evidence to suggest that Jason had shot Ali, or vice versa, or that shots had actually been fired on the Property.

218.    At this point, Deputy Erickson should have reported the truth, that no support or evidence existed for them to have ever entered the Property without permission, and certainly they no longer had any reason to remain.

219.    Deputy Erickson described the videos Ms. Floyd showed him as too dark to distinguish actions. He also stated that it recorded audio of Jason arguing with Ali, and that a firearm was discharged multiple times and no arguing was heard after. He admitted that Ms. Floyd did not and could not produce a video recording of Jason stating he would kill the neighborhood, but she stated that she heard him yell that.

220.    At 2:09 a.m., when he returned to the Property from walking over to Ms. Floyd's house, Deputy Erickson told Lt. Morgan, Deputy Williams, and

Captain Williams, that he could not see anything in the video.

221. Deputy Erickson reported to Lt. Morgan, Deputy Williams, and Captain Williams that he could hear arguing in the video and "him" telling "her" to call the police and then about 5 shots going off.

222. Deputy Erickson reported to Lt. Morgan, Deputy Williams, and Captain Williams that he could not tell what the woman was saying on the video.

223. Deputy Erickson reported to Lt. Morgan, Deputy Williams, and Captain Williams that there was no video of "him" threatening the neighborhood or law enforcement.

224. Deputy Erickson reported to Lt. Morgan, Deputy Williams, and Captain Williams that Ms. Floyd told him that "he" shot into the garage.

225. In reality, the video Ms. Floyd showed Deputy Erickson around 2:00 a.m. does not have any audio that could be considered discernable words from either Jason or Ali. To the extent that a few voices are heard very sparingly over the course of the video, it is not clear who is speaking or what is said (other than a woman's voice saying "stop" about 4 times while music is playing loudly).

226. The video does not show anyone shooting a gun at all, much less into the garage on the Property.

227. Presumably, if the garage door on the Property had been open with the lights on, that would have been seen on the video. Ms. Floyd's video does not show the garage on the Property at all, certainly no lights coming from an open door or any person silhouetted against the backdrop of lights coming from an open garage door.

The video definitely does not show any person shooting any type of weapon into an open garage door. Ms. Floyd's video does not show evidence of the door being opened and a well-lit interior with that light going out when the garage door is closed

228.   If the CCSD deputies and leadership standing around outside the garage for hours actually thought that Jason had shot Ali in the garage based on the report from Deputy Erickson who heard it from Ms. Floyd, they did not take any action to try and help her in the garage.

229.   If a person had been shot and was possibly bleeding to death in the garage, and these CCSD employees really suspected that to be true, they should have immediately taken steps to enter the garage and provide emergency medical care to her. Instead, they did nothing for hours.

230.   If Jason had shot Ali inside the garage 10 times as Ms. Floyd suggested, these CCSD employees would have found several freshly fired bullet casings around the precise spot they were standing around for hours. They did not find any such evidence.

231.   If Jason had shot Ali inside the garage and tried to move her after shooting her, these CCSD employees would have found blood and drag marks on the ground around the precise spot they were standing around for hours. They did not find any such evidence.

232.   The CCSD employees did nothing but stand around for hours because they knew that, despite Ms. Floyd's story about "him" shooting into the garage 10 times, no evidence existed under the very feet or in front of their eyes to conclude that

this probably, or even reasonably, had occurred thirty minutes before the initial 3 deputies arrival.

233. Deputy Erickson gave a false report to Lt. Morgan, Deputy Williams, and Captain Williams, and they eagerly accepted it without scrutiny or consideration of common sense and visible evidence.

234. Cpt. Williams reported that when he returned from Ms. Floyd's house, Deputy Erickson reported that Ms. Floyd "stated that she saw the male subject fire a round into the garage and shut the garage door and walk into the [home] and that she never saw the female subject."

235. Cpt. Williams also reported that deputies looked through the windows in the home, but could not see any person.

236. Cpt. Williams and Lt. Morgan and the others at the Property could have watched the video from Deputy Erickson's bodycam footage where he recorded what Ms. Floyd showed him from her phone. They did not need to take Deputy Erickson's word for it, they could watch the same thing he had just seen and know the truth. They even told him to make sure that he recorded the video on her phone with his bodycam before they sent him down there on that mission. Despite this history, they did not look at Deputy Erickson's bodycam footage and just relied on his false report.

237. The CCSD deputies and supervisors at the Property decided to "stretch" the truth of what Deputy Erickson saw on Ms. Floyd's videos to justify their continued siege and to ensure that the SWAT team would come finish the job, without regard to the actual evidence.

**E. Lt. Teasdale applies for a search warrant 15 minutes after CCSD knows the neighbor does not possess video as she originally claimed.**

238. About 15 minutes after Deputy Erickson confirmed that Ms. Floyd's video did not support any of her claims as she had initially told the 911 dispatcher, Lt. Teasdale applied for a search warrant.

239. Lt. Teasdale did not visit the scene at the Property before he applied for a search warrant.

240. Lt. Teasdale did not speak to Ms. Floyd before he applied for a search warrant.

241. Lt. Teasdale had not bothered to speak to Deputy Erickson, who had reviewed Ms. Floyd's video and verified that it did not support her claims, before he applied for a search warrant.

242. Lt. Teasdale did not even speak to any deputy or Lt. Morgan or Lt. Payne, or Cpt. Williams, who were actually present at the Property, before he applied for a search warrant.

243. Instead, Lt. Teasdale only reviewed what the 911 dispatcher wrote down before applying for a search warrant. He obtained all of his information to apply for the search warrant from that single person who had conducted a single unverified phone call.

244. Lt. Teasdale swore an oath and had Magistrate Josh Postell sign the affidavit.

245. In his affidavit, Lt. Teasdale wrote:

On December 13, 2022 Cherokee County Communications Center

received a 911 call from Emily Floyd (neighbor) of Jason Kloepfer stating she heard gun shots and fireworks going off. Floyd said she could hear male and female arguing. Floyd stated she heard the wife of Kloepfer screaming stop it a bunch of times and then a couple of shots went off. Now Floyd cannot hear the male. Floyd stated she had video recording of male saying he will kill everyone in the neighborhood and to send the cops "I'll get them too."

246.    Based on Deputy Erickson's encounter with Ms. Floyd before Lt. Teasdale provided this information under oath to Magistrate Postell, this information was false. No video evidence existed of Jason threatening anyone, much less his neighbor who was hundreds of yards away, down the hill, in the dark, through the woods. No video evidence existed of Jason saying he would get the cops, too. No video existed of Jason saying any words that could be understood at all. These facts were well known to CCSD officers and leadership before Lt. Teasdale swore a false oath and had Magistrate Postell issue the search warrant.

247.    A detective, like Lt. Teasdale, should have easily understood that these factual affirmations he wrote down in an affidavit, and swore under oath were true, were false if he had bothered to review them from the primary source himself.

248.    This sworn testimony was false, and Lt. Teasdale knew or should have known that before he swore an oath about it in front of a judicial officer.

249.    Instead, Lt. Teasdale said under oath in his affidavit: "The information contained in the affidavit is provided by the case card that was filled out by Cherokee County Communication Center based on Floyd and officers on scene."

250.    Lt. Teasdale had no idea if this information was true, he just got it from a 911 dispatcher and swore an oath about it. He did not speak to Ms. Floyd. He did

not even speak to the 911 dispatcher, according to his affidavit.

251.    Lt. Teasdale later claimed that he spoke to Lt. Morgan, who told him:

> there was a neighbor that heard screaming and after a gunshot never heard her again. Deputies arrived on scene and started trying to get someone to come to the door but no one would answer. Deputies looked around the garage unit and could hear loud music coming from it. Deputies were unable to get anyone to come to a door at the garage either… The neighbor had a video of the incident where Mr. Kloepfer threatened the neighbor and where he stated he would hurt officers also if they arrived.

252.    Apparently, Lt. Teasdale recognized the futility of seeking a search warrant if the deputies on the scene actually thought someone had been shot. He said on the phone call: "I advised Lt. Morgan there could be an exigent circumstance if there is a possibility of someone hurt and he stated he was told to get a search warrant."

253.    It is unclear who told Lt. Morgan to get a search warrant, but if it was a superior officer then it was either the Sheriff, Cpt. Williams, or Chief Deputy Jacobs.

254.    What Lt. Teasdale wrote in the affidavit did not describe anyone getting shot, just that there were some fireworks and gun shots. There was no evidence of any crime in what he described, just that Ms. Floyd could not hear the male. His affidavit provided no information about timing of when certain things happened, and consequently, draws fanciful conclusions based on a disjointed story devoid of the very video evidence Ms. Floyd claimed to possess. He did not describe a hostage situation or barricaded subject.

255. Lt. Teasdale wrote that Ms. Floyd had video recording of the male making threats, but he did nothing to even try to review that video. He did not even know the most basic facts.

256. Instead, Lt. Teasdale wrote in his affidavit: "Based on the facts of the case, it is believed that there may be evidence pertaining to a possible assault, homicide at [the Property]. Your affiant is requesting the issuance of this search warrant for [the Property] to search for anyone that may be injured or harmed at the residence. The evidence sought for will assist in the possible prosecution of any crimes of the suspect in this incident."

257. There was no evidence of any crime, as discussed above. To the extent that any of these officers, to include Lt. Teasdale, really thought that Ali or Jason, or anyone else, had been shot and was injured in some building on the Property, they could and should have acted in real time to address such an ongoing medical emergency. The CCSD policy required that, without regard to a search warrant. Lt. Teasdale reported saying this to Lt. Morgan, who simply replied that he had been ordered to get a search warrant without explaining why.

258. To the extent that Lt. Teasdale really was using this search warrant as an attempt to avoid getting an arrest warrant to "assist in the possible prosecution of any crimes of the suspect in this incident," an officer cannot get a search warrant because it is an easier process than getting an arrest warrant if the officer is truly trying to arrest a suspect. Lt. Teasdale and the CCSD employees had no basis to think a crime had occurred and arrest Jason.

259. Lt. Teasdale and the CCSD employees had no basis to think a crime had occurred and arrest Jason. At most, they should have spent 5 or 10 minutes on the Property trying to make a proper welfare check based on a noise complaint, and upon seeing no problems or crimes, left immediately. They had no legal right to be there past 11:30 p.m. on December 12, 2022. Instead, they lingered for hours, obtained a search warrant on false premises, and set an ambush with a foreign SWAT team.

260. Lt. Teasdale misled Magistrate Postell into signing a search warrant for evidence of the crime of "assault with a deadly weapon" at 2:14 a.m. on December 13, 2022, based on false information he swore to under oath.

261. At about 2:27 a.m., Lt. Morgan called the 911 dispatch and reported:

> Update – Ok this was a domestic that was ongoing outside. Subject fired several rounds. He was yelling at a neighbor told the neighbor that he'd kill everybody in the neighborhood and he would kill the cops if he would call the cops. Said he fired one round into the garage that is here, that is secured. He did not see the female that he was in the domestic with. She said the male then went into the camper. Did not see the female. Said he secured the garage apartment and he went into the camper. We've been unable to get him to come out of the camper. We've attempted to call him out over PA. We've got it lit up. There's been no response from it. It's a camper trailer with doors all on one side. Other than that we have no further.

262. No logical explanation could justify how the story had evolved so much, when nobody had seen or interacted with Jason or Ali, from the limited story Ms. Floyd relayed to the 911 dispatcher around 11:00 p.m. on December 12, 2022, to this unsupported account by a CCSD leader who did not witness any of the events he described 3 and a half hours later.

263. Lt. Morgan said it "was a domestic that was ongoing outside" but there

was no evidence of any domestic violence, from Ms. Floyd or otherwise.

264. Lt. Morgan said "subject fired several rounds" which he presumably meant Jason shooting a gun several times, but there was no evidence of Jason, or any specific person at the Property, shooting a gun once, from Ms. Floyd or otherwise.

265. Lt. Morgan said "He was yelling at a neighbor told the neighbor that he'd kill everybody in the neighborhood and he would kill the cops if he would call the cops" which presumably meant Jason was yelling at Ms. Floyd. Ms. Floyd is a woman, not a man. Ms. Floyd never said Jason was near her or yelling directly at her, just that he was making generic statements on his own Property, while she was hundreds of yards away, down the hill, through the trees, in the dark. Her video confirms that she did not record Jason making any such comments, and she could not see him, or anyone, at the Property.

266. Lt. Morgan said "he fired one round into the garage" which presumably meant Jason shot 1 round of a gun into the garage. The video Ms. Floyd recorded, if it is even of the Property that night, does not show any person, much less Jason, shooting a gun into the garage. Ms. Floyd could not see anyone on the Property, much less what actions they may have taken, while she was hundreds of yards away, down the hill, through the trees, in the dark. Her video confirms that she did not record Jason, or anyone, shooting a gun into the garage at the Property. Her story was that she heard 10 gun shots, not 1 round into the garage. If the video showed anything, it had the sounds of 5 gun shots. None of this adds up to Lt. Morgan's fictional narrative of 1 round into the garage.

267.    Lt. Morgan said "did not see the female that he was in the domestic with. She said the male then went into the camper. Did not see the female. Said he secured the garage apartment and he went into the camper" which presumably meant Jason went into the home, but not Ali. Well, this is obviously not true and betrays the reality that Ms. Floyd could not see anything on the Property. Unequivocally, Ali and Jason went into the home, and that is where they stayed, sleeping through the night, until the SWAT team broke into their home around 4:57 am. Again, Ms. Floyd was hundreds of yards away, down the hill, through the trees, in the dark. Her video confirms that she did not record Jason or Ali going into the home, or even the garage with the bright lights that would have shown out into the night when the door was open to be easily seen.

268.    Even if the CCSD deputies at the Property believed and relied upon that erroneous version of events at that moment in time, this just provides further reason for them to get access to the garage immediately, without any arrest or search warrant, to help that supposed victim. If they had truly believed the story they created, their actions would have conveyed that. Instead, they sat around next to the garage for several hours doing nothing.

269.    Lt. Morgan is correct that neither Jason nor Ali came out of their home when the initial 3 deputies knocked on a door around 11:20-11:45 p.m. on December 12, 2022, but the deputies never announced who they were and why they were there. Nor did Jason or Ali emerge when Lt. Morgan announced a few times on the PA system that the CCSD asked to speak with them after they had been asleep

for a few hours around 1:45 a.m. But neither Ali, nor Jason, had any obligation to open the door to their home under those circumstances. Lt. Morgan's assessment inverted reality. The CCSD loitering in the front yard with guns drawn for hours related to a noise complaint does not create any legal obligation for citizens to placate law enforcement. Instead, the CCSD deputies should have known better than to violate a citizen's sanctity of private property in such a way that converted what should have been a simple 10 minute welfare check, at most, into a make-believe hostage situation for over 5 hours, and then culminated with the SWAT team breaking into their home and shooting them. Lt. Morgan's version of reality is that the worse the officers' mistakes get over time, the more justification officers have for shooting unarmed citizens in their own home. It is not just a misstatement of the law, but offensively so.

**F.    EBCI SWAT assembles at the CCSD office with the Sheriff.**

270.    At 3:00 a.m., the Sheriff and Officer Roger Neadeau Jr. from the EBCIPD executed a written formal request, purportedly in accordance with a pre-existing MAA, for the EBCIPD SWAT team to be able to provide assistance with the CCSD from 3:00 a.m. to 11:00 a.m. on December 13, 2022.

271.    Both the Sheriff and Officer Neadeau signed this document in person, at the CCSD office in Murphy. The Sheriff had arrived at the CCSD office sometime before 3:00 a.m.

272.    Upon information and belief, Officer Neadeau lacked the statutory authority or any delegation from the EBCIPD Chief to sign this form on her behalf.

273.    Thus, there was no effective or legal MAA in effect for the EBCIPD to

assist the CCSD that day.

274.   Pursuant to N. C. G. S. Chapter 160A-288 and other applicable laws and the MAA, the EBCIPD SWAT team was subject to the lawful operational commands of the superior officers within the CCSD. The Sheriff had, and was required to maintain, operational control of the actions of the SWAT team.

275.   Upon information and belief, neither the Sheriff, nor his other leaders who were present at the Property like Lt. Morgan or Lt. Payne or Cpt. Williams or Chief Deputy Jacobs, maintained operational control of the actions of the SWAT team at the Property. Instead, the CCSD leadership team improperly surrendered control of the SWAT team to Cmdr. Buttery.

276.   Lt. Teasdale made a presentation to the SWAT team once it assembled at the CCSD office describing the unverified story that Jason had shot Ali and was barricaded in the home on the Property. Upon information and belief, Sheriff Smith joined this presentation at the CCSD office in Murphy. Upon information and belief, Lt. Teasdale told the SWAT team that Jason was a problem and misrepresented information to escalate the situation. Upon information and belief, Sheriff Smith not only witnessed this but participated in and condoned it.

277.   Around 3:23 a.m., the 911 dispatcher called EMS to put them on notice to drive over near the Property and be ready for victims because "SWAT team is about to kick some doors in . . . they can just put it on a service call.  We are trying to keep it off public radio."

278.   Again, the 911 dispatcher revealed the secret by saying it out loud.

Bushwhacking Jason was the plan all along. Soon enough after arriving at the Property, the SWAT team kicked down the door on the home and shot Jason and tried hard to shoot Ali, but luckily missed.

279.  Around 3:45 a.m., Lt. Teasdale and Sheriff Smith rode with the SWAT team to an assembly point at a church off of Highway 294 near the Property. From that point, the Sheriff and Lt. Teasdale got into the SWAT team's armored Bearcat vehicle and rode with them up to the Property. The SWAT team arrived at the Property around 4:19 a.m.

280.  In a press release published on Facebook on December 13, 2022, Sheriff Smith claimed he was not present at the scene of the shooting on the Property when the shooting actually took place.

281.  Upon information and belief, Sheriff Smith rode with the SWAT team in the armored Bearcat from the church close by to the Property around 4:19 am.

282.  When the SWAT team arrived on the scene, Cmdr. Buttery assumed control of all law enforcement officers at the Property even though Sheriff Smith, Chief Deputy Jacobs, Cpt. Williams, Lt. Morgan, Lt. Teasdale, Lt. Payne, and several other CCSD supervisors were present.

283.  According to the CCSD policy, a deputy is only justified in using deadly physical force upon another person when he reasonably believes it necessary: 1. To defend himself or a third person from what the officer reasonably believes to be the use or imminent use of deadly force; or 2. To affect an arrest or to prevent the escape from custody of a person who the officer reasonably believes is attempting to escape

by means of a deadly weapon or who by his conduct or any other means indicates that he presents an imminent threat of death or serious physical injury to others unless apprehended without delay.

284. Nobody from the CCSD nor the EBCIPD obtained an arrest warrant for either Jason or Ali prior to opening fire on both of them on December 13, 2022.

285. Nobody from the CCSD nor the EBCIPD knocked and announce who they were to properly serve a search warrant for either Jason or Ali prior to opening fire on both of them on December 13, 2022.

286. Neither the CCSD officers nor the EBCIPD SWAT team thought that either Jason or Ali presented a threat to each other prior to opening fire on both of them on December 13, 2022.

287. Neither the CCSD officers nor the EBCIPD SWAT team thought that either Jason or Ali posed an imminent threat to each other prior to opening fire on both of them on December 13, 2022.

288. Neither the CCSD officers nor the EBCIPD SWAT team thought that either Jason or Ali posed an imminent threat to anyone outside the home prior to opening fire on both of them on December 13, 2022.

289. Neither the CCSD officers nor the EBCIPD SWAT team thought that either Jason or Ali were attempting to escape custody by means of a deadly weapon prior to opening fire on both of them on December 13, 2022.

290. Neither the CCSD officers nor the EBCIPD SWAT team thought that either Jason or Ali were in custody prior to opening fire on both of them on

December 13, 2022

291.   According to the CCSD policy, a deputy is only justified in using non-deadly force when, and to the extent, the officer reasonably believes it necessary: 1. To prevent the escape from custody or to affect an arrest of a person who the officer reasonably believes has committed a criminal offense, unless the officer knows that the arrest is unauthorized. 2. To defend himself or a third person from what the officer reasonably believes to be the use or imminent use of physical force while effecting or attempting to effect an arrest, while preventing or attempting to prevent an escape, or effect compliance with a lawful order.

292.   Nobody from the CCSD nor the EBCIPD was justified in using non-deadly force with either Jason or Ali prior to opening fire on both of them on December 13, 2022.

293.    Nobody from the CCSD nor the EBCIPD could have reasonably thought either Jason or Ali were attempting to escape.

294.   Nobody from the CCSD nor the EBCIPD could have reasonably thought either Jason or Ali had committed any criminal offense.

295.   The CCSD officers and the EBCIPD SWAT team should have recognized that any attempt to arrest either Jason or Ali was unauthorized and completely unsupported when they saw Ali alive and unharmed, emerging from sleeping in the same bed as Jason. It was not a hostage slumber party.

296.   Nobody from the CCSD nor the EBCIPD could have reasonably thought that they needed to defend any other officer against the imminent use of physical

harm by either Jason or Ali while the officers attempted to arrest them.

297. Nobody from the CCSD nor the EBCIPD could have reasonably thought that they needed to defend Jason or Ali against the imminent use of physical harm by each other while the officers attempted to arrest them.

298. Nobody from the CCSD nor the EBCIPD could have reasonably thought that they needed to defend any other officer against the imminent use of physical harm by either Jason or Ali while they attempted to escape.

299. Nobody from the CCSD nor the EBCIPD could have reasonably thought that they needed to defend Jason or Ali against the imminent use of physical harm by each other while they attempted to escape.

## G. EBCI SWAT breaks into the home, sees Jason is unarmed, and shoots at him and Ali anyway.

300. At about 4:54 a.m., the SWAT team walked up to the door of the home, opened it, without permission or knocking, and tossed a drone robot through the door of the home.

301. The SWAT team did not announce who they were, nor did they announce the purpose of their visit to the Property before opening the door of the home.

302. The drone robot had wheels, a flashlight, and a camera that sent real-time video footage from inside the home to the SWAT team outside.

303. The SWAT team had at least one member who was actively monitoring a screen that showed the real-time video footage the drone transmitted from inside the home to the SWAT team outside.

304. The SWAT team members wore intercom devices that included ear

pieces and a microphone connected to their helmets and used their intercom devices to speak with and listen to each other to discuss what was seen while actively monitoring the screen that showed the real-time video footage the drone transmitted from inside the home to the SWAT team outside.

305. Every SWAT team member was aware of what was seen on the screen that showed the real-time video footage the drone transmitted from inside the home to the SWAT team outside either by directly watching the screen, or by speaking with the members who were directly watching the screen and reporting what was seen on the screen as it happened.

306. Upon information and belief, the drone also transmitted audio footage in real time, so the SWAT team knew what Jason and Ali were saying inside the home as they approached the front door.

307. At about 4:57 a.m., the drone robot woke Jason and Ali up as it rolled through the home, up close to the bedroom, making noise and flashing a light, where they slept inside their home.

308. Jason and Ali were groggy as some foreign invader woke them up around 4:57 a.m. by making noise and shining a light on their bed.

309. After they woke up, they could hear Sgt. Dore on the PA system instructing Jason to come outside with his hands up in the air.

310. Several of the CCSD officers claimed that Sgt. Dore announced on the PA system something to the effect that "He has a gun" and "Put the gun down." This is not true. Sgt. Dore never said that.

311.    Instead, Sgt. Dore said on the PA system: "Come outside Jason. Step outside the door onto the deck and show us your hands. Jason we just want to talk to you, come outside. Show us your hands."

312.    Sgt. Dore was not a certified hostage negotiator nor was he a member of the SWAT team.

313.    Jason sat on the edge of the bed, pulled on some shoes, lit a cigarette that he held in his left hand, and walked thru the home to the front door.

314.    The SWAT team members saw Jason take these actions on the drone live video feed directly or when the member watching the monitor described Jason's actions over the intercom.

315.    As he approached the drone on the floor of his home at the doorway of his bedroom, Jason seemed surprised and did not know what it was or how it had gotten inside his home.

316.    Jason stooped over and picked up the drone with his right hand.

317.    Jason now held a cigarette in his left hand and the drone in his right hand.

318.    Every SWAT team member was aware that Jason held a cigarette in his left hand and the drone in his right hand as he walked from the bedroom to the front door because they could see that on the screen that showed the real-time video footage the drone transmitted from inside the home to the SWAT team outside either by directly watching the screen, or by speaking with the members who were directly watching the screen and reporting what was seen on the screen as it happened.

319.   Jason turned both of the overhead lights on as he walked from the bedroom through his home and approached the front door.

320.   There was plenty of light for the drone to clearly show on its video feed what was happening inside the home as Jason walked from the bedroom through his home and approached the front door, especially after he cut the lights on.

321.   The SWAT team knew that Jason did not have a gun in his hands as he walked from the bedroom through his home and approached and then opened the front door.

322.   Jason opened the front door of his home, as Sgt. Dore had instructed him to do, and walked outside with his hands held up high in the air above his head.

323.   Ali stood directly behind Jason, almost touching his back with her chest, with her hands held up high in the air, too.

324.   Jason and Ali were confused about what the commotion was in their yard at 4:57 a.m. in the morning as they had been sleeping in the same bed for hours until some strange robot drone flashed lights on them and woke them up.

325.   Almost immediately, at about 4:57 a.m., several SWAT team members, including at least Officers Messer, Harris, and Ferguson, opened fire and shot at Jason and Ali about 15 shots.

326.   At least two of the rifle shots fired by the SWAT team struck Jason.

327.   One bullet struck Jason entering in the front of his chest and plowing through to exit his rib cage on the left side.

328.   One bullet struck Jason in the left arm just above his elbow blowing a

tunnel through his flesh and muscle.

329.    Jason fell backwards after the bullets tore through his body, falling into Ali before slamming into the floor on his back.

330.    One or more SWAT team members fired at least five rifle shots into the home after Jason fell backwards under the barrage and neither of them were in the shooters' sites. They just kept firing blindly into an occupied home, trying to kill Jason and Ali.

331.    Ali pulled Jason back into the home.

332.    Jason and Ali screamed that they had shot Jason, and they did not have a gun and had put their hands up. All of that was true.

333.    One or more members of the SWAT team members fired their weapons from a position where the bullets were certain to enter the home and were likely to cause serious death or great bodily harm to any occupants struck inside. This is a serious crime under N.C. Gen. Stat. § 14-34.1: Discharging certain barreled weapons or a firearm into occupied property.

334.    At least one of the bullets fired by the SWAT team passed through a closet located in bedroom of the home and exited out of the far wall of the home, near the bed where Jason and Ali peacefully slept until ambushed by the SWAT team.

335.    At least one of the bullets fired by the SWAT team passed through the cabinets in the kitchen of the home.

336.    These SWAT team members fired assault rifles with scopes aiming into the home, when they knew at least two citizens occupied the dwelling.

337. Presumably, the SWAT team members thought that at least one of the two occupants was a hostage. Typically, when there is a hostage situation and the door is opened, the hostage is in front of the kidnapper, used as a human shield.

338. When the SWAT team opened fire four seconds after Jason emerged from the front door of the home, they either had enough time to recognize it was Jason, not Ali, and thought he was the "kidnapper," or they just fired with reckless abandon before knowing whether the person could have been the very victim they were purportedly there to protect. If the former, and the SWAT team members had enough time to evaluate who the person emerging from the door was, and discerned that it was Jason and not Ali, then they also had plenty of time to recognize that he did not have a gun and posed no threat to them. Either way, there is no excuse for this attempted execution at close range with assault rifles equipped with target assisting devices. This is especially true after they saw both Jason and Ali emerge from sleeping in the same bed a minute prior. There was no possible hostage scenario.

**H. CCSD arrests Ali and drags Jason on the ground after shooting him.**

339. CCSD deputies point their assault rifles at Ali as they scream at her to walk down the ramp. They force her to kneel on the ground and handcuff her behind her back. They grab her arm and force her to walk over to the back of Lt. Morgan's SUV. She did not have any shoes on in the cold December pre-dawn. They push her into the patrol vehicle, away from Jason. She feared Jason was dying, the last thing she saw was he had been shot several times, including in the chest.

340. The CCSD deputies keep Ali handcuffed in the back of the patrol SUV

for over a half hour, even though they had allegedly showed up to protect her, the supposed hostage in their story. They keep her there against her will in the cold without proper clothing. She suffers from the cold and the unknown fate of Jason.

341.   She screamed "Where is the ambulance?  Someone help him! Please!" She could not see what was happening with Jason and she was terrified. She heard Jason yell, "Ali, I love you!"  She was losing her mind thinking Jason was dying and she could not even hold his hand and tell him she loved him.

342.   At about 4:58 a.m., two members of the SWAT team approached the door, stepped over the gravely wounded Jason without assisting him, and walked through the home and the bedroom. They performed a cursory sweep of the home, and then one of them said to get to work on Jason.

343.   A SWAT team member grabbed Jason by one arm as he was lying on his back in the doorway, and dragged him down a wooden ramp to the cold dirt and rocks.

344.   The SWAT team members provided emergency aid to Jason who was alert and repeatedly asked why did the officers shoot him.

345.   Ali screamed for Jason, and Jason yelled out that he loved her. But the CCSD and SWAT team would not let them speak to each other directly.

346.   Jason said "look at me, I'm not going to make it, please let me talk to my wife one last time, I promise I won't tell her I'm going to die. I know how to calm her down." But, those officers would not even look at Jason in the eye. They just ignored his dying request to comfort Ali as he had to hear the pain in her voice.

347.   Jason thought he was going to die lying there on the ground. So, he tilted

his head fully back and just looked at the sky. There was zero light pollution at the Property and the pre-dawn sky was perfect; all the stars were out like a planetarium. At that point he told the men who shot him, "well at least it's a beautiful night out to die." He literally feared he was going to die before they even got him to a hospital.

348.    Immediately after the shooting, Sheriff Smith finally walked up from lurking in the shadows. In his press release the next day, he falsely claims he was not present at the scene, and only obtained information after the fact from the SWAT team. He also falsely accuses Jason of arguing with the officers, in an attempt to rationalize the illegal shooting. Only later, after Jason's video footage from inside his home proves the truth, does Sheriff Smith recant his original, false story blaming Jason.

349.    Chief Deputy Jacobs also walked up from where he had been hiding in the shadows with Sheriff Smith right after the shooting. Chief Deputy Jacobs stood over Jason as the SWAT team provide medical care before the EMS took over. He rode with Jason to the hospital in the back of the ambulance.

350.    At about 5:00 a.m., three SWAT team members entered the home again, even though the home had been cleared of any potential threat and was a crime scene and should have been cordoned off until an SBI investigation until the shooting had been completed. One of the SWAT team members put his hands on his head and stated "Fuck Bro Fuck." Another member exclaimed "Cameras."

351.    Upon information and belief, the SWAT team member who stated "Cameras" was reacting to a closed circuit TV monitor and DVR facing the officers in

the home or a camera on the wall above them. He was warning the other officers to be quiet so they did not inculpate themselves further after shooting an unarmed man for no reason and without legal justification.

352.    The 3 SWAT team members then went through to the bedroom where one exclaimed "where is the firearm?"

353.    The 3 SWAT team members did not search for any weapons in the front part of the home, where Jason stood when they shot him.

354.    A SWAT team member later wrote in his report about the shooting that he could tell that Jason did not have a gun in his hands that were held up high before his SWAT colleagues hailed rifle bullets at him as he stood motionless outside his front door.

355.    At about 5:14 a.m., Lt. Teasdale and Sgt. Dore entered the home. Lt. Teasdale dropped a search warrant on a table and stated "search warrant." When they dropped this warrant inside, Jason was on his back on the ground at the bottom of his mobility ramp getting emergency medical treatment from EMS for his life-threatening gunshot wounds and Ali was in handcuffs in the back of Lt. Morgan's SUV at the time of this announcement and presentment of the search warrant. They looked around the home and left without seizing anything pursuant to the search warrant.

356.    EMS lifted Jason onto a stretcher and rolled him down the rocky driveway. Jason was bouncing around causing him excruciating pain where the bullets bored tunnels through his body as they took him to the ambulance.

357. The EMS requested a helicopter to fly Jason to Erlanger Medical Center in Chattanooga, Tennessee at 5:07 a.m.

358. At 5:19 a.m., the EMS were informed that no helicopter was available due to weather.

359. At about 5:22 a.m., the EMS transported Jason to Erlanger Medical Center in Chattanooga by ambulance. Chief Deputy Jacobs rode in the ambulance with them to the hospital in Tennessee.

360. Jason was awake for about 2 and a half hours after being shot before either the pain or pain medicine forced him to pass out when he finally arrived at the hospital.

361. The officers would not allow Ali, who had just watched Jason get gunned down by the SWAT team, comfort Jason after he was shot. Nor would they allow her to accompany Jason in the ambulance to the hospital. She had no idea what happened to Jason for over 10 hours. She thought he had died, and nobody would tell her anything about him.

362. When Jason arrived at Erlanger Medical Center in Chattanooga, they had to stabilize him in the emergency department and rush him for several surgical procedures to treat his gunshot wounds.

363. When Jason woke back up from the first round of surgeries, he had about 70 staples in his chest, about 20 stitches in his arm, and a tube down his throat. He suffered intense pain from his injuries for days and weeks.

364. Jason suffered serious, painful and permanent injuries, major damage

to his liver, a laceration to his spleen, damage to his heart, damage to his stomach, numerous fractured ribs, a wound to his left arm, and other serious and painful internal injuries directly caused by the bullets Defendants fired at him.

365. The CCSD deputies transported Ali to the CCSD office where they kept her locked in a small room for hours under guard. Ali did not commit any crimes on December 12 or 13, 2022, and the CCSD never had any reasonable suspicion, much less probable cause, to ever believe that she had. She felt like she was a criminal, instead of the victim who had been shot at by the same officers who kept her locked in the room. She thought she was under arrest, and did not feel like she had a choice but to be there, in the Sheriff's custody. They never gave her shoes, but did eventually give her a pair of grey jail slippers. Eventually, some investigator questioned her about the events of December 12 and 13.

366. At one point, when she was escorted to the bathroom by an officer, Ali saw a room that had Jason's picture and information about the Property on it. This was the war room where Lt. Teasdale and Sheriff Smith had briefed the SWAT team about shooting Jason before they left on that mission. Ali passed a few of the SWAT team members lounging out in the hall, one of them was sleeping. She was kept under guard and escorted to the restroom while the men who shot Jason and tried to shoot her got to relax and hang out together to get their stories straight.

367. The CCSD deputies finally released Ali from custody several hours later, around noon of December 13. However, when they drove her back to the Property, they blocked her from accessing the home or any of her things in the home for several

more hours. They continued the illegal search and seizure well past 5:00 a.m., for at least another 12 hours that day.

368.    When she finally got access to her home, hours later, the law enforcement officers had left blood and bullet holes in the home.  Ali used her phone to call her family and Jason's family and, only then, finally found out where Jason was. She left and drove the 2 hours to the hospital in Tennessee to stay with Jason.

**I.    CCSD swears out false arrest warrants against Jason while he is hospitalized.**

369.    After the shooting on December 13, 2022, the CCSD deputies swear out arrest warrant and charge Jason with the criminal offenses of Communicating Threats and Resisting a Public Officer.  They had scant reason to be on the Property in the first place, they ambush him and try to kill him without legal cause or justification, and then they blame him by arresting him for false crimes. This was an overt attempt to cover up their illegal actions after the fact.

370.    The allegation against Jason in the "Resisting a Public Officer warrant was that "on or about the date of offense shown and in the County named above the defendant unlawfully and willfully did resist, delay and obstruct Sgt. Dennis Dore, a public officer holding the office of Cherokee County Sheriff, by refusing to comply with orders given to Jason Kloepfer.  At the time, the officer was discharging and attempting to discharge an official duty by investigating a disturbance call located at Kloepfer's residence."

371.    The allegation against Jason in the "Communicating Threats" warrant was that "On or about the date of offense shown and in the county named above the

defendant unlawfully and willfully did threaten to physically injure the person of Emily Floyd. The threat was communicated to Emily Floyd by stating that he was going to kill all the neighbors and the threat was made in a manner and under circumstances which would cause a reasonable person to believe that the threat was likely to be carried out and the person threatened believed that the threat would be carried out."

372. As soon as Jason got released from the hospital on December 20, 2022, CCSD deputies arrested Jason at the CCSD Jail in Murphy. They served Jason with the arrest warrants for Communicating Threats and for Resisting a Public Officer and gave him an unsecured bond.

373. Jason was not guilty of the charges of communicating threats and willfully resisting arrest and both charges were dismissed by District Attorney Ashley Welch on the 1st day of March, 2023.

374. The local District Attorney withdrew from the investigation because she thinks that the CCSD employees lied to her and misled her which made her a witness in any criminal investigation against those law enforcement officers. The North Carolina Attorney General's office agreed to take up the investigation when the DA was forced to recuse due to the CCSD and EBCIPD's lies that she could not support or cover up. However, the NC AG's office has since, for unknown reasons, declined to prosecute the officers.

**J.      Sheriff Smith publishes false and defamatory stories about Jason.**

375. On December 14, 2022, the CCSD and Sheriff Smith issued a press

release and published it online and to several local media including the Cherokee Scout newspaper in Murphy, North Carolina.

376. The press release issued by the Sheriff Smith contained false and defamatory statements about Jason's actions the night he was shot.

377. Sheriff Smith said "Recognizing there was an armed suspect present and the potential for a hostage situation, CCSD obtained a search warrant and requested assistance from EBCIPD SWAT. The suspected shooter engaged in a verbal altercation with officers and emerged from a camper trailer and confronted officers. Members of the SWAT team fired upon the suspect and wounded him. ... After consultation with the DA, Jason has been charged with Communicating Threats and Resist, Obstruct, and Delay. The matter remains under investigation and more charges may follow."

378. When Sheriff Smith published the statement: "there was an armed suspect present and the potential for a hostage situation," that was demonstrably false, and he knew or should have known it before he published this defamatory lie.

379. When Sheriff Smith published the statement: "the suspected shooter engaged in a verbal altercation with officers and emerged from a camper trailer and confronted officers," that was demonstrably false, and he knew or should have known it before he published this defamatory lie.

380. When Sheriff Smith published the statement: "Members of the SWAT team fired upon the suspect and wounded him," that was at least a gross misinterpretation and attempt to minimize the reality of the SWAT team shooting 2

unarmed citizens who complied with police commands, and he knew or should have known it before he published this defamatory statement.

381. When Sheriff Smith published the statement: "Jason has been charged with Communicating Threats and Resist, Obstruct, and Delay," that was at least a gross misinterpretation and attempt to cover up the reality of the illegal actions by the CCSD and EBCIPD, and he knew or should have known it before he published this defamatory statement.

382. According to CCSD policies,

Social Networking Policy A. To provide guidelines for department employees concerning the release of information to social media sites in order to ensure the protection of the property, images and reputation of the Cherokee County Office of the Sheriff and its employees. To assist staff in working with social media sites and to coordinate the appropriate communication of timely and accurate information to support the mission and message of the Cherokee County Office of the Sheriff. This policy is not meant to address one particular form of social media; rather social media in general, as advances in technology occur and new tools emerge. B. The Cherokee County Office of the Sheriff recognizes that the use of web-based social networking sites is a popular activity that can enhance communication, collaboration, and information exchange; however, employees must be mindful that inappropriate postings regarding the Cherokee County Office of the Sheriff will have a negative impact upon its relationship with the community. This directive addresses the impact that these sites can have for the Cherokee County Office of the Sheriff and identifies the type of activities that are prohibited by our employees. D. PROCEDURE 1. Using the official approval form or process, employees must obtain permission from the Sheriff of his authorized representative prior to representing the Cherokee County Office of the Sheriff's via a social media/networking site in the performance of an authorized duty. 2. The Social Networking sites will be regularly monitored in order to ensure appropriate usage and representation of the Office. 3. Where possible, each approved social media page shall include an introductory statement that clearly specifies the purpose and scope of the Office presence on the website. 4. Where possible, each approved social media page(s) should link to the Office official website. 5. Whether in the performance of an authorized duty or operating a personal device,

employees shall not post, transmit, reproduce, and/or disseminate information (text, pictures, video, audio, etc.) to the internet or any other forum (public or private) that would tend to discredit or reflect unfavorably upon the Cherokee County Office of the Sheriff or any of the department's employees. 6. Employees are responsible for immediately notifying their Chain of Command when they become aware of or have knowledge of a posting or any website or web page that violates the provisions of this policy; or any situation where information, pictures or data representing the Cherokee County Office of the Sheriff is posted to an unapproved site. 7. Employees will not disclose any information that is confidential or proprietary to the County of Cherokee, the Office of the Sheriff or any third party who has disclosed information to the Cherokee County Sheriff's Office. 9. Employees will act in accordance with all other Cherokee County Office of the Sheriff's policies and directives. 10. Employees will act in a manner consistent with the Cherokee County Office of the Sheriff's public image by upholding the value of respect for individuals, avoiding the use of the Cherokee County Sheriff's Office resources in a derogatory or unprofessional manner and refraining from making defamatory statements about employees, citizens, partners, vendors or other agencies. E. Employees should be aware that they may be subject to civil litigation for: 1. Publishing or posting false information that harms the reputation of another person, group or organization (defamation); 2. Publishing or posting private facts and personal information about someone without their permission that has not been previously revealed to the public, is not of legitimate public concern, and would be offensive to a reasonable person; 3. Using someone else's name, likeness, or other personal attributes without that person's permission for an exploitative purpose; U. Unnecessary violence or show of force toward any person.

383.    Sheriff Smith violated his own policy by publishing false statements about Jason that defamed him. Sheriff Smith left those false statements published even after he admitted that those statements were false.

384.    Upon information and belief, CCSD officers and employees and EBCIPD officers made false statements concerning their actions leading up to shooting Jason and Ali on December 13 to District Attorney Ashley Welch and her employees during the attempt by the DA's office to prosecute Jason for crimes.

385. Upon information and belief, Sheriff Smith's false press release and the false statements CCSD officers and employees and EBCIPD made to the DA's office were intended to cover up and hide wrongdoing by the CCSD and the SWAT team.

**K. CCSD and EBCI refuse to hold their officers accountable.[2]**

386. According to CCSD policies,

It is the policy of the Cherokee County Sheriff's Office to investigate all complaints of alleged employee misconduct, and to equitably determine whether the allegations are valid or not and to take appropriate action. All citizen complaints pertaining to Sheriff's Office policies and procedures or alleging employee misconduct will be documented and investigated by the Sheriff's Office. A. Complaints may be made verbally or in writing and may be made in person or by telephone. B. Anonymous complaints or complaints from citizens who wish their names to be held confidential will be accepted and investigated. C. Citizen complaints may be accepted by any supervisor. Non-supervisory personnel receiving a citizen's complaint will refer it to their immediate supervisor or other appropriate on duty supervisor. 1. Any supervisor receiving such complaints will document in writing and forward it to the Division Supervisor. 2. The supervisor may attempt to resolve the complaint by explaining Sheriff's Office policies and procedures to the complainant at the time the complaint is made. Attempts to resolve complaints will be noted in the Citizen Complaint Report. II. Investigative Responsibilities A. The Chief Deputy shall have primary responsibility for the review and investigation of all complaints against employees, whether initiated by a citizen or from within the Sheriff's Office. B. The Sheriff or Chief Deputy will review the complaint and determine whether or not to assume primary investigation of the complaint or to assign the investigation to the appropriate supervisor. 1. Allegations of misconduct that could result in discharge, suspension, demotion, or criminal charges, will be investigated by the Chief Deputy or Division Supervisor. 2. Allegations or minor rule violations may be assigned to the employee's supervisor for investigation. 3. A supervisor's investigation may be stopped at any time to allow for a full investigation by the Sheriff. C. All investigations will be completed within 30 days of the filing of the

---

[2] CCSD provided Plaintiffs with policies from 2015, which Plaintiffs have been led to believe are in effect still and has relied upon in this Complaint. Despite numerous requests to a public entity, EBCIPD refused to provide Plaintiffs with any of their policies for how they operate and interact with the public. Presumably the EBCIPD policies would be similar to the CCSD's policies on similar topics.

complaint. Any extensions beyond this period must be approved by the Sheriff.

387. Despite the obvious problems that exist in the wrongful and illegal violations of Jason and Ali's due process that occurred when the deputies entered improperly, searched illegally, and lingered for hours without purpose, before the unjustified shooting at Jason and Ali in their home, neither of whom were armed, Sheriff Smith has taken no action to comply with his own policy about investigating wrongdoing of his employees and agents related to the events of December 12 and 13.

388. According to CCSD policies, a CCSD employee or agent is responsible for NEGLECT OF DUTY: Failure to give suitable attention to the performance of duty. Examples include, but not limited to: Failure to take appropriate action on the occasion of a crime, disorder or other act or condition deserving police attention; failure to report for duty at the time and place so designated; failure to perform duties prescribed by the policy and procedures manual; failure to conform to policies and procedures as set out herein.

389. Despite the obvious problems that exist in the wrongful and illegal violations of Jason and Ali's due process that occurred when the deputies entered improperly, searched illegally, and lingered for hours without purpose, before the unjustified shooting at Jason and Ali in their home, neither of whom were armed, Sheriff Smith has taken no action to comply with his own policy about holding his employees and agents responsible for their neglect of duty related to the events of December 12 and 13.

390. According to CCSD policies, a CCSD employee or agent is responsible

for Interference with Due Process: Employees shall not interfere with or interrupt, or be associated with any activity which might interfere with or interrupt, the proper administration of justice or any investigation.

391.   Despite the obvious problems that exist in the wrongful and illegal violations of Jason and Ali's due process that occurred when the deputies entered improperly, searched illegally, and lingered for hours without purpose, before the unjustified shooting at Jason and Ali in their home, neither of whom were armed, Sheriff Smith has taken no action to comply with his own policy about holding his employees and agents responsible for their interference with due process related to the events of December 12 and 13, and he and his employees even participated in the filing of false criminal charges against Jason after it was obvious that he and Ali had committed no crimes.

392.   According to CCSD policies, a CCSD employee or agent is responsible for Truthfulness: Employees are required to be truthful at all times, whether under oath or not. Upon order of the Sheriff or designee, employees shall truthfully answer all questions specifically directed and narrowly related to the scope of employment and operations of the Sheriff's Office which may be asked of them.

393.   Despite the obvious problems that exist in the wrongful and illegal violations of Jason and Ali's due process that occurred when the deputies entered improperly, searched illegally, and lingered for hours without purpose, before the unjustified shooting at Jason and Ali in their home, neither of whom were armed, Sheriff Smith has taken no action to comply with his own policy about holding his

employees and agents responsible for their lack of truthfulness related to the events of December 12 and 13.

394. According to CCSD policies, a CCSD employee or agent is responsible for Discretion: each employee shall be held accountable for the sound use of discretion and the use of good judgment in the performance of duties.

395. Despite the obvious problems that exist in the wrongful and illegal violations of Jason and Ali's due process that occurred when the deputies entered improperly, searched illegally, and lingered for hours without purpose, before the unjustified shooting at Jason and Ali in their home, neither of whom were armed, Sheriff Smith has taken no action to comply with his own policy about holding his employees and agents responsible for their lack of discretion or good judgment related to the events of December 12 and 13.

396. According to CCSD policies, a CCSD employee or agent is responsible for Competency:

> Employees shall establish and maintain sufficient competency to effectively perform their duties and carry out the responsibilities of their position, and the functions and objectives of the office. Incompetence may be demonstrated by: A. A lack of knowledge in the application of laws to be enforced; B. An unwillingness or inability to perform assigned tasks or duties; C. A failure to conform to work standards established for the employee's rank, grade, or position. D. A history of repeated poor performance E. Repeated infractions of the rules, regulations, policies, or procedures of the Sheriff's Office; Or F. Failure to maintain those skills required by the State of North Carolina for certification or allowing certifications to expire or lapse.

397. Despite the obvious problems that exist in the wrongful and illegal violations of Jason and Ali's due process that occurred when the deputies entered

improperly, searched illegally, and lingered for hours without purpose, before the unjustified shooting at Jason and Ali in their home, neither of whom were armed, Sheriff Smith has taken no action to comply with his own policy about holding his employees and agents responsible for their lack of competency or knowledge of the laws or unwillingness to comply with the applicable law or basic skills of a sworn law enforcement officer in North Carolina related to the events of December 12 and 13.

398.   According to CCSD policies, a CCSD employee or agent is responsible for Obedience to Laws and Regulations:

> Employees shall observe and obey all laws, ordinances, Sheriff's Office rules, directives, special orders, and standard operating procedures. All employees have the responsibility to be thoroughly familiar with the provisions of this Policy Manual and are expected to know and assume their duties and obligations. In the event of a breach of discipline or a violation of a rule, procedure, directive or duty, it will be presumed that the employee was familiar with the same.

399.   Despite the obvious problems that exist in the wrongful and illegal violations of Jason and Ali's due process that occurred when the deputies entered improperly, searched illegally, and lingered for hours without purpose, before the unjustified shooting at Jason and Ali in their home, neither of whom were armed, Sheriff Smith has taken no action to comply with his own policy about holding his employees and agents responsible for their lack of obedience of the laws or unwillingness to comply with the applicable law or CCSD policies and duties related to the events of December 12 and 13.

400.   According to CCSD policies, a CCSD employee or agent is responsible for Duty to Report Violations:

Employees knowing of or suspecting other employees of violating laws, ordinances, Sheriff's Office rules, directives, special orders, or standard operating procedures shall report the same to their supervisor. If an employee believes the information is of such a nature or gravity, official channels may be bypassed and the information may be reported directly to the Sheriff.

401. Despite the obvious violations, none of the Sheriff's employees or agents complied with the CCSD policy to report violations related to the obvious problems with the wrongful and illegal violations of Jason and Ali's due process that occurred when the deputies entered improperly, searched illegally, and lingered for hours without purpose, before the unjustified shooting at Jason and Ali in their home, neither of whom were armed, and the Sheriff has taken no action to comply with his own policy about holding his employees and agents responsible for their lack of compliance with their duty to report these violations related to the events of December 12 and 13.

402. According to CCSD policies, a CCSD employee or agent is responsible for Submission of Reports:

Employees are responsible for the accurate completion of all reports, forms, or other documents required by their duties or competent authority, and are responsible for the timely submission of such documents prior to the end of their tour of duty. However, at no time will members be allowed to submit their reports more than twenty-four (24) hours after the completion of their investigation.

403. None of the deputies or CCSD employees or agents complied with the CCSD policy to submit timely reports related to the obvious problems with the wrongful and illegal violations of Jason and Ali's due process that occurred when the deputies entered improperly, searched illegally, and lingered for hours without

purpose, before the unjustified shooting at Jason and Ali in their home, neither of whom were armed, and Sheriff Smith has taken no action to comply with his own policy about holding his employees and agents responsible for their lack of compliance with their duty to submit a timely report related to the events of December 12 and 13. Instead, Sheriff Smith allowed them to write written reports several weeks after the events, upon information and belief, after the employees had conferred to collaborate on their stories amongst each other.

404.   According to CCSD policies, a CCSD employee or agent is responsible for Dereliction of Duty:

> on the part of any member of this Office, prejudicial to the proper performance of the functions of this office, is the cause of disciplinary action and will be punished according to the seriousness of the offense, the results brought about by the offense, and the affect it has on the discipline, good order, and best interest of the office. The following constitute violations of this section: A. Failure to abide by the laws of the United States and the State of North Carolina, and the ordinances of municipalities. B. Failure to observe and give effect to the policies of the Cherokee County Office of the Sheriff. E. Failure to be courteous, patient, and respectful in dealing with the public. M. Failure to deliver, or make proper report of, offenses reported, investigated or observed.

405.   Despite the obvious violations by the deputies or CCSD employees or agents related to the problems with the wrongful and illegal violations of Jason and Ali's due process that occurred when the deputies entered improperly, searched illegally, and lingered for hours without purpose, before the unjustified shooting at Jason and Ali in their home, neither of whom were armed, Sheriff Smith has taken no action to comply with his own policy about holding his employees and agents responsible through punishment, or even counseling or training, for their dereliction

of duty that negatively affected the discipline, good order, and best interests of the CCSD by failing to abide by the laws of the United States or North Carolina, failure to observe and comply with CCSD policies, failure to deliver, or make proper report of other law enforcement officers' misconduct they observed, and the utter failure to be courteous, patient, and respectful in dealing with Jason and Ali, private citizens who were just sleeping in their own home, related to the events of December 12 and 13.

406. Upon information and belief, EBCIPD has done even less to investigate and hold their employees responsible for this illegal and unconstitutional conduct than Sheriff Smith and the CCSD have. While Jason asked for records to investigate this allegation from EBCIPD prior to filing this Complaint, EBCIPD refused to produce such information voluntarily. So, Jason is left with making these allegations upon information and belief.

**L. Sheriff Smith admits he and Darryl Brown published false and defamatory stories about Jason.**

407. On January 18, 2023, Jason published the video from inside his home taken of the events where the SWAT team broke into his home, illegally searched it with a drone robot, he and Ali heard the instructions to go to the door, he opened the door and walked out with his hands up held high in the air above his head, and the SWAT team opened fire on he and Ali. This video proved that all of the stories told by the CCSD, to include Sheriff Smith's defamatory press release, and the EBCIPD and SWAT team were false.

408. On January 20, 2023, faced with the truth from the video released two

days earlier, Sheriff Smith published a new press release saying:

> Neither myself nor Chief Deputy Justin Jacobs were on the scene at the time of the shooting, so we relied on information provided to us from the EBCIPD. My goal with issuing that press release was not to comment on the subsequent criminal investigation, which remains ongoing, but rather to update the public on a dangerous situation. The first time I ever saw video footage from the shooting was on January 18, 2023. It's my understanding that the state and DA office has been notified of the video as well. When I campaigned for the office of Sheriff, I had several conversations with fellow law enforcement officers and the public about the need for Cherokee County to have its own tactical team. It is imperative for us to be self-reliant when it comes to fighting crime, especially during a situation in which time is of the essence, such as a hostage or active shooter event.

409. Sheriff Smith's CCSD website claims that: "the Core Values of The Cherokee County Office of the Sheriff is to adhere to the traditions of ethical law enforcement agencies. We continue to believe in Professionalism, Integrity, Honesty, Impartiality and Compassion." Sheriff Smith failed to adhere to his core values in a most basic way by publishing defamatory statements about Jason after his deputies and agents violated Jason's constitutional rights for hours before shooting them without reason or provocation, and then compounded the problems by continuing to pursue false criminal charges against Jason for weeks after the truth came out by video. His employees and agents also failed to do so, as well.

410. Sheriff Smith and Chief Deputy Jacobs were at the scene of the Property at the time of the shooting on December 13, 2022.

411. Sheriff Smith knew that there was no dangerous situation at the time of publishing his first press release. In fact, he knew well that there was never any dangerous situation and all of the fantasy about a hostage situation or barricaded

subject evaporated as soon as the robot drone live streamed video footage of Jason and Ali getting out of the same bed at least 2 minutes before the SWAT team shot them.

412.   In spite of the reality that always existed, and even Sheriff Smith could no longer deny after he saw Jason's video, and in spite of what this second press release tried to distort, Sheriff Smith continued to pursue the two false criminal charges against Jason for another 7 weeks after he knew that the truth had been caught on camera, and his deceitful press release had been exposed.

413.   Darryl Brown resigned from his job as Sheriff Smith's attorney after Sheriff Smith published the second press release and blamed Mr. Brown for writing the first press release. Sheriff Smith stated in the second press release: "Following the shooting, my office issued a press release about the event. The release was prepared by the county attorney based on information my office received from CIPD."

**M.   Jason and Ali's lives are permanently harmed and disrupted.**

414.   Jason has suffered from obvious physical pain caused by being shot, but the mental and emotional harm to he and Ali is even worse.

415.   Jason has trouble sleeping at night and suffers from nightmares when he does sleep.

416.   Ali has panic attacks and is under the care of a mental health provider related to her symptoms.

417.   They have lived away from their home on the Property out of fear of retaliation from the law enforcement officers. This has led to unexpected and otherwise unnecessary expenses that have drained their financial reserves and

caused stress related to that predicament.

418. They suspect, and upon information and belief it is true, that the law enforcement officers have either been following them or have hired spies to snoop on them and surreptitiously record their movements.

419. They fear that their lives are in danger from the powerful law enforcement officers and government entities who have reason to finish what they started and finalize the cover up.

420. All of this has been very difficult for both of them and caused unendurable stress, beyond just the obvious physical pain and property damage.

421. Defendants' actions alleged herein constitute extreme and outrageous conduct that shocks the conscience.

## CAUSES OF ACTION

**COUNT 1: VIOLATION OF 42 U.S.C. §1983: SHERIFF SMITH, CHIEF DEPUTY JACOBS, CAPT. WILLIAMS, LT. TEASDALE, LT. MORGAN, LT. PAYNE, SGT. DORE, SGT. WILLIAMS, DETECTIVE QUEEN, DEPUTY STILES, DEPUTY GRAY, DEPUTY HALL, DEPUTY LATULIPE, DEPUTY ERICKSON, and DEPUTY FRY**
**(in their individual and official capacities)**

422. The allegations in the Paragraphs above are incorporated by reference.

423. The Federal Civil Rights Act, 42 U.S.C. § 1983, imposes civil liability upon every person who, under color of law, deprives another of rights secured by the Constitution and laws of the United States. 42 U.S.C. § 1983.

424. At all relevant times, Sheriff Smith, Chief Deputy Jacobs, Capt. Williams, Lt. Teasdale, Lt. Morgan, Lt. Payne, Sgt. Dore, Sgt. Williams, Detective Queen, Deputy Stiles, Deputy Gray, Deputy Hall, Deputy Latulipe, Deputy Erickson,

and Deputy Fry ("CCSD Defendants") acted under color of state law as the elected Sheriff or as one of his employees conducting law enforcement duties in Cherokee County pursuant to state law and the North Carolina Constitution.

425. The use of deadly force is a seizure subject to the Fourth Amendment. Firing a gun at someone is always deadly force. It makes no difference if the intent of the law enforcement officer was merely to frighten or wound. Once the weapon is discharged, the law enforcement officer has used deadly force. The Fourth Amendment permits the use of deadly force only when a law enforcement officer has probable cause to believe that a suspect poses a threat of serious physical harm, either to the law enforcement officer or to others. Three factors generally inform this analysis: (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the safety of the law enforcement officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest. The focus should be placed on the totality of the circumstances based on the information available to the law enforcement officer immediately prior to and at the very moment he shoots his gun.

426. At all relevant times on December 13, 2022, Jason had committed no crime, posed no threat, immediate or otherwise, to the safety of any law enforcement officer or other person, and were not resisting arrest or attempting to evade arrest. No law enforcement officer present thought or could have reasonably suspected that Jason and Ali committed any crimes at all, much less that there was a hostage situation. Jason and Ali had committed no crimes at all, and certainly not during the

6 hours that law enforcement officers had seized and occupied the Property. Jason and Ali complied with law enforcement officers' instructions to come outside with their hands up in the air. At least one of the EBCIPD officers present admitted that Jason did not appear to have a gun in his hands and all of them saw or heard that Jason held the drone in his hand, not a gun. Jason did not make any movement that could possibly have been interpreted as a threat to the law enforcement officers or give any indication that he posed any threat to the law enforcement officers when he walked out of his front door with his hands up in the air as instructed before they shot him. Certainly Ali never made any type of threatening move to justify shooting at her. Jason and Ali did not resist arrest or communicate any threats when they complied with law enforcement officers' instructions to come outside with their hands up. No law enforcement officer present could have reasonably held any belief or suspicion that Jason and Ali posed a threat when Jason walked out of the door with his hands held high above his head and Ali stood directly behind him with her hands held high above her head, too.

427. At all relevant times, CCSD Defendants knew, or should have known, that they had no legal right or belief that the use of deadly force against Jason or Ali was lawful or constitutional.

428. At all relevant times, CCSD Defendants violated Plaintiffs' constitutional rights by the illegal and unlawful use of deadly force against Jason and Ali.

429. At all relevant times, CCSD Defendants knew, or should have known,

that they could not just stand by and watch as other law enforcement officers used deadly force by shooting several bullets at Jason and Ali when there was no legal right or belief that the use of deadly force against Jason and Ali was lawful or constitutional.

430. At all relevant times, CCSD Defendants violated Plaintiffs' constitutional rights by their failure to intervene to prevent the illegal and unlawful use of deadly force against Jason.

431. At all relevant times, a citizen had a clearly established Fourth Amendment right to possess a firearm in his own home in a non-threatening manner while investigating a nocturnal disturbance on his premises.

432. At all relevant times, neither Jason nor Ali possessed a firearm as they opened the door and walked out of their home in a non-threatening manner while investigating the illegal disturbance on their premises at night.

433. At all relevant times, CCSD Defendants violated Plaintiffs' constitutional right to open the door and walk out of their home in a non-threatening manner while unarmed to investigate the illegal disturbance on their Property and in their home at night by using deadly force against Jason and Ali.

434. A citizen has the constitutional right to live peaceably in his or her own home on his or her own property without interference from a law enforcement officer.

435. At all relevant times, CCSD Defendants knew, or should have known, that, on December 12 and 13, 2022, Jason and Ali had a constitutional right to live peaceably in their own home on their own property without interference from a law

enforcement officer.

436. At all relevant times, CCSD Defendants violated Plaintiffs' constitutional right to live peaceably in their own home on their own property without interference from a law enforcement officer.

437. A law enforcement officer trespassing on a citizen's private property without a valid reason is a search or seizure subject to the Fourth Amendment.

438. At all relevant times, CCSD Defendants knew, or should have known, that, on December 12 and 13, 2022, Jason and Ali had a constitutional right to be free from law enforcement officers trespassing on their property without a valid reason.

439. At all relevant times, CCSD Defendants violated Plaintiffs' constitutional right to be free from law enforcement officers trespassing on their property without a valid reason.

440. A law enforcement officer making armed patrols for hours on a citizen's private property without a valid reason is a search or seizure subject to the Fourth Amendment.

441. At all relevant times, CCSD Defendants knew, or should have known, that, on December 12 and 13, 2022, Jason and Ali had a constitutional right to be free from law enforcement officers making armed patrols for hours in the middle of the night on Jason and Ali's private property without a valid reason.

442. At all relevant times, CCSD Defendants violated Plaintiffs' constitutional right to be free from law enforcement officers making armed patrols for hours in the middle of the night on Jason and Ali's private property without a

113

valid reason.

443. A law enforcement officer breaking into the closed door on a citizen's home on private property without knocking and announcing is a search or seizure subject to the Fourth Amendment.

444. At all relevant times, CCSD Defendants knew, or should have known, that, on December 12 and 13, 2022, Jason and Ali had a constitutional right to be free from law enforcement officers breaking into the closed door of their home on private property without knocking and announcing and throwing a surveillance drone robot inside.

445. At all relevant times, CCSD Defendants violated Plaintiffs' constitutional right to be free from law enforcement officers breaking into the closed door on their home on private property without knocking and announcing and throwing a surveillance drone robot inside.

446. A law enforcement officer fabricating evidence and presenting false evidence under oath to a judicial officer *ex parte* to obtain an unlawful search warrant is a search or seizure subject to the Fourth Amendment and a violation of due process subject to the Fifth Amendment.

447. At all relevant times, CCSD Defendants knew, or should have known, that, on December 13, 2022, Jason and Ali had a constitutional right to be free from law enforcement officers fabricating evidence and presenting false evidence under oath to a judicial officer *ex parte* to obtain an unlawful search warrant.

448. At all relevant times, CCSD Defendants violated Plaintiffs'

constitutional right to be free from law enforcement officers fabricating evidence and presenting false evidence under oath to a judicial officer *ex parte* to obtain an unlawful search warrant.

449.    A law enforcement officer fabricating evidence and presenting false evidence under oath to a judicial officer *ex parte* to obtain an unlawful arrest warrant is a search or seizure subject to the Fourth Amendment and a violation of due process subject to the Fifth Amendment.

450.    At all relevant times, CCSD Defendants knew, or should have known, that, on December 13, 2022, Jason and Ali had a constitutional right to be free from law enforcement officers fabricating evidence and presenting false evidence under oath to a judicial officer *ex parte* to obtain an unlawful arrest warrant.

451.    At all relevant times, CCSD Defendants violated Plaintiffs' constitutional right to be free from law enforcement officers fabricating evidence and presenting false evidence under oath to a judicial officer *ex parte* to obtain an unlawful a warrant.

452.    A law enforcement officer arresting a citizen on charges that the officer knows are false or if the law enforcement officer arrests a citizen without probable cause is a search or seizure subject to the Fourth Amendment, a violation of due process subject to the Fifth Amendment, and a cruel and unusual punishment without conviction that violates the Eight Amendment.

453.    At all relevant times, CCSD Defendants knew, or should have known, that, on December 13, 2022, Jason had a constitutional right to be free from law

enforcement officers arresting him on charges that the officers know were false and without probable cause.

454. At all relevant times, CCSD Defendants violated Jason's constitutional right to be free from law enforcement officers arresting him on charges that the officers know were false without probable cause.

455. At all relevant times, CCSD Defendants knew, or should have known, that, on December 13, 2022, Ali had a constitutional right to be free from law enforcement officers arresting her on charges that the officers know were false without probable cause.

456. At all relevant times, CCSD Defendants violated Ali's constitutional right to be free from law enforcement officers arresting her on charges that the officers know were false without probable cause.

457. A law enforcement officer destroying evidence of the illegal use of force, false search warrant process, and false arrest warrant process after the fact is a search or seizure subject to the Fourth Amendment and a violation of due process subject to the Fifth Amendment.

458. At all relevant times, CCSD Defendants knew, or should have known, that, on December 13, 2022, Jason and Ali had a constitutional right to be free from law enforcement officers destroying evidence of the illegal use of force, false search warrant process, and false arrest warrant process after the fact.

459. At all relevant times, CCSD Defendants violated Jason's and Ali's constitutional rights to be free from law enforcement officers destroying evidence of

the illegal use of force, false search warrant process, and false arrest warrant process after the fact.

460.  At all relevant times, CCSD Defendants had a duty to know of and comply with all applicable laws and policies related to the situation at the Property on December 12 and 13 to ensure that they did not violate Jason's and Ali's constitutional rights.

461.  At all relevant times, if CCSD Defendants had known of and complied with all applicable laws and policies related to the situation at the Property on December 12 and 13, they would not have violated Jason's and Ali's constitutional rights.

462.  At all relevant times, CCSD Defendants either did not know of or certainly did not comply with all applicable laws and policies related to the situation at the Property on December 12 and 13, and, in doing so, they violated Jason's and Ali's constitutional rights as described above.

463.  On December 13, 2022, these rights to freedom from: unjustified and illegal use of deadly force, hours long armed trespass on private property, breaking in to an occupied home without knocking or announcing, fabricating evidence and giving false sworn testimony to obtain search and arrest warrants, arresting a citizen based on a false warrant, and destroying evidence in an attempt to cover up the illegal wrongdoing were clearly established constitutional rights, pursuant to the Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution. These are rights that any reasonable sheriff, officer, deputy, supervisor, agent, or employee

in the position of each of these Defendants would and should have known, and did know. It is not possible, given the normal expectations of law enforcement officers in general, and the policies and training and experience of these Defendants specifically, that these Defendants can claim that they were unaware of what should have happened to avoid violating Jason's and Ali's constitutionally protected rights in this situation. Indeed, if these Defendants had merely ensured that they knew about and complied with the Sheriff's policies, Jason and Ali would not have even been disturbed by the officers because they would have promptly left after it became clear they had no reason or support for loitering. Instead, these Defendants stayed on the Property for 6 hours until they shot and almost killed Jason and tried to shoot Ali. As a result, the defense of qualified immunity is unavailable to, and has been waived by, these Defendants.

464. A supervisor can be held liable in his or her individual capacity under § 1983 if there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. The supervisor is responsible if he has supervisory authority over his subordinate government actor who commits constitutional violations.

465. In addition to their direct actions, Sheriff Smith, Chief Deputy Jacobs, Capt. Williams, Lt. Teasdale, Lt. Morgan, Lt. Payne, Sgt. Dore, and Sgt. Williams ("CCSD Supervisors") violate Jason and Ali's constitutional rights described above while acting in their supervisory capacity, too. For these CCSD Supervisors, they acted under color of state law, the acts and failures to act by their subordinates

violated Jason and Ali's constitutional rights, and the CCSD Supervisors were aware or should have been aware of their subordinates' actions and omissions that violated Jason and Ali's constitutional rights as they were happening such that the CCSD Supervisors could and should have stopped the violations before they culminated in the injuries and harms that befell Jason and Ali. These CCSD Supervisors engaged in conduct that showed a reckless or callous indifference to the deprivation of Jason's and Ali's protected constitutional rights by their subordinates. These CCSD Supervisors engaged in conduct that was so closely related to all of the other Defendants' actions that led to the deprivation of Jason's and Ali's protected constitutional rights as to be the moving force that caused the ultimate injury.

466. As a direct and proximate result of the deprivation and violations of Jason's and Ali's protected constitutional rights and federal rights as alleged above, they suffered painful physical injuries and terrifying, preventable, and totally unnecessary mental anguish and emotional distress from this near-death event while peacefully sleeping in their own home on their own property at 4:57 a.m. They also suffered property damage at their home and otherwise unnecessary out of pocket expenses as a result of these violations. They have suffered a complete loss of a normal life as they knew it before these violations. Consequently, Jason and Ali are entitled to recover from each of these CCSD Defendants, in their individual capacities, and CCSD Supervisors, in their supervisory capacity, compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of seventy-five thousand dollars ($75,000.00).

467. Furthermore, Jason and Ali are entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) and under federal law and common law from each of these CCSD Defendants, in their individual capacities and official capacities, and CCSD Supervisors, in their supervisory capacity, in an amount in excess of seventy-five thousand dollars ($75,000.00), to punish these CCSD Defendants for their illegal, reprehensible, unconstitutional, egregiously wrongful, reckless and willful misconduct and to both ensure that these CCSD Defendants and CCSD Supervisors will never repeat this shameful conduct ever again and also to deter others from engaging in similar conduct in the future.

**COUNT 2: VIOLATION OF FEDERAL CIVIL RIGHTS LAWS UNDER *Monell* 42 U.S.C. §§ 1983 and 1988: CCSD, SHERIFF SMITH, CHIEF DEPUTY JACOBS, CAPT. WILLIAMS, LT. TEASDALE, LT. MORGAN, LT. PAYNE, SGT. DORE, and SGT. WILLIAMS.**
**(in their Individual and Official Capacities)**

468. The allegations in the Paragraphs above are incorporated by reference.

469. Sheriff Smith was elected in November 2022 and took the oath of office and became the Sheriff of Cherokee County on December 5, 2022.

470. Sheriff Smith was and is the Sheriff of Cherokee County and has oversight over all CCSD employees and agents.

471. Sheriff Smith was and is the final policymaker for the CCSD.

472. In his official capacity, Sheriff Smith's actions and inactions were those of the CCSD.

473. The CCSD Supervisors are "persons" as defined pursuant to 42 U.S.C.

§ 1983 and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018 (1978), and its progeny.

474.    Plaintiffs can establish a *Monell* claim against the CCSD by showing Sheriff Smith and the CCSD Supervisors violated Plaintiffs' constitutional rights: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

475.    Sheriff Smith and the CCSD Supervisors' acts and omissions directly and proximately caused the deprivation of Jason's rights; that is, Sheriff Smith and the CCSD Supervisors' acts and omissions were so closely related to the deprivation of Jason's rights as to be the moving force that caused the ultimate injury.

476.    At all relevant times, Sheriff Smith and the CCSD Supervisors were responsible for the formulation and execution of policies regarding the safety and constitutionality of CCSD employees and agents as they engaged in law enforcement activities with the public in the community.

477.    At all relevant times, Sheriff Smith and the CCSD Supervisors were responsible for the formulation of, training on, and execution of policies for CCSD employees and agents regarding the appropriate, legal, and constitutional use of force, including the rare use of deadly force, when and how to obtain and execute search warrants, and when and how to obtain and execute arrest warrants when

interacting with citizens in the community.

478. At all relevant times, Sheriff Smith and the CCSD Supervisors were responsible for the formulation of, training on, and execution of policies for CCSD employees and agents regarding the appropriate, legal, and constitutional conduct of wellness visits and how to respond to noise complaints at citizens' homes in the community.

479. At all relevant times, Sheriff Smith and the CCSD Supervisors were responsible for the formulation of, training on, and execution of policies for CCSD employees and agents regarding the appropriate, legal, and constitutional use of force, including deadly force, when CCSD employees and agents requested and supervised SWAT team raids at citizens' homes in the community.

480. At all relevant times, Sheriff Smith and the CCSD Supervisors were responsible for the formulation of, training on, and execution of policies for CCSD employees and agents regarding the appropriate, legal, and constitutional use of force, including on rare occasions deadly force, when CCSD employees and agents performed unannounced breaking and entering to toss a video streaming drone robot into sleeping citizens' homes in the community.

481. Sheriff Smith established as official policy or de facto practice or custom lackadaisical, irresponsible, dangerous, and reckless behavior by the deputies, officers, and other employees and agents of the CCSD. While he had a written policies to handle law enforcement activities in the field, Defendants failed to adhere to the Sheriff's safety policies.

482. The CCSD, through Sheriff Smith and the CCSD Supervisors, maintained a policy, custom, or pattern and practice of promoting, facilitating, and condoning the improper, illegal, and unconstitutional techniques by the deputies and other CCSD agents and employees. These CCSD Supervisors' acts and omissions led to the shooting of Jason and Ali and shock the conscience.

483. The CCSD, through Sheriff Smith and the CCSD Supervisors, further failed to adequately train, supervise, monitor, enforce, or discipline Defendants, as set forth above, in connection with complying with the written policy to protect and ensure Jason and Ali's constitutional rights were not violated.

484. Because Sheriff Smith and the CCSD supervisors were the final policy makers on December 12 and 13, 2023, their acts or omission during that time constituted the policy, custom, or pattern and practice of the CCSD.

485. These failures to train and use of illegal and unconstitutional practices and customs that diverge from any written policy amounted to violations of the rights of persons with whom the Sheriff and his employees and agents came into contact. Sheriff Smith's failure to train, and instead allowing and condoning the use of illegal and unconstitutional practices and customs that diverge from any written policy, reflected a deliberate or consciously indifferent "policy," that these failures can fairly be said to be the moving force behind the constitutional violation and are closely related to the harm and injury Jason and Ali suffered, meaning it is at least a cause of the injuries and harm they suffered.

486. Upon information and belief and at all relevant times, Sheriff Smith and

the CCSD Supervisors had in effect de facto policies, practices, and customs that were a direct and proximate cause of the wrongful, unconstitutional, and unlawful conduct of deputies and CCSD officers, employees, and agents who violated Jason and Ali's constitutional rights, as alleged above, including, *inter alia*:

a. The failure to draft or institute constitutionally adequate policies or procedures necessary to ensure that excessive force and deadly force were not used for a simple welfare check or noise complaint;

b. The failure to adequately train, supervise, instruct, or monitor deputies and CCSD officers, employees, and agents in the proper methods, practices, or policies for conducting a simple welfare check or noise complaint;

c. The failure to draft or institute constitutionally adequate policies or procedures necessary to ensure that excessive force and deadly force were not used when 2 unarmed citizens slept in their home through the night and came out the door with their hands held up in the air above their heads as instructed;

d. The failure to adequately train, supervise, instruct, or monitor deputies and CCSD officers, employees, and agents in the proper methods, practices, or policies to ensure that excessive force and deadly force were not used

when 2 unarmed citizens slept in their home through the night and came out the door with their hands held up in the air above their heads as instructed;

e.    The failure to draft or institute constitutionally adequate policies or procedures necessary to ensure that deputies and CCSD officers, employees, and agents did not fabricate evidence or give false sworn testimony to judicial officers to obtain search or arrest warrants;

f.    The failure to adequately train, supervise, instruct, or monitor deputies and CCSD officers, employees, and agents in the proper methods, practices, or policies for properly obtaining search or arrest warrants;

g.    The failure to draft or institute constitutionally adequate policies or procedures necessary to ensure that deputies and CCSD officers, employees, and agents investigated and held accountable after a blatant violation of citizens' rights occurred so that the citizens of Cherokee County would not face life or death deprivations of their constitutional rights like Jason and Ali faced when they were almost killed by deputies and CCSD officers, employees, and agents;

h.    Ratifying the unconstitutional violations by deputies and CCSD officers, employees, and agents that Sheriff Smith

and CCSD Supervisors knew of and specifically made a deliberate choice to approve of and actually participated in with the cover up, defamation, and false prosecution of Jason;

i.  The failure to ensure deputies and CCSD officers, employees, and agents were trained on and familiar with, and actually complied with the CCSD Standard Operating Guidelines related to the proper methods, practices, or policies for providing safe, constitutional, and legal interactions with the citizens of Cherokee County;

j.  The failure to ensure deputies and CCSD officers, employees, and agents complied with the CCSD Standard Operating Guidelines related to the proper methods, practices, or policies for providing safe, constitutional, and legal interactions with the citizens of Cherokee County;

k.  The failure to ensure deputies and CCSD officers, employees, and agents complied with applicable statutes and the state and federal constitution; and

l.  Other violations of policies, customs, rules, laws, the Constitution, and practices to be identified during the course of discovery or trial.

487. Upon information and belief, Sheriff Smith and the CCSD Supervisors

had actual or constructive knowledge that the deputies and CCSD officers, employees, and agents were, and had been before and after December 12 and 13, 2022, engaged in conduct in direct conflict with the CCSD policies and the applicable laws and rules that posed a pervasive and unreasonable risk of constitutional injury to the citizens of Cherokee County, such as Jason and Ali.

488. Upon information and belief, the response of Sheriff Smith and the CCSD Supervisors to such actual or constructive knowledge, even after repeated instances of injury or death to other citizens of Cherokee County, was so inadequate as to show deliberate indifference to or tacit authorization of the offensive, unconstitutional, and illegal acts and practices described above. In fact, by their conduct, Sheriff Smith and the CCSD Supervisors created and encouraged a culture of excessive force and danger towards citizens of Cherokee County, culminating in the shooting of Jason that shocked the conscience.

489. The violations of these policies, practices, and customs; failures to adequately train and supervise; adoption of de facto policies in conflict with the written policies by default; and encouragement during and ratification after the fact of acts that violated Plaintiffs' constitutional rights by the CCSD, Sheriff Smith, and the CCSD Supervisors directly and proximately resulted in the violations of Jason and Ali's rights under the United States Constitution, including rights secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments, and under other federal laws.

490. As a direct and proximate result of the deprivation and violations of Jason and Ali's constitutional and federal rights as alleged above, they suffered

painful physical injuries and terrifying, preventable, and totally unnecessary mental anguish and emotional distress from this near-death event while peacefully sleeping in their own home on their own Property at 4:57 a.m. They also suffered property damage at their home and otherwise unnecessary out of pocket expenses as a result of these violations. They have suffered a complete loss of a normal life as they knew it before these violations. Consequently, Jason and Ali are entitled to recover from the CCSD and each of these CCSD Supervisor Defendants, in their individual and official capacities, compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of seventy-five thousand dollars ($75,000.00).

491.     Furthermore, Jason and Ali are entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) and under federal law and common law from the CCSD and each of these each of these CCSD Supervisor Defendants, in their individual and official capacities, in an amount in excess of seventy-five thousand dollars ($75,000.00), to punish these Defendants for their illegal, reprehensible, unconstitutional, egregiously wrongful, reckless and willful misconduct and to both ensure that these Defendants will never repeat this shameful and wanton conduct ever again and also to deter others from engaging in similar conduct in the future.

**COUNT 3: NEGLIGENCE and NEGLIGENCE PER SE: CCSD, SHERIFF SMITH, CHIEF DEPUTY JACOBS, CPT. WILLIAMS, LT. TEASDALE, LT. MORGAN, LT. PAYNE, SGT. DORE, SGT. WILLIAMS, DET. QUEEN, DEP. STILES, DEP. GRAY, DEP. HALL, DEP. LATULIPE, DEP. ERICKSON, and DEP. FRY.**
**(in their Official and Individual Capacities)**

492.     The allegations in the Paragraphs above are incorporated by reference.

493.     CCSD Defendants had a duty to Jason and Ali to use ordinary care in

the performance of their duties as law enforcement officers.

494.　By their conduct alleged above, CCSD Defendants breached their duty to use ordinary care in the performance of their duties as law enforcement officers and were negligent.

495.　By their conduct alleged above, CCSD Defendants violated several laws while they breached their duty to use ordinary care in the performance of their duties as law enforcement officers and were negligent per se.

496.　It was reasonably foreseeable to CCSD Defendants that such negligence would cause Jason and Ali harm.

497.　Ali and Jason suffered harm, damages, and injury as a direct and proximate result of the negligence of the CCSD Defendants alleged above.

498.　As a direct and proximate result of the CCSD Defendants' negligence as alleged above, Jason and Ali suffered painful and terrifying, preventable, and totally unnecessary physical harm, mental anguish and emotional distress, and property damage from this near-death event while peacefully sleeping in their own home on their own property at 4:57 a.m. They have suffered a complete loss of a normal life as they knew it before this negligence. Consequently, Jason and Ali are entitled to recover from each of these CCSD Defendants, in their individual and official capacities, compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of seventy-five thousand dollars ($75,000.00).

499.　Furthermore, Jason and Ali are entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from each of these CCSD Defendants, in

their individual and official capacities, in an amount in excess of seventy-five thousand dollars ($75,000.00), to punish these CCSD Defendants for their illegal, reprehensible, unconstitutional, egregiously wrongful, reckless and willful misconduct causing an improper harm, injury, damage, and emotional distress on Jason and Ali as alleged above and to both ensure that these CCSD Defendants will never repeat this shameful and wanton conduct ever again and also to deter others from engaging in similar conduct in the future.

## COUNT 4: GROSS NEGLIGENCE: CCSD, SHERIFF SMITH, CHIEF DEPUTY JACOBS, CPT. WILLIAMS, LT. TEASDALE, LT. MORGAN, LT. PAYNE, SGT. DORE, SGT. WILLIAMS, DET. QUEEN, DEP. STILES, DEP. GRAY, DEP. HALL, DEP. LATULIPE, DEP. ERICKSON, and DEP. FRY.
### (in their Official and Individual Capacities)

500.   The allegations in the Paragraphs above are incorporated by reference.

501.   CCSD Defendants had a duty to Jason and Ali to use ordinary care in the performance of their duties as law enforcement officers.

502.   By their conduct alleged above, CCSD Defendants breached their duty to use ordinary care in the performance of their duties as law enforcement officers and were grossly negligent by virtue of their recklessness, willful and wanton conduct, utter disregard for the safety of others, shooting blindly into an occupied home without knowing or caring who was inside, and then engaging in an elaborate cover up to ratify their illegal actions and obfuscate the evidence while taking no responsibility for the egregious conduct that shattered these two citizens' lives.

503.   It was reasonably foreseeable to CCSD Defendants that such grossly negligent conduct would cause Jason and Ali harm.

504.  Ali and Jason suffered harm, damages, and injury as a direct and proximate result of the gross negligence of the CCSD Defendants alleged above.

505.  As a direct and proximate result of the CCSD Defendants' gross negligence as alleged above, Jason and Ali suffered painful and terrifying, preventable, and totally unnecessary physical harm, mental anguish and emotional distress, and property damage from this near-death event while peacefully sleeping in their own home on their own property at 4:57 a.m. They have suffered a complete loss of a normal life as they knew it before this gross negligence. Consequently, Jason and Ali are entitled to recover from each of these CCSD Defendants, in their individual and official capacities, compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of seventy-five thousand dollars ($75,000.00).

506.  Furthermore, Jason and Ali are entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from each of these CCSD Defendants, in their individual and official capacities, in an amount in excess of seventy-five thousand dollars ($75,000.00), to punish these CCSD Defendants for their illegal, reprehensible, unconstitutional, egregiously wrongful, reckless and willful misconduct causing an improper harm, injury, damage, and emotional distress on Jason and Ali as alleged above and to both ensure that these CCSD Defendants will never repeat this shameful and wanton conduct ever again and also to deter others from engaging in similar conduct in the future.

**COUNT 5: ABUSE OF PROCESS BY CCSD, SHERIFF SMITH, CHIEF DEPUTY JACOBS, CPT. WILLIAMS, LT. TEASDALE, LT. MORGAN, LT. PAYNE, SGT. DORE, SGT. WILLIAMS, and DEP. FRY.**
**(in their Official and Individual Capacities)**

507.   The allegations in the Paragraphs above are incorporated by reference.

508.   After the CCSD and the SWAT team committed the wrongful conduct alleged above, Deputy Frye was instructed by his CCSD Supervisors to charge Jason with the crime of communicating threats to Ms. Floyd.

509.   Upon information and belief, Deputy Frye, acting on instructions from his CCSD Supervisors appeared before a Magistrate on December 13, and swore under oath that "Jason Kloepfer threatened to physically injure the person of Emily Floyd on December 13, 2022" and that "such threat was communicated to Emily Floyd by stating that he was going to kill the neighbors and the threat was made in a manner and under circumstances which would cause a reasonable person to believe that the threat was likely to be carried out and the person threatened believed that the threat would be carried out."

510.   At the time Deputy Frye appeared before the Magistrate on December 13, both he and his CCSD Supervisors, including Sheriff Smith, knew or reasonably should have known the following facts:

a.   Deputy Erickson had personally viewed the video and audio allegedly taken by Ms. Floyd on December 12, and was aware that such audio and video did not corroborate Ms. Floyd's statements in her call to 911 dispatch. No evidence existed to suggest that Jason had threatened to kill her, or any other of the far-flung

neighbors, nor had he threatened to harm any law enforcement officers;

b.     Jason had no direct contact with Ms. Floyd on December 12, and communicated no threats to her;

c.     No facts existed to support the assertion that Ms. Floyd, or anyone else who lived far away from the Property in the neighborhood, could possibly, much less reasonably, believe that Jason had made any such threats, or even if someone could have interpreted anything that they heard as a threat, that Jason had any intention or capacity to carry it out;

d.     The SWAT team members shot Jason as he walked out of the door of his home with his hands up in the air while he was unarmed;

e.     No law enforcement officer made any effort prior to the SWAT team shooting Jason to obtain any arrest warrant against Jason for Communicating Threats or Resisting an officer in the performance of his duties.

511.    Upon information and belief, after the CCSD and the SWAT team committed the wrongful conduct alleged above, Sgt. Dore was instructed by his CCSD supervisors to charge Jason with the crime of Resisting a Public Officer.

512.    Upon information and belief, Sgt. Dore, acting on instructions from his CCSD supervisors appeared before a Magistrate on December 13, and swore under oath that "on December 13, Jason unlawfully and willfully did resist, delay, and

obstruct Sgt. Dore, a public officer in the CCSD, by refusing to comply with orders given to Jason, at the time the officer was discharging and attempting to discharge an official duty by while investigating a disturbance call located at Kloepfer's residence."

513. At the time Sgt. Dore appeared before the Magistrate on December 13, Sgt. Dore and his CCSD Supervisors, including Sheriff Smith, knew or reasonably should have known the following facts:

    a.    The CCSD and SWAT team had no lawful right to be on the Property on December 12 or 13, 2022;

    b.    Jason and Ali were asleep in the home until the SWAT team broke into their home and threw an uninvited, unauthorized robot drone inside on December 13;

    c.    After the illegal drone robot woke him up, Jason immediately complied with the commands of Sgt. Dore and walked out of the door of his home with his hands up, and for no good reason, SWAT team members shot Jason as soon as he walked out of the door of his home, unarmed, with his hands held up high in the air;

    d.    No law enforcement officer made any effort prior to the SWAT team shooting Jason to obtain any arrest warrant against Jason for Communicating Threats or Resisting a Public Officer.

514. On December 20, 2022, CCSD deputies arrested Jason at the CCSD Jail in Murphy as soon as Jason got released from his week-long stay at the hospital.

They served Jason with the arrest warrants for Communicating Threats and for Resisting a Public Officer and gave him an unsecured bond.

515. On March 1, 2023, Assistant District Attorney Jason Arnold dismissed the charges against Jason for Communicating Threats and Resisting a Public Officer without ever trying the case to a judge or jury.

516. At the time that Sgt. Dore and Deputy Frye instituted criminal charges against Jason, no facts or circumstances existed that a reasonable person would believe justified prosecuting Jason for either crimes they charged him with.

517. Nonetheless, Sgt. Dore and Deputy Frye and their CCSD Supervisors kept the charges in effect against Jason from December 13, 2022 until March 1, 2023, knowing no probable cause ever existed for such charges.

518. Until Assistant District Attorney Jason Arnold finally dismissed them, Sgt. Dore and Deputy Frye and their CCSD Supervisors instituted these 2 criminal charges against Jason and kept them in effect intentionally and willfully and without excuse or just cause and with actual malice to make it appear that Jason committed criminal offenses in a vain effort to justify the illegal actions by the law enforcement officers that led to the SWAT team shooting Jason on December 13, 2022.

519. Sgt. Dore and Deputy Frye and their CCSD Supervisors had an ulterior purpose in bringing the criminal charges against Jason. They wanted to fool the public, the SBI, and the Court system and to make it appear to anyone investigating their illegal shooting of Jason that Jason had committed criminal wrongdoing which would have justified them shooting him. In fact, Jason committed no criminal act

leading to the SWAT team illegally shooting Jason on December 13, 2022.

520. After the criminal process was issued against Jason, Sgt. Dore and Deputy Frye and their CCSD Supervisors intentionally publicized and broadcast the false criminal charges against Jason to fool the public and to make it appear to anyone investigating their illegal shooting of Jason that Jason had committed criminal wrongdoing which would have justified them shooting him. Sheriff Smith and Darryl Brown published it in the first press release from December 13, 2022. Several news media outlets included that information in their published stories about the events.

521. Sgt. Dore and Deputy Frye and their CCSD Supervisors intentionally publicized, broadcast, and promoted the criminal charges against Jason to gain advantage in any civil proceeding that might be brought by Jason against them and to insulate themselves from the criminal charges that could have been pursued against them for their actions arising out of the SWAT team shooting Jason on December 13, 2022.

522. As a direct and proximate result of abuse of process by Sgt. Dore and Deputy Frye and their CCSD Supervisors, Jason is entitled to recover compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of seventy-five thousand dollars ($75,000.00).

523. Furthermore, as a direct and proximate result of abuse of process by Sgt. Dore and Deputy Frye and their CCSD Supervisors, Jason is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from Sgt. Dore and Deputy Frye and each of their CCSD supervisors in an amount in excess of seventy-

five thousand dollars ($75,000.00) to punish these Defendants for their illegal, reprehensible, egregiously wrongful, reckless and willful misconduct and to both ensure that these Defendants will never repeat this shameful and wanton conduct ever again and also to deter others from engaging in similar conduct in the future.

**COUNT 6:  MALICIOUS PROSECUTION: CCSD, SHERIFF SMITH, CHIEF DEPUTY JACOBS, CPT. WILLIAMS, LT. TEASDALE, LT. MORGAN, LT. PAYNE, SGT. DORE, SGT. WILLIAMS, and DEP. FRY.**
**(in their Official and Individual Capacities)**

524.  The allegations in the Paragraphs above are incorporated by reference.

525.  After the CCSD and the SWAT team committed the wrongful conduct alleged above, including, but not limited to, shooting Jason, Deputy Frye was instructed by his CCSD Supervisors to charge Jason with communicating threats to Ms. Floyd.

526.  Upon information and belief, Deputy Frye, acting on instructions from his CCSD Supervisors appeared before a Magistrate on December 13, 2022 and swore under oath that "Jason Kloepfer threatened to physically injure the person of Emily Floyd on December 13, 2022" and that "such threat was communicated to Emily Floyd by stating that he was going to kill the neighbors and the threat was made in a manner and under circumstances which would cause a reasonable person to believe that the threat was likely to be carried out and the person threatened believed that the threat would be carried out."

527.  At the time Deputy Frye appeared before the Magistrate on December 13, Deputy Frye and his CCSD supervisors, including Sheriff Smith, knew or reasonably should have known the following facts:

a.     Deputy Erickson had personally viewed the video and audio allegedly taken by Ms. Floyd on December 12, and was aware that such audio and video did not corroborate Ms. Floyd's statements in her call to 911 dispatch. No evidence existed to suggest that Jason had threatened to kill her, or any other of the far-flung neighbors, nor had he threatened to harm any law enforcement officers;

b.     Jason had no direct contact with Ms. Floyd on December 12, and communicated no threats to her;

c.     No facts existed to support the assertion that Ms. Floyd, or anyone else who lived far away from the Property in the neighborhood, could possibly, much less reasonably, believe that Jason had made any such threats, or even if someone could have interpreted anything that they heard as a threat, that Jason had any intention or capacity to carry it out;

d.     The SWAT team members shot Jason as he walked out of the door of his home with his hands up in the air while he was unarmed;

e.     No law enforcement officer made any effort prior to the SWAT team shooting Jason to obtain any arrest warrant against Jason for Communicating Threats or Resisting an officer in the performance of his duties.

528.   At the time Deputy Frye appeared before the Magistrate on

December 13, and Deputy Frye and his CCSD supervisors obtained this arrest warrant against Jason, they acted with malice, and knew it was an illegal and improper action.

529. Upon information and belief, after the CCSD and the SWAT team committed the wrongful conduct alleged above, including, but not limited to, shooting Jason, Sgt. Dore was instructed by his CCSD supervisors to charge Jason with Resisting a Public Officer.

530. Upon information and belief, Sgt. Dore, acting on instructions from his CCSD supervisors, appeared before a Magistrate on December 13, and swore under oath that on December 13, Jason "unlawfully and willfully did resist, delay, and obstruct Sgt. Dore, a public officer holding the office of Cherokee County Sheriff, by refusing to comply with orders given to Jason, At the time, the officer was discharging and attempting to discharge an official duty by while investigating a disturbance call located at Kloepfer's residence."

531. At the time Sgt. Dore appeared before the Magistrate on December 13, Sgt. Dore and his CCSD supervisors knew or reasonably should have known the following facts:

      a.    The CCSD and SWAT team had no lawful right to be on the Property on December 12 or 13, 2022;

      b.    Jason and Ali were asleep in the home until the SWAT team broke into their home and threw an uninvited, unauthorized robot drone inside on December 13;

c. After the illegal drone robot woke him up, Jason immediately complied with the commands of Sgt. Dore and walked out of the door of his home with his hands up, and for no good reason, SWAT team members shot Jason as soon as he walked out of the door of his home, unarmed, with his hands held up high in the air;

d. No law enforcement officer made any effort prior to the SWAT team shooting Jason to obtain any arrest warrant against Jason for Communicating Threats or Resisting a Public Officer.

532. At the time Sgt. Dore appeared before the Magistrate on December 13, and Deputy Frye and his CCSD supervisors obtained this arrest warrant against Jason, they acted with malice, and knew it was an illegal and improper action.

533. On December 20, 2022, CCSD deputies arrested Jason at the CCSD Jail in Murphy as soon as Jason got released from his week-long stay at the hospital. They served Jason with the arrest warrants for Communicating Threats and for Resisting a Public Officer and gave him an unsecured bond.

534. On March 1, 2023, Assistant District Attorney Jason Arnold dismissed the charges against Jason for Communicating Threats and Resisting a Public Officer without ever trying the case to a judge or jury.

535. No facts or circumstances existed at the time that Sgt. Dore and Deputy Frye instituted criminal charges against Jason that a reasonable person would believe justified prosecuting Jason for either crimes they charged him with.

536. Nonetheless, Sgt. Dore and Deputy Frye and their CCSD Supervisors

kept the charges in effect against Jason from December 13, 2022 until March 1, 2023, knowing no probable cause ever existed for such charges.

537. Upon information and belief, Defendants instituted the criminal charges against Jason and continued them in effect intentionally and willfully and without excuse or just cause and with actual malice until they were dismissed by Assistant District Attorney Jason Arnold to make it appear that Jason committed criminal offenses justify and cover up the CCSD and EBCIPD officers illegally shooting him on December 13.

538. After the criminal process was issued against Jason, Sgt. Dore and Deputy Frye and their CCSD Supervisors intentionally publicized and broadcast the false criminal charges against Jason to fool the public and to make it appear to anyone investigating their illegal shooting of Jason that Jason had committed criminal wrongdoing which would have justified them shooting him. Sheriff Smith and Darryl Brown published it in the first press release from December 13, 2022. Several news media outlets included that information in their published stories about the events.

539. Sgt. Dore and Deputy Frye and their CCSD Supervisors intentionally publicized, broadcast, and promoted the criminal charges against Jason to gain advantage in any civil proceeding that might be brought by Jason against them and to insulate themselves from the criminal charges that could have been pursued against them for their actions arising out of the SWAT team shooting Jason on December 13, 2022.

540. As a direct and proximate result of malicious prosecution by Sgt. Dore

and Deputy Frye and their CCSD Supervisors, Jason is entitled to recover compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of seventy-five thousand dollars ($75,000.00).

541.    Furthermore, as a direct and proximate result of malicious prosecution by Sgt. Dore and Deputy Frye and their CCSD Supervisors, Jason is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from Sgt. Dore and Deputy Frye and each of their CCSD supervisors in an amount in excess of seventy-five thousand dollars ($75,000.00) to punish these Defendants for their illegal, reprehensible, egregiously wrongful, reckless and willful misconduct and to both ensure that these Defendants will never repeat this shameful and wanton conduct ever again and also to deter others from engaging in similar conduct in the future.

**COUNT 7: UNLAWFUL DETENTION: CCSD, SHERIFF SMITH, CHIEF DEPUTY JACOBS, CPT. WILLIAMS, LT. TEASDALE, LT. MORGAN, LT. PAYNE, SGT. DORE, SGT. WILLIAMS, DET. QUEEN, DEP. STILES, DEP. GRAY, DEP. HALL, DEP. LATULIPE, DEP. ERICKSON, and DEP. FRY (in their Official and Individual Capacities)**

542.    The allegations in the Paragraphs above are incorporated by reference.

543.    The CCSD Defendants did not arrest and detain Ali, as alleged above, pursuant to an arrest with a valid warrant. They never got an arrest warrant for Ali, and she never committed any crime that could have justified such an arrest warrant.

544.    The CCSD Defendants did not arrest and detain Ali, as alleged above, pursuant to an arrest without an arrest warrant for a misdemeanor offense committed in the officer's presence. She never committed any misdemeanor offense

at all. In fact, Ali was the supposed hostage in the CCSD Defendants' fantastic tale of what transpired over the course of December 12 into the early morning of December 13, 2022, even though none of them laid eyes on neither hide nor hair of Ali until the SWAT team started shooting at her hours later.

545. The CCSD Defendants did not arrest and detain Ali, as alleged above, pursuant to an arrest for a felony committed outside the officer's presence. She never committed any felony and they never thought she did.

546. The CCSD Defendants' arrest and detention of Ali was willful, intentional, and against her will. She told them this when they handcuffed her and forced her to stay barefoot in the cold back seat of the patrol car while Jason cried out for her as she thought he was dying.

547. As a direct and proximate result of the CCSD Defendants' unlawful, willful, and intentional arrest and detention of Ali, against her will, Ali was frightened, humiliated, deprived of access to Jason who the SWAT team had been critically wounded and sounded like he was dying.

548. The CCSD Defendants had no probable cause to believe that Ali had committed any crime justifying her arrest and detention described above.

549. The CCSD Defendants' actions alleged above were willful, intentional, oppressive, insulting, wanton, and malicious, and upon information and belief, were meant to retaliate against Ali for the support and love she showed for Jason after they wrongfully shot him.

550. The CCSD Defendants' actions described above constitute false

imprisonment under North Carolina law.

551.    As a direct and proximate result of the actions of Defendants described above, Ali has undergone mental pain and suffering and suffers from mental health issues, including anxiety and post-traumatic stress disorder.

552.    As a direct and proximate result of false imprisonment by CCSD Defendants, Ali is entitled to recover compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of seventy-five thousand dollars ($75,000.00).

553.    Furthermore, as a direct and proximate result of false imprisonment by CCSD Defendants, Ali is entitled recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from CCSD Defendants in an amount in excess of seventy-five thousand dollars ($75,000.00) to punish these Defendants for their illegal, reprehensible, egregiously wrongful, reckless and willful misconduct and to both ensure that these Defendants will never repeat this shameful and wanton conduct ever again and also to deter others from engaging in similar conduct in the future.

## COUNT 8: DEFAMATION: CCSD, SHERIFF SMITH, AND DARRELL BROWN.
### (in their Official and Individual Capacities)

554.    The allegations in the Paragraphs above are incorporated by reference.

555.    On December 13, Darryl Brown prepared a press release at the request of Sheriff Smith.

556.    Sheriff Smith approved of the press release and adopted and ratified its contents.

557.  Mr. Brown and Sheriff Smith authorized the publication of such press release in local news media outlets, including the Cherokee Scout Newspaper in Murphy, North Carolina.

558.  At Mr. Brown's and Sheriff Smith's direction, the CCSD sent the press release to several media outlets and published on the CCSD Facebook page where it has been seen by many thousands and millions of people.

559.  Mr. Brown and Sheriff Smith said "Recognizing there was an armed suspect present and the potential for a hostage situation, CCSD obtained a search warrant and requested assistance from EBCIPD SWAT.  The suspected shooter engaged in a verbal altercation with officers and emerged from a camper trailer and confronted officers. Members of the SWAT team fired upon the suspect and wounded him. … After consultation with the DA, Jason has been charged with Communicating Threats and Resist, Obstruct, and Delay. The matter remains under investigation and more charges may follow."

560.  The press release contains several false and untruthful statements and innuendo concerning the CCSD and SWAT team's shooting of Jason at the Property on December 13, 2022, including:

> a.  "there was an armed suspect present and the potential for a hostage situation:" that was demonstrably false, and they knew or should have known it before they published this defamatory lie;
>
> b.  "the suspected shooter engaged in a verbal altercation with

officers and emerged from a camper trailer and confronted officers:" that was demonstrably false, and they knew or should have known it before they published this defamatory lie;

c.      "Members of the SWAT team fired upon the suspect and wounded him:" that was at least a gross misinterpretation and attempt to minimize the reality of the SWAT team shooting 2 unarmed citizens who complied with police commands, and they knew or should have known it before they published this defamatory statement; and

d.      "Jason has been charged with Communicating Threats and Resist, Obstruct, and Delay:" that was at least a gross misinterpretation and attempt to cover up the reality of the illegal actions by the CCSD and EBCIPD, and they knew or should have known it before they published this defamatory statement; and

e.      "the matter remains under investigation and more charges may follow:" that was at least a gross misinterpretation and attempt to cover up the reality of the illegal actions by the CCSD and EBCIPD, the only investigation going on after the attempted murder was the SBI investigation of CCSD and the SWAT team, and they knew or should have known it before they published this defamatory statement.

561. At the time Sheriff Smith and Mr. Brown prepared the press release and the CCSD published it, they knew the above statements were false or failed to exercise ordinary care in order to determine whether the statements were false.

562. As a direct and proximate result of the defamation and publication of the defamatory statements by Sheriff Smith, the CCSD, and Mr. Brown, Jason has suffered damage to his reputation in the community in which he lives, and all over the world where these false slanders have been seen by millions of people, and he has undergone mental pain and suffering as a result of being wrongfully accused of criminal acts. As such, Jason is entitled to recover compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of seventy-five thousand dollars ($75,000.00).

563. Furthermore, as a direct and proximate result of the defamation and publication of the defamatory statements by Sheriff Smith, the CCSD, and Mr. Brown, Jason is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from Sheriff Smith, the CCSD, and Mr. Brown in an amount in excess of seventy-five thousand dollars ($75,000.00) to punish these Defendants for their illegal, reprehensible, egregiously wrongful, reckless and willful misconduct and to both ensure that these Defendants will never repeat this shameful and wanton conduct ever again and also to deter others from engaging in similar conduct in the future.

**COUNT 9: INTRUSION AND INVASION OF PRIVACY: CCSD, SHERIFF SMITH, CHIEF DEPUTY JACOBS, CPT. WILLIAMS, LT. TEASDALE, LT. MORGAN, LT. PAYNE, SGT. DORE, SGT. WILLIAMS, DET. QUEEN, DEP. STILES, DEP. GRAY, DEP. HALL, DEP. LATULIPE, DEP. ERICKSON, and DEP. FRY.**

**(in their Official and Individual Capacities)**

564. The allegations in the Paragraphs above are incorporated by reference.

565. The CCSD Defendants unlawfully intruded upon and invaded the privacy of Jason and Ali by:

    a.    Entering the Property and approaching the home Ali and Jason occupied without permission and repeatedly knocking on the door for several hours without announcing who they were or what their purpose was in being at the Property;

    b.    Entering to the Property and remaining on it for more than 6 hours without lawful authority or permission;

    c.    Repeatedly looking into the windows of the home and garage without lawful authority over more than 6 hours;

    d.    Entering the garage without any just cause, permission, authority, or excuse prior to obtaining any search warrant;

    e.    Disabling and rendering inoperative the surveillance cameras on the Property to prevent Jason and Ali from observing their activities on the Property prior to obtaining any legal process whatsoever;

    f.    Opening the door of the home without lawful authority and without just cause or excuse while Jason and Ali slept inside; and

g. Tossing in a drone robot that transmitted live stream audio and video of their intimate quarters into Jason and Ali's home as they slept, unaware, in the bedroom while the drone recorded the inside.

566. CCSD Defendants' invasion and intrusion of Plaintiffs' peace of mind and privacy was willful, intentional, and without just cause.

567. A reasonable person, under the same or similar circumstances, would be highly offended by CCSD Defendants' invasion and intrusion against Jason and Ali.

568. As a direct and proximate result of the CCSD Defendants' invasion and intrusion of Jason and Ali's privacy as alleged above, they suffered painful physical injuries and terrifying, preventable, and totally unnecessary mental anguish and emotional distress from this near-death event while peacefully sleeping in their own home on their own property at 4:57 a.m. They have suffered a complete loss of a normal life as they knew it before these invasion and intrusion. Consequently, Jason and Ali are entitled to recover from each of these CCSD Defendants, in their individual and official capacities, compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of seventy-five thousand dollars ($75,000.00).

569. Furthermore, Jason and Ali are entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from each of these CCSD Defendants, in their individual and official capacities, in an amount in excess of seventy-five thousand dollars ($75,000.00), to punish these Defendants for their illegal,

149

reprehensible, unconstitutional, egregiously wrongful, reckless and willful misconduct causing an improper invasion and intrusion of Jason and Ali's privacy as alleged above and to both ensure that these Defendants will never repeat this shameful and wanton conduct ever again and also to deter others from engaging in similar conduct in the future.

**COUNT 10: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS: CCSD, SHERIFF SMITH, CHIEF DEPUTY JACOBS, CPT. WILLIAMS, LT. TEASDALE, LT. MORGAN, LT. PAYNE, SGT. DORE, SGT. WILLIAMS, DET. QUEEN, DEP. STILES, DEP. GRAY, DEP. HALL, DEP. LATULIPE, DEP. ERICKSON, and DEP. FRY.**
**(in their Official and Individual Capacities)**

570. The allegations in the Paragraphs above are incorporated by reference.

571. CCSD Defendants had a duty to Jason and Ali to use ordinary care in the performance of their duties as law enforcement officers.

572. By their conduct alleged above, CCSD Defendants breached their duty to use ordinary care in the performance of their duties as law enforcement officers and were negligent, negligent per se, and grossly negligent.

573. It was reasonably foreseeable to CCSD Defendants that such negligence would cause Jason and Ali severe emotional distress.

574. Ali and Jason suffered severe emotional distress as a direct and proximate result of the negligence of the Defendants alleged above.

575. Ali is presently receiving mental health treatment as a result of the experience she went through on December 13, and suffers from the diagnosed mental health conditions including anxiety and post-traumatic stress disorder. She also suffers from difficulty sleeping in a manner as she could before these events where

Jason was shot in her arms and then she was kept from him as she thought he was dying for hours on December 13, 2022.

576. Jason has experienced physical trauma which has led to mental and emotional suffering. He suffers from extreme anxiety that has caused extreme agitation since being gunned down in his home and has great difficulty sleeping or maintaining any sense of calm or concentration as a result of being shot and nearly dying on December 13, 2022.

577. As a direct and proximate result of the CCSD Defendants' negligent infliction of emotional distress on Jason and Ali as alleged above, they suffered painful and terrifying, preventable, and totally unnecessary mental anguish and emotional distress from this near-death event while peacefully sleeping in their own home on their own property at 4:57 a.m. They have suffered a complete loss of a normal life as they knew it before this negligent infliction of emotional distress. Consequently, Jason and Ali are entitled to recover from each CCSD Defendant, in their individual and official capacities, compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of seventy-five thousand dollars ($75,000.00).

578. Furthermore, Jason and Ali are entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from each CCSD Defendant, in their individual and official capacities, in an amount in excess of seventy-five thousand dollars ($75,000.00), to punish CCSD Defendants for their illegal, reprehensible, unconstitutional, egregiously wrongful, reckless and willful misconduct causing an

improper infliction of emotional distress on Jason and Ali as alleged above and to both ensure that CCSD Defendants will never repeat this shameful and wanton conduct ever again and also to deter others from engaging in similar conduct in the future.

**COUNT 11: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS: CCSD, SHERIFF SMITH, CHIEF DEPUTY JACOBS, CPT. WILLIAMS, LT. TEASDALE, LT. MORGAN, LT. PAYNE, SGT. DORE, SGT. WILLIAMS, DET. QUEEN, DEP. STILES, DEP. GRAY, DEP. HALL, DEP. LATULIPE, DEP. ERICKSON, and DEP. FRY.**
**(in their Official and Individual Capacities)**

579. The allegations in the Paragraphs above are incorporated by reference.

580. The conduct of CCSD Defendants constitute extreme and outrageous conduct, which was intended to cause, and did cause, Jason and Ali severe emotional distress.

581. CCSD Defendants' conduct was recklessly indifferent to the likelihood that Jason and Ali would suffer severe emotional distress as a result of their conduct, including watching her loved one, Jason, who was unarmed, being shot multiple times and not being able to care for him; and for Jason, being shot but then knowing how much he needed to comfort Ali because he could hear her crying out but they would not let him even see her before taking him away.

582. As a direct and proximate result of the CCSD Defendants' intentional infliction of emotional distress on Jason and Ali as alleged above, they suffered painful and terrifying, preventable, and totally unnecessary mental anguish and emotional distress from this near-death event while peacefully sleeping in their own home on their own property at 4:57 a.m. They have suffered a complete loss of a

normal life as they knew it before this intentional infliction of emotional distress. Consequently, Jason and Ali are entitled to recover from each of these CCSD Defendants, in their individual and official capacities, compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of seventy-five thousand dollars ($75,000.00).

583.    Furthermore, Jason and Ali are entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from each of these CCSD Defendants, in their individual and official capacities, in an amount in excess of seventy-five thousand dollars ($75,000.00), to punish these Defendants for their illegal, reprehensible, unconstitutional, egregiously wrongful, reckless and willful misconduct causing an improper infliction of emotional distress on Jason and Ali as alleged above and to both ensure that these Defendants will never repeat this shameful and wanton conduct ever again and also to deter others from engaging in similar conduct in the future.

## COUNT 12:  NEGLIGENT HIRING SUPERVISION RETENTION BY CCSD, SHERIFF SMITH, CHIEF DEPUTY JACOBS, CPT. WILLIAMS, LT. TEASDALE, LT. MORGAN, LT. PAYNE, SGT. DORE, SGT. WILLIAMS. (in their Official and Individual Capacities)

584.    The allegations in the Paragraphs above are incorporated by reference.

585.    At all relevant times, Sheriff Smith was the duly elected Sheriff of Cherokee County and was in charge of running the CCSD. As the elected Sheriff, Sheriff Smith had the final say in all management and organizational decisions. This included all hiring and firing decisions and ensuring that deputies and other CCSD officers, agents, and employees complied with CCSD policies and procedures.

586. Sheriff Smith owed a duty to all citizens to create and maintain a safe working environment free from illegal searches and seizures or deadly use of force that violated CCSD policies, North Carolina and federal laws, and the North Carolina and United States Constitutions.

587. Sheriff Smith breached this duty by his negligent, grossly negligent, or reckless or willful and wanton acts and omissions in one or more of the following ways:

    a. Hiring all of the CCSD deputies, officers, employees and agents who acted negligently and grossly negligently and in the ways described above to violate Plaintiffs' rights for hours on December 12 and 13, 2022, without justification or authority, culminating in the attempted murder of Jason and Ali by the SWAT team around 4:57 am, December 13;

    b. Failing to properly supervise the CCSD deputies, officers, employees and agents which led to them violating the applicable standards, policies, procedures, and protocols, the laws of North Carolina and the United States, and the North Carolina and United States Constitutions, and common decency by invading and occupying Plaintiffs' Property for hours on December 12 and 13, 2022, without justification or authority, culminating in the attempted murder of Jason and Ali by the SWAT team around 4:57 a.m., December 13;

c.     Failing to ensure those CCSD deputies, officers, employees and agents were properly trained on and regularly applied the applicable standards, policies, procedures, and protocols, the laws of North Carolina and the United States, and the North Carolina and United States Constitutions at issue;

d.     Retaining the CCSD deputies, officers, employees and agents after they overtly violated the applicable standards, policies, procedures, and protocols, which led to them violating the applicable standards, policies, procedures, and protocols, the laws of North Carolina and the United States, and the North Carolina and United States Constitutions, and common decency by shooting Jason around 4:57 a.m., December 13;

e.     Failing to report and investigate the CCSD deputies, officers, employees and agents after they overtly violated the applicable standards, policies, procedures, and protocols, which led to them violating the applicable standards, policies, procedures, and protocols, the laws of North Carolina and the United States, and the North Carolina and United States Constitutions, and common decency by shooting Jason around 4:57 a.m., December 13;

f.     Ratifying and endorsing the overt violations of the applicable standards, policies, procedures, and protocols, which led to them violating the applicable standards, policies, procedures, and

protocols, the laws of North Carolina and the United States, and the North Carolina and United States Constitutions, and common decency by the CCSD deputies, officers, employees and agents when they tried to cover up the illegal shooting of Jason around 4:57 a.m., December 13;

g.    Failing to use that degree of care that an ordinary and prudent supervisor would have used under the same or similar circumstances; and

h.    Any additional acts and omissions that may be further developed in discovery and proved at trial.

588.   The CCSD Supervisors similarly engaged in the same type of failures for their subordinates who they hired, trained, retained, and supervised which amounts to the same type of negligent hiring, training, supervision, and retention violations as committed by Sheriff Smith.

589.   Sheriff Smith's and the CCSD Supervisors' conduct and failures related to the negligent hiring, training, supervision, and retention of the CCSD deputies, officers, employees and agents were a direct and proximate cause of the damages and injuries Plaintiffs suffered because he allowed the SWAT team to use unauthorized and unconstitutional deadly force to attack Plaintiffs.

590.   All of this conduct and these failures related to the negligent hiring, training, supervision, and retention by Sheriff Smith and the CCSD Supervisors include the actions of the EBCIPD and its SWAT team because Sheriff Smith brought

them into Cherokee County and assumed responsibility for their actions pursuant to the MAA and otherwise (even though the MAA was not valid as to the EBCI because an unauthorized person signed it who lacked any authority to bind the EBCI).

591. As a direct and proximate result of the Sheriff Smith's and the CCSD Supervisors' conduct and failures related to the negligent hiring, training, supervision, and retention of the CCSD deputies, officers, employees and agents as alleged above, Jason and Ali suffered painful and terrifying, preventable, and totally unnecessary physical harm, mental anguish and emotional distress, and property damage from this near-death event while peacefully sleeping in their own home on their own property at 4:57 a.m. They have suffered a complete loss of a normal life as they knew it before this negligence. Consequently, Jason and Ali are entitled to recover from each of these CCSD Supervisors Defendants, in their individual and official capacities, compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of seventy-five thousand dollars ($75,000.00).

592. Furthermore, Jason and Ali are entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from each of these CCSD Supervisors Defendants, in their individual and official capacities, in an amount in excess of seventy-five thousand dollars ($75,000.00), to punish these Defendants for their illegal, reprehensible, unconstitutional, egregiously wrongful, reckless and willful misconduct causing an improper harm, injury, damage, and emotional distress on Jason and Ali as alleged above and to both ensure that these Defendants will never repeat this shameful and wanton conduct ever again and also to deter others from

engaging in similar conduct in the future.

**COUNT 13: TRESPASS: CCSD, SHERIFF SMITH, CHIEF DEPUTY JACOBS, CPT. WILLIAMS, LT. TEASDALE, LT. MORGAN, LT. PAYNE, SGT. DORE, SGT. WILLIAMS, DET. QUEEN, DEP. STILES, DEP. GRAY, DEP. HALL, DEP. LATULIPE, DEP. ERICKSON, DEP. FRY, EBCI, ASSISTANT CHIEF TAYLOR, LT. DET. NEADEAU, LT. FERGUSON, SWAT COMMANDER BUTTERY, DET. SGT. RAMIREZ, SGT. SMITH, DET. WOLFE, DET. MCKINNEY, OFCR. MESSER, OFCR. SAMPSON, and OFCR. HARRIS. (in their Official and Individual Capacities)**

593. The allegations in the Paragraphs above are incorporated by reference.

594. At all relevant times, Jason and Ali rightfully and legally possessed the Property and had a legal right to be in their home and left alone.

595. At all relevant times, CCSD Defendants and Assistant Chief Taylor, Lt. Det. Neadeau, Lt. Ferguson, Swat Commander Buttery, Det. Sgt. Ramirez, Sgt. Smith ("EBCIPD Supervisors"), and Det. Wolfe, Det. Mckinney, Ofcr. Messer, Ofcr. Sampson, and Ofcr. Harris ("EBCIPD") unlawfully entered on Jason and Ali's Property and remained without any legal right for hours until they shot at Jason and Ali, striking Jason twice.

596. These unlawful acts constitute a trespass that, as described above, resulted in damages and harm to Jason and Ali.

597. As a direct and proximate result of Defendants' conduct and actions related to this trespass as alleged above, Jason and Ali suffered painful and terrifying, preventable, and totally unnecessary physical harm, mental anguish and emotional distress, and property damage from this near-death event while peacefully sleeping in their own home on their own property at 4:57 a.m. They have suffered a complete loss of a normal life as they knew it before this conspiracy. Consequently,

Jason and Ali are entitled to recover from each Defendant, in their individual and official capacities, compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of seventy-five thousand dollars ($75,000.00).

598. Furthermore, Jason and Ali are entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from each Defendant, in their individual and official capacities, in an amount in excess of seventy-five thousand dollars ($75,000.00), to punish Defendants for their illegal, reprehensible, unconstitutional, egregiously wrongful, reckless and willful misconduct causing an improper harm, injury, damage, and emotional distress on Jason and Ali as alleged above and to both ensure that these Defendants will never repeat this shameful and wanton conduct ever again and also to deter others from engaging in similar conduct in the future.

**COUNT 14: CIVIL CONSPIRACY ENDORSED AND RATIFIED AFTER THE FACT: CCSD, SHERIFF SMITH, CHIEF DEPUTY JACOBS, CPT. WILLIAMS, LT. TEASDALE, LT. MORGAN, LT. PAYNE, SGT. DORE, SGT. WILLIAMS, DET. QUEEN, DEP. STILES, DEP. GRAY, DEP. HALL, DEP. LATULIPE, DEP. ERICKSON, DEP. FRY, EBCI, CHIEF NEADEAU, ASSISTANT CHIEF TAYLOR, LT. DET. NEADEAU, LT. FERGUSON, SWAT COMMANDER BUTTERY, DET. SGT. RAMIREZ, SGT. SMITH, DET. WOLFE, DET. MCKINNEY, OFCR. MESSER, OFCR. SAMPSON, and OFCR. HARRIS.**
**(in their Official and Individual Capacities)**

599. The allegations in the Paragraphs above are incorporated by reference.

600. At all relevant times, CCSD Defendants and EBCIPD Defendants agreed either during the commission of these unlawful violations of Jason and Ali's state and federal rights under these various constitutional provisions and laws described throughout this Complaint, or after the fact during the ratification and cover up phase, to engage in unlawful conduct and perform unlawful acts to directly

159

harm or indirectly cover up and obfuscate the violations to Jason and Ali.

601. These unlawful acts constitute a civil conspiracy that, separate and apart from the individual claims described throughout this Complaint, caused harm to Jason and Ali.

602. As a direct and proximate result of Defendants' conduct and actions related to conspiracy as alleged above, Jason and Ali suffered painful and terrifying, preventable, and totally unnecessary physical harm, mental anguish and emotional distress, and property damage from this near-death event while peacefully sleeping in their own home on their own property at 4:57 a.m. They have suffered a complete loss of a normal life as they knew it before this conspiracy. Consequently, Jason and Ali are entitled to recover from each Defendant, in their individual and official capacities, compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of seventy-five thousand dollars ($75,000.00).

603. Furthermore, Jason and Ali are entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from each Defendant, in their individual and official capacities, in an amount in excess of seventy-five thousand dollars ($75,000.00), to punish Defendants for their illegal, reprehensible, unconstitutional, egregiously wrongful, reckless and willful misconduct causing an improper harm, injury, damage, and emotional distress on Jason and Ali as alleged above and to both ensure that these Defendants will never repeat this shameful and wanton conduct ever again and also to deter others from engaging in similar conduct in the future.

**COUNT 15: ASSAULT AND BATTERY BY EXCESSIVE USE OF FORCE: CCSD, SHERIFF SMITH, CHIEF DEPUTY JACOBS, CPT. WILLIAMS, LT. TEASDALE, LT. MORGAN, LT. PAYNE, SGT. DORE, SGT. WILLIAMS, DET. QUEEN, EBCI, CHIEF NEADEAU, ASSISTANT CHIEF TAYLOR, LT. DET. NEADEAU, LT. FERGUSON, SWAT COMMANDER BUTTERY, DET. SGT. RAMIREZ, SGT. SMITH, DET. WOLFE, DET. MCKINNEY, OFCR. MESSER, and OFCR. HARRIS.**
**(in their Official and Individual Capacities)**

604.    The allegations in the Paragraphs above are incorporated by reference.

605.    Upon information and belief, on December 13, Lt. Ferguson and Officers Messer and Harris (and perhaps other members of the EBCIPD yet undetermined), willfully and intentionally fired multiple rifle shots at Jason striking him in the chest and left arm, inflicting severe physical pain and suffering on Jason.

606.    Lt. Ferguson and Officers Messer and Harris shot Jason during an alleged attempt to serve an illegal search warrant that lacked probable cause and was not subject to a proper knock and announcement, or in an attempt to effect an unlawful arrest of Jason.

607.    At the time Lt. Ferguson and Officers Messer and Harris shot Jason, Jason was following the commands of Sgt. Dore to come out of the camper trailer with his hands up. He had his hands high in the air up above his head.

608.    At the time Lt. Ferguson and Officers Messer and Harris shot Jason, he was not actively resisting arrest or attempting to escape anyone, and he made no threatening movements towards any officers.

609.    At the time Lt. Ferguson and Officers Messer and Harris shot Jason, he was unarmed.

610.    At the time Lt. Ferguson and Officers Messer and Harris shot Jason, he

posed no immediate threat to the safety of the officers or others. They had seen both Jason and Ali wake up from and emerge from the same bed in no apparent distress or conflict, so it was impossible for them to think any make believe hostage situation persisted.

611.     At the time Lt. Ferguson and Officers Messer and Harris shot Jason, they endangered the life of Ali, the other occupant of the home, by firing multiple shots blindly into the occupied home. They had no ability to see into the home and know where the occupants were or where their bullets were striking in relation to the occupants. They even continued to shoot aimlessly into the occupied dwelling after they shot Jason and he fell backwards while Ali pulled him back into the home. This is a serious felony prosecuted frequently around the State and leading convicted criminal defendants to spend years in prison.

612.     Lt. Ferguson and Officers Messer and Harris actions constituted assault and battery in violation of North Carolina Law.

613.     CCSD Supervisors and EBCIPD Supervisors are responsible for Lt. Ferguson and Officers Messer and Harris assault and battery as they supervised and controlled those officers' actions. Furthermore, CCSD Supervisors and EBCIPD Supervisors are responsible for Lt. Ferguson and Officers Messer and Harris assault and battery as they ratified and endorsed those officers' actions after the fact, to include actively attempting to minimize and cover up and evade responsibility for that assault and battery.

614.     As a direct and proximate result of Lt. Ferguson and Officers Messer

and Harris assault and battery and the CCSD Supervisors and EBCIPD Supervisors conduct and failures related to the assault and battery of Jason as alleged above, Jason suffered painful and terrifying, preventable, and totally unnecessary physical harm, mental anguish and emotional distress, and property damage from this near-death event. He has suffered a complete loss of a normal life as he knew it before this assault and battery. Consequently, Jason is entitled to recover from each of Lt. Ferguson and Officers Messer and Harris and the CCSD Supervisors and EBCIPD Supervisors, in their individual and official capacities, compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of seventy-five thousand dollars ($75,000.00).

615.    Furthermore, Jason is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from each of Lt. Ferguson and Officers Messer and Harris and the CCSD Supervisors and EBCIPD Supervisors, in their individual and official capacities, in an amount in excess of seventy-five thousand dollars ($75,000.00), to punish these Defendants for their illegal, reprehensible, unconstitutional, egregiously wrongful, reckless and willful misconduct causing an improper harm, injury, damage, and emotional distress on Jason and Ali as alleged above and to both ensure that these Defendants will never repeat this shameful and wanton conduct ever again and also to deter others from engaging in similar conduct in the future.

## COUNT 16: VIOLATION OF 42 U.S.C. §1983 EBCI, CHIEF NEADEAU, ASSISTANT CHIEF TAYLOR, LT. DET. NEADEAU, LT. FERGUSON, SWAT COMMANDER BUTTERY, DET. SGT. RAMIREZ, SGT. SMITH, DET. WOLFE, DET. MCKINNEY, OFCR. MESSER, and OFCR. HARRIS.
### (in their Official and Individual Capacities)

616.    The allegations in the Paragraphs above are incorporated by reference.

617.    The Federal Civil Rights Act, 42 U.S.C. § 1983, imposes civil liability upon every person who, under color of law, deprives another of rights secured by the Constitution and laws of the United States.  42 U.S.C. § 1983.

618.    At all relevant times, EBCIPD Defendants acted under color of state law conducting law enforcement duties in Cherokee County with Sheriff Smith's invitation pursuant to state law and the North Carolina Constitution.

619.    The use of deadly force is a seizure subject to the Fourth Amendment. Firing a gun at someone is always deadly force. It makes no difference if the intent of the law enforcement officer was merely to frighten or wound. Once the weapon is discharged, the law enforcement officer has used deadly force. The Fourth Amendment permits the use of deadly force only when a law enforcement officer has probable cause to believe that a suspect poses a threat of serious physical harm, either to the law enforcement officer or to others. Three factors generally inform this analysis: (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the safety of the law enforcement officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest. The focus should be placed on the totality of the circumstances based on the information available to the law enforcement officer immediately prior to and at the very moment he shoots his gun.

620. At all relevant times on December 13, 2022, Jason had committed no crime, posed no threat, immediate or otherwise, to the safety of any law enforcement officer or other person, and were not resisting arrest or attempting to evade arrest. No law enforcement officer present thought or could have reasonably suspected that Jason and Ali committed any crimes at all, much less that there was a hostage situation. Jason and Ali had committed no crimes at all, and certainly not during the six hours that law enforcement officers had seized and occupied the Property. Jason and Ali complied with law enforcement officers' instructions to come outside with their hands up in the air. Jason did not make any movement that could possibly have been interpreted as a threat to the law enforcement officers or give any indication that he posed any threat to the law enforcement officers when he walked out of his front door with his hands up in the air as instructed before they shot him. Certainly Ali never made any type of threatening move to justify shooting at her. Jason and Ali did not resist arrest or communicate any threats when they complied with law enforcement officers' instructions to come outside with their hands up. No law enforcement officer present could have reasonably held any belief or suspicion that Jason and Ali posed a threat when Jason walked out of the door with his hands held high above his head and Ali stood directly behind him with her hands held high, too.

621. At all relevant times, EBCIPD Defendants knew, or should have known, that they had no legal right or belief that the use of deadly force against Ali and Jason was lawful or constitutional.

622. At all relevant times, EBCIPD Defendants violated Plaintiffs' constitutional rights by the illegal and unlawful use of deadly force against Ali and Jason.

623. At all relevant times, EBCIPD Defendants knew, or should have known, that they could not just stand by and watch as other law enforcement officers used deadly force by shooting several bullets at Jason and Ali when there was no legal right or belief that the use of deadly force against Jason and Ali was lawful or constitutional.

624. At all relevant times, EBCIPD Defendants violated Plaintiffs' constitutional rights by their failure to intervene to prevent the illegal and unlawful use of deadly force against Jason and Ali.

625. At all relevant times, a citizen had a clearly established Fourth Amendment right to possess a firearm in his own home in a non-threatening manner while investigating a nocturnal disturbance on his premises.

626. At all relevant times, neither Jason nor Ali possessed a firearm as they opened the door and walked out of their home in a non-threatening manner while investigating the illegal disturbance on their premises at night.

627. At all relevant times, EBCIPD Defendants violated Jason and Ali's constitutional right to open the door and walk out of their home in a non-threatening manner while unarmed to investigate the illegal disturbance on their Property and in their home at night by using deadly force against Jason and Ali.

166

628. A citizen has the constitutional right to live peaceably in his own home on his own property without interference from a law enforcement officer.

629. At all relevant times, EBCIPD Defendants knew, or should have known, that, on December 12 and 13, 2022, Plaintiffs had a constitutional right to live peaceably in their own home on their own property without interference from a law enforcement officer.

630. At all relevant times, EBCIPD Defendants violated Plaintiffs' constitutional right to live peaceably in their own home on their own property without interference from a law enforcement officer.

631. A law enforcement officer trespassing on a citizen's private property without a valid reason is a search or seizure subject to the Fourth Amendment.

632. At all relevant times, EBCIPD Defendants knew, or should have known, that, on December 12 and 13, 2022, Plaintiffs had a constitutional right to be free from law enforcement officers trespassing on their property without a valid reason.

633. At all relevant times, EBCIPD Defendants violated Plaintiffs' constitutional right to be free from law enforcement officers trespassing on their property without a valid reason.

634. A law enforcement officer making armed patrols for hours on a citizen's private property without a valid reason is a search or seizure subject to the Fourth Amendment.

635. At all relevant times, EBCIPD Defendants knew, or should have known, that, on December 12 and 13, 2022, Jason and Ali had a constitutional right to be free

from law enforcement officers making armed patrols for hours in the middle of the night on Jason and Ali's private property without a valid reason.

636. At all relevant times, EBCIPD Defendants violated Plaintiffs' constitutional right to be free from law enforcement officers making armed patrols for hours in the middle of the night on Jason and Ali's private property without a valid reason.

637. A law enforcement officer breaking into the closed door on a citizen's home on private property without knocking and announcing is a search or seizure subject to the Fourth Amendment.

638. At all relevant times, EBCIPD Defendants knew, or should have known, that, on December 12 and 13, 2022, Plaintiffs had a constitutional right to be free from law enforcement officers breaking into the closed door on a citizen's home on private property without knocking and announcing and throwing a surveillance drone robot inside.

639. At all relevant times EBCIPD Defendants violated Plaintiffs' constitutional right to be free from law enforcement officers breaking into the closed door on a citizen's home on private property without knocking and announcing and throwing a surveillance drone robot inside.

640. At all relevant times, EBCIPD Defendants knew, or should have known, that, on December 13, 2022, Jason had a constitutional right to be free from law enforcement officers fabricating evidence and presenting false evidence under oath to a judicial officer *ex parte* to obtain an unlawful arrest warrant.

641. At all relevant times, EBCIPD Defendants violated Jason's constitutional right to be free from law enforcement officers fabricating evidence and presenting false evidence under oath to a judicial officer *ex parte* to obtain an unlawful a warrant.

642. A law enforcement officer arresting a citizen on charges that the officer knows are false or if the law enforcement officer arrests a citizen without probable cause is a search or seizure subject to the Fourth Amendment, a violation of due process subject to the Fifth Amendment, and a cruel and unusual punishment without conviction that violates the Eight Amendment.

643. At all relevant times, EBCIPD Defendants knew, or should have known, that, on December 13, 2022, Jason had a constitutional right to be free from law enforcement officers arresting him on charges that the officers know were false and without probable cause.

644. At all relevant times, EBCIPD Defendants violated Jason's constitutional right to be free from law enforcement officers arresting him on charges that the officers know were false without probable cause.

645. At all relevant times, EBCIPD Defendants knew, or should have known, that, on December 13, 2022, Ali had a constitutional right to be free from law enforcement officers arresting her on charges that the officers know were false without probable cause.

646. At all relevant times, EBCIPD Defendants violated Ali's constitutional right to be free from law enforcement officers arresting her on charges that the

officers know were false without probable cause.

647. A law enforcement officer destroying evidence of the illegal use of force, false search warrant process, and false arrest warrant process after the fact is a search or seizure subject to the Fourth Amendment and a violation of due process subject to the Fifth Amendment.

648. At all relevant times, EBCIPD Defendants knew, or should have known, that, on December 13, 2022, Ali had a constitutional right to be free from law enforcement officers destroying evidence of the illegal use of force, false search warrant process, and false arrest warrant process after the fact.

649. At all relevant times, EBCIPD Defendants violated Ali's constitutional right to be free from law enforcement officers destroying evidence of the illegal use of force, false search warrant process, and false arrest warrant process after the fact.

650. At all relevant times, EBCIPD Defendants had a duty to know of and comply with all applicable laws and policies related to the situation at the Property on December 12 and 13 to ensure that they did not violate Ali's constitutional rights.

651. At all relevant times, if EBCIPD Defendants had known of and complied with all applicable laws and policies related to the situation at the Property on December 12 and 13, they would not have violated Ali's constitutional rights.

652. At all relevant times, EBCIPD Defendants either did not know of or certainly did not comply with all applicable laws and policies related to the situation at the Property on December 12 and 13, and, in doing so, they violated Ali's constitutional rights as described above.

653. On December 13, 2022, these rights to freedom from: unjustified and illegal use of deadly force, hours long armed trespass on private property, breaking in to an occupied home without knocking or announcing, fabricating evidence and giving false sworn testimony to obtain search and arrest warrants, arresting a citizen based on a false warrant, and destroying evidence in an attempt to cover up the illegal wrongdoing were clearly established constitutional rights, pursuant to the Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution. These are rights that any reasonable sheriff, officer, deputy, supervisor, agent, or employee in the position of each of these Defendants would and should have known, and did know. It is not possible, given the normal expectations of law enforcement officers in general, and the policies and training and experience of these Defendants specifically, that these Defendants can claim that they were unaware of what should have happened to avoid violating Jason and Ali's constitutionally protected rights in this situation. Indeed, if these Defendants had merely ensured that they knew about and complied with the Sheriff's policy, Jason and Ali would not have even been disturbed by the law enforcement officers because they would have promptly left after it became clear they had no reason or support for loitering. Instead, these Defendants stayed on the Property for 6 hours until they shot and almost killed Jason and tried to shoot Ali. As a result, the defense of qualified immunity is unavailable to, and has been waived by, these Defendants.

654. A supervisor can be held liable in his or her individual capacity under § 1983 if there is a sufficient causal connection between the supervisor's wrongful

conduct and the constitutional violation. The supervisor is responsible if he has supervisory authority over his subordinate government actor who commits constitutional violations. In addition to their direct actions, EBCIPD Supervisors acted in their supervisory capacity to violate Jason and Ali's constitutional rights described above. For these EBCIPD Supervisors, they acted under color of state law, the acts and failures to act by their subordinates violated Jason and Ali's constitutional rights, and the EBCIPD Supervisors were aware or should have been aware of their subordinates' actions and omissions that violated the Jason and Ali's constitutional rights as they were happening such that the EBCIPD Supervisors could and should have stopped the violations before they culminated in the injuries and harms that befell Jason and Ali. These EBCIPD Supervisors engaged in conduct that showed a reckless or callous indifference to the deprivation by their subordinates of the rights of Jason and Ali. These EBCIPD Supervisors engaged in conduct that was so closely related to all of the other Defendants' actions that led to the deprivation of Jason and Ali's rights as to be the moving force that caused the ultimate injury.

655. As a direct and proximate result of the deprivation and violations of Jason and Ali's constitutional and federal rights as alleged above, they suffered painful physical injuries and terrifying, preventable, and totally unnecessary mental anguish and emotional distress from this near-death event while peacefully sleeping in their own home on their own property at 4:57 am. They also suffered property damage at their home and otherwise unnecessary out of pocket expenses as a result of these violations. They have suffered a complete loss of a normal life as they knew

it before these violations. Consequently, Jason and Ali are entitled to recover from each of these EBCIPD Defendants, in their individual capacities, compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of $75,000.00.

656. Furthermore, Jason and Ali are entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) and under federal law and common law from each of these EBCIPD Defendants, in their individual capacities, to punish these Defendants for their illegal, reprehensible, unconstitutional, egregiously wrongful, reckless and willful misconduct and to both ensure that these EBCIPD Defendants will never repeat this shameful conduct ever again and also to deter others from engaging in similar conduct in the future.

## COUNT 17: VIOLATION OF 42 U.S.C. §§ 1983 and 1988 *Monell* EBCI, CHIEF NEADEAU, ASSISTANT CHIEF TAYLOR, LT. DET. NEADEAU, LT. FERGUSON, SWAT COMMANDER BUTTERY, DET. SGT. RAMIREZ, SGT. SMITH.
### (in their Official and Individual Capacities)

657. The allegations in the Paragraphs above are incorporated by reference.

658. Chief Neadeau became the Chief of the EBCIPD on September 1, 2022.

659. Chief Neadeau was and is the Chief of the EBCIPD and has oversight over all EBCIPD employees and agents.

660. Chief Neadeau was and is the final policymaker for the EBCIPD.

661. In her official capacity, Chief Neadeau's actions and inactions were those of the EBCIPD.

662. EBCIPD Supervisors are "persons" as defined pursuant to 42 U.S.C. § 1983 and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018 (1978), and its progeny.

663. Plaintiffs can establish a *Monell* claim against the EBCI by showing Chief Neadeau and the EBCIPD Supervisors violated Plaintiffs' constitutional rights: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

664. Chief Neadeau and the EBCIPD Supervisors' acts and omissions directly and proximately caused the deprivation of Jason's rights; that is, Chief Neadeau and the EBCIPD Supervisors' acts and omissions were so closely related to the deprivation of Jason's rights as to be the moving force that caused the ultimate injury.

665. At all relevant times, Chief Neadeau and the EBCIPD Supervisors were responsible for the formulation and execution of policies regarding the safety and constitutionality of EBCIPD employees and agents as they engaged in law enforcement activities with the public in the community.

666. At all relevant times, Chief Neadeau and the EBCIPD Supervisors were responsible for the formulation of, training on, and execution of policies for EBCIPD employees and agents regarding the appropriate, legal, and constitutional use of

force, including the rare use of deadly force, when and how to obtain and execute search warrants, and when and how to obtain and execute arrest warrants when interacting with citizens in the community.

667.　At all relevant times, Chief Neadeau and the EBCIPD Supervisors were responsible for the formulation of, training on, and execution of policies for EBCIPD employees and agents regarding the appropriate, legal, and constitutional conduct of wellness visits and how to respond to noise complaints at citizens' homes in the community.

668.　At all relevant times, Chief Neadeau and the EBCIPD Supervisors were responsible for the formulation of, training on, and execution of policies for EBCIPD employees and agents regarding the appropriate, legal, and constitutional use of force, including deadly force, when EBCIPD employees and agents engaged in SWAT team raids at citizens' homes in the community.

669.　At all relevant times, Chief Neadeau and the EBCIPD Supervisors were responsible for the formulation of, training on, and execution of policies for EBCIPD employees and agents regarding the appropriate, legal, and constitutional use of force, including on rare occasions deadly force, when EBCIPD employees and agents performed unannounced breaking and entering to toss a video streaming drone robot into sleeping citizens' homes in the community.

670.　Chief Neadeau established as official policy or de facto practice or custom lackadaisical, irresponsible, dangerous, and reckless behavior by the deputies, officers, and other employees and agents of the EBCIPD. While she had a

written policy to handle law enforcement activities in the field, EBCIPD Defendants failed to adhere to the EBCIPD safety policy.

671. The EBCIPD, through Chief Neadeau and the EBCIPD Supervisors, maintained a policy, custom, or pattern and practice of promoting, facilitating, and condoning the improper, illegal, and unconstitutional techniques by the officers and other EBCIPD agents and employees. These EBCIPD Supervisors' acts and omissions led to the shooting of Jason and Ali and shock the conscience.

672. The EBCIPD, through Chief Neadeau and the EBCIPD Supervisors, further failed to adequately train, supervise, monitor, enforce, or discipline EBCIPD Defendants, as set forth above, in connection with complying with the written policy to protect and ensure Jason and Ali's constitutional rights were not violated.

673. Because Chief Neadeau and the EBCIPD Supervisors were the final policy makers on December 12 and 13, 2023, their acts or omission during that time constituted the policy, custom, or pattern and practice of the EBCIPD.

674. These failures to train and use of illegal and unconstitutional practices and customs that diverge from any written policy amounted to violations of the rights of persons with whom EBCIPD officers, employees, and agents came into contact. Chief Neadeau's failure to train, and instead allowing and condoning the use of illegal and unconstitutional practices and customs that diverge from any written policy, reflected a deliberate or consciously indifferent "policy," that these failures can fairly be said to be the moving force behind the constitutional violation and are closely related to the harm and injury Jason and Ali suffered, meaning it is at least a cause

of the injuries and harm they suffered.

675. Upon information and belief and at all relevant times, Chief Neadeau and the EBCIPD Supervisors had in effect de facto policies, practices, and customs that were a direct and proximate cause of the wrongful, unconstitutional, and unlawful conduct of EBCIPD officers, employees, and agents who violated Jason and Ali's constitutional rights, as alleged above, including, *inter alia*:

a. The failure to draft or institute constitutionally adequate policies or procedures necessary to ensure that excessive force and deadly force were not used for a simple welfare check or noise complaint;

b. The failure to adequately train, supervise, instruct, or monitor officers, employees, and agents of the EBCIPD in the proper methods, practices, or policies for conducting a simple welfare check or noise complaint;

c. The failure to draft or institute constitutionally adequate policies or procedures necessary to ensure that excessive force and deadly force were not used when 2 unarmed citizens slept in their home through the night and came out the door with their hands held up in the air above their heads as instructed;

d. The failure to adequately train, supervise, instruct, or monitor officers, employees, and agents of the EBCIPD in the proper methods, practices, or policies to ensure that excessive force and deadly force were not used when 2 unarmed citizens slept in their

home through the night and came out the door with their hands held up in the air above their heads as instructed;

e.      The failure to draft or institute constitutionally adequate policies or procedures necessary to ensure that officers, employees, and agents of the EBCIPD did not fabricate evidence or give false sworn testimony to judicial officers to obtain arrest warrants;

f.      The failure to adequately train, supervise, instruct, or monitor officers, employees, and agents of the EBCIPD in the proper methods, practices, or policies for properly obtaining arrest warrants;

g.      The failure to draft or institute constitutionally adequate policies or procedures necessary to ensure that officers, employees, and agents of the EBCIPD investigated and held accountable after a blatant violation of citizens' rights occurred so that the citizens of Cherokee County would not face life or death deprivations like Jason faced when they were almost killed by EBCIPD employees and agents;

h.      Ratifying the unconstitutional violations by officers, employees, and agents of the EBCIPD that EBCIPD Supervisors knew of and specifically made a deliberate choice to approve of and actually participated in the cover up, defamation, and false prosecution of Jason;

i. The failure to ensure officers, employees, and agents of the EBCIPD were trained on and familiar with, and actually complied with the EBCIPD Standard Operating Procedures or policies related to the proper methods, practices, or policies for providing safe and constitutional and legal interactions with the citizens of Cherokee County;

j. The failure to ensure officers, employees, and agents of the EBCIPD complied with the EBCIPD Standard Operating Procedures or policies related to the proper methods, practices, or policies for providing safe and constitutional and legal interactions with the citizens of Cherokee County;

k. The failure to ensure EBCIPD Defendants complied with applicable statutes and the state and federal constitution; and

l. Other violations of policies, customs, rules, laws, the Constitution, and practices to be identified during the course of discovery or trial.

676. Upon information and belief, Chief Neadeau and the EBCIPD Supervisors had actual or constructive knowledge that the EBCIPD officers, employees, and agents were, and had been before and after December 12 and 13, 2022, engaged in conduct in direct conflict with the EBCIPD policies and the applicable laws and rules that posed a pervasive and unreasonable risk of constitutional injury to the citizens of Cherokee County and the EBCI, such as

Plaintiffs.

677.    Upon information and belief, the response of Chief Neadeau and the EBCIPD Supervisors to such actual or constructive knowledge, even after repeated instances of injury or death to other citizens of Cherokee County and the EBCI, was so inadequate as to show deliberate indifference to or tacit authorization of the offensive, unconstitutional, and illegal acts and practices described above. In fact, by their conduct, Chief Neadeau and the EBCIPD Supervisors created and encouraged a culture of excessive force and danger towards citizens of Cherokee County and the EBCI, culminating in the shooting of Jason that shocked the conscience.

678.    The violations of these policies, practices, and customs; failures to adequately train and supervise; adoption of de facto policies in conflict with the written policies by default; and encouragement during and ratification after the fact of acts that violated Plaintiffs' constitutional rights by Chief Neadeau and the EBCIPD Supervisors directly and proximately resulted in the violations of Jason and Ali's rights under the United States Constitution, including rights secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments, and under other federal laws.

679.    As a direct and proximate result of the deprivation and violations of Jason and Ali's constitutional and federal rights as alleged above, they suffered painful physical injuries and terrifying, preventable, and totally unnecessary mental anguish and emotional distress from this near-death event while peacefully sleeping in their own home on their own property at 4:57 a.m. They also suffered property damage at their home and otherwise unnecessary out of pocket expenses as a result

of these violations. They have suffered a complete loss of a normal life as they knew it before these violations. Consequently, Jason and Ali are entitled to recover from each of EBCIPD Supervisors, in their individual and official capacities, compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of seventy-five thousand dollars ($75,000.00).

680.     Furthermore, Jason and Ali are entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) and under federal law and common law from each of these EBCIPD Supervisors, in their individual and official capacities, in an amount in excess of seventy-five thousand dollars ($75,000.00), to punish EBCIPD Supervisors for their illegal, reprehensible, unconstitutional, egregiously wrongful, reckless and willful misconduct and to both ensure that EBCIPD Supervisors will never repeat this shameful and wanton conduct ever again and also to deter others from engaging in similar conduct in the future.

**COUNT 18:  VIOLATION OF 42 U.S.C. §§ 1983 and 1988** *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* **403 U.S. 388, 397, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971) EBCI, CHIEF NEADEAU, ASSISTANT CHIEF TAYLOR, LT. DET. NEADEAU, LT. FERGUSON, SWAT COMMANDER BUTTERY, DET. SGT. RAMIREZ, SGT. SMITH, DET. WOLFE, DET. MCKINNEY, OFCR. MESSER, and OFCR. HARRIS.**
**(in their Official and Individual Capacities)**

681.     The allegations in the Paragraphs above are incorporated by reference.

682.     The allegations of Count 17 and 18 are incorporated in this *Bivens* claim and the same claims apply to the EBCI Defendants under *Bivens* as they did under 1983 and *Monell* claims if the EBCIPD employees are considered to be acting under color of federal law.

683.   As a direct and proximate result of the deprivation and violations of Jason and Ali's constitutional and federal rights as alleged above, they suffered painful physical injuries and terrifying, preventable, and totally unnecessary mental anguish and emotional distress from this near-death event while peacefully sleeping in their own home on their own property at 4:57 am. They also suffered property damage at their home and otherwise unnecessary out of pocket expenses as a result of these violations. They have suffered a complete loss of a normal life as they knew it before these violations. Consequently, Jason and Ali are entitled to recover from each of these EBCIPD Defendants, in their individual capacities, compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of $75,000.00.

684.   Furthermore, Jason and Ali are entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) and under federal law and common law from each of these EBCIPD Defendants, in their individual capacities, to punish these Defendants for their illegal, reprehensible, unconstitutional, egregiously wrongful, reckless and willful misconduct and to both ensure that these EBCIPD Defendants will never repeat this shameful conduct ever again and also to deter others from engaging in similar conduct in the future.

**COUNT 19:   NEGLIGENCE and NEGLIGENCE PER SE: EBCI, CHIEF NEADEAU, ASSISTANT CHIEF TAYLOR, LT. DET. NEADEAU, LT. FERGUSON, SWAT COMMANDER BUTTERY, DET. SGT. RAMIREZ, SGT. SMITH, DET. WOLFE, DET. MCKINNEY, OFCR. MESSER, and OFCR. HARRIS.**
**(in their Official and Individual Capacities)**

685.   The allegations in the Paragraphs above are incorporated by reference.

686.   EBCIPD Defendants had a duty to Jason and Ali to use ordinary care in the performance of their duties as law enforcement officers.

687.   By their conduct alleged above, EBCIPD Defendants breached their duty to use ordinary care in the performance of their duties as law enforcement officers and were negligent.

688.   By their conduct alleged above, EBCIPD Defendants violated several laws while they breached their duty to use ordinary care in the performance of their duties as law enforcement officers and were negligent per se.

689.   It was reasonably foreseeable to EBCIPD Defendants that such negligent conduct would cause Jason and Ali severe emotional distress.

690.   Ali and Jason suffered severe emotional distress as a direct and proximate result of the negligence of EBCIPD Defendants alleged above.

691.   Ali is presently receiving mental health treatment as a result of the experience she went through on December 13, and suffers from the diagnosed mental health conditions including anxiety and post-traumatic stress disorder. She also suffers from difficulty sleeping in a manner as she could before these events where Jason was shot in her arms and then she was kept from him as she thought he was dying for hours on December 13, 2022.

692.   Jason has experienced physical trauma which has led to mental and emotional suffering. He suffers from extreme anxiety and has great difficulty sleeping as a result of being shot and nearly dying on December 13, 2022.

693. As a direct and proximate result of the EBCIPD Defendants' negligent infliction of emotional distress on Jason and Ali as alleged above, they suffered painful and terrifying, preventable, and totally unnecessary mental anguish and emotional distress from this near-death event while peacefully sleeping in their own home on their own property at 4:57 a.m. They have suffered a complete loss of a normal life as they knew it before this negligent infliction of emotional distress. Consequently, Jason and Ali are entitled to recover from each EBCIPD Defendant, in their individual and official capacities, compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of seventy-five thousand dollars ($75,000.00).

694. Furthermore, Jason and Ali are entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from each EBCIPD Defendant, in their individual and official capacities, in an amount in excess of seventy-five thousand dollars ($75,000.00), to punish EBCIPD Defendants for their illegal, reprehensible, unconstitutional, egregiously wrongful, reckless and willful misconduct causing an improper infliction of emotional distress on Jason and Ali as alleged above and to both ensure that EBCIPD Defendants will never repeat this shameful and wanton conduct ever again and also to deter others from engaging in similar conduct in the future.

**COUNT 20: GROSS NEGLIGENCE: EBCI, CHIEF NEADEAU, ASSISTANT CHIEF TAYLOR, LT. DET. NEADEAU, LT. FERGUSON, SWAT COMMANDER BUTTERY, DET. SGT. RAMIREZ, SGT. SMITH, DET. WOLFE, DET. MCKINNEY, OFCR. MESSER, and OFCR. HARRIS.**

**(in their Official and Individual Capacities)**

695.   The allegations in the Paragraphs above are incorporated by reference.

696.   EBCIPD Defendants had a duty to Jason and Ali to use ordinary care in the performance of their duties as law enforcement officers.

697.   By their conduct alleged above, EBCIPD Defendants breached their duty to use ordinary care in the performance of their duties as law enforcement officers and were grossly negligent by virtue of their recklessness, willful and wanton conduct, utter disregard for the safety of others, shooting blindly into an occupied home without knowing or caring who was inside, and then engaging in an elaborate cover up to ratify their illegal actions and obfuscate the evidence while taking no responsibility for the egregious conduct that shattered these two citizens' lives.

698.   It was reasonably foreseeable to EBCIPD Defendants that such grossly negligent conduct would cause Jason and Ali harm.

699.   Ali and Jason suffered harm, damages, and injury as a direct and proximate result of the gross negligence of the EBCIPD Defendants alleged above.

700.   As a direct and proximate result of the EBCIPD Defendants' gross negligence as alleged above, Jason and Ali suffered painful and terrifying, preventable, and totally unnecessary physical harm, mental anguish and emotional distress, and property damage from this near-death event while peacefully sleeping in their own home on their own property at 4:57 a.m. They have suffered a complete loss of a normal life as they knew it before this gross negligence. Consequently, Jason and Ali are entitled to recover from each of these EBCIPD Defendants, in their

individual and official capacities, compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of seventy-five thousand dollars ($75,000.00).

701.    Furthermore, Jason and Ali are entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from each of these EBCIPD Defendants, in their individual and official capacities, in an amount in excess of seventy-five thousand dollars ($75,000.00), to punish these Defendants for their illegal, reprehensible, unconstitutional, egregiously wrongful, reckless and willful misconduct causing an improper harm, injury, damage, and emotional distress on Jason and Ali as alleged above and to both ensure that these Defendants will never repeat this shameful and wanton conduct ever again and also to deter others from engaging in similar conduct in the future.

**COUNT 21:    INTRUSION AND INVASION OF PRIVACY: EBCI, CHIEF NEADEAU, ASSISTANT CHIEF TAYLOR, LT. DET. NEADEAU, LT. FERGUSON, SWAT COMMANDER BUTTERY, DET. SGT. RAMIREZ, SGT. SMITH, DET. WOLFE, DET. MCKINNEY, OFCR. MESSER, and OFCR. HARRIS.**
**(in their Official and Individual Capacities)**

702.    The allegations in the Paragraphs above are incorporated by reference.

703.    The  EBCIPD Defendants unlawfully intruded upon and invaded the privacy of Jason and Ali by:

        a.    Entering the Property and approaching the home Ali and Jason occupied without permission and knocking on the door without announcing who they were or what their purpose was in being at the Property;

b.    Entering to the Property and remaining on it for hours without lawful authority or permission;

c.    Looking into the windows of the home and garage without lawful authority over several hours;

d.    Entering the garage without any just cause, permission, authority, or excuse prior to obtaining any search warrant;

e.    Opening the door of the home without lawful authority and without just cause or excuse while Jason and Ali slept inside; and

f.    Tossing in a drone robot that transmitted live stream audio and video of their intimate quarters into Jason and Ali's home as they slept, unaware, in the bedroom while the drone recorded the inside.

704.    EBCIPD Defendants' invasion and intrusion of Plaintiffs' peace of mind and privacy was willful, intentional, and without just cause.

705.    A reasonable person, under the same or similar circumstances, would be highly offended by EBCIPD Defendants' invasion and intrusion against Jason and Ali.

706.    As a direct and proximate result of the EBCIPD Defendants' invasion and intrusion of Jason and Ali's privacy as alleged above, they suffered painful physical injuries and terrifying, preventable, and totally unnecessary mental anguish and emotional distress from this near-death event while peacefully sleeping in their own home on their own property at 4:57 a.m. They have suffered a complete loss of a

normal life as they knew it before these invasion and intrusion. Consequently, Jason and Ali are entitled to recover from each EBCIPD Defendant, in their individual and official capacities, compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of seventy-five thousand dollars ($75,000.00).

707.    Furthermore, Jason and Ali are entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from each EBCIPD Defendant, in their individual and official capacities, in an amount in excess of seventy-five thousand dollars ($75,000.00), to punish EBCIPD Defendants for their illegal, reprehensible, unconstitutional, egregiously wrongful, reckless and willful misconduct causing an improper invasion and intrusion of Jason and Ali's privacy as alleged above and to both ensure that EBCIPD Defendants will never repeat this shameful and wanton conduct ever again and also to deter others from engaging in similar conduct in the future.

## COUNT 22:  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS; EBCI, CHIEF NEADEAU, ASSISTANT CHIEF TAYLOR, LT. DET. NEADEAU, LT. FERGUSON, SWAT COMMANDER BUTTERY, DET. SGT. RAMIREZ, SGT. SMITH, DET. WOLFE, DET. MCKINNEY, OFCR. MESSER, and OFCR. HARRIS.
### (in their Official and Individual Capacities)

708.    The allegations in the Paragraphs above are incorporated by reference.

709.    EBCIPD Defendants had a duty to Jason and Ali to use ordinary care in the performance of their duties as law enforcement officers.

710.    By their conduct alleged above, EBCIPD Defendants breached their duty to use ordinary care in the performance of their duties as law enforcement officers and were negligent, negligent per se, and grossly negligent.

711.   Ali suffered severe emotional distress as a direct and proximate result of the negligence and gross negligence of the EBCIPD Defendants alleged above.

712.   Ali is presently receiving mental health counseling as a result of the experience she went through on December 13, and suffers from the diagnosed mental health condition known as post-traumatic stress syndrome.

713.   Jason has experienced physical trauma which has led to mental and emotional suffering. He suffers from extreme anxiety that has caused extreme agitation since being gunned down in his home and has great difficulty sleeping or maintaining any sense of calm or concentration as a result of being shot and nearly dying on December 13, 2022.

714.   As a direct and proximate result of the EBCIPD Defendants' negligent infliction of emotional distress on Jason and Ali as alleged above, they suffered painful and terrifying, preventable, and totally unnecessary mental anguish and emotional distress from this near-death event while peacefully sleeping in their own home on their own property at 4:57 a.m. They have suffered a complete loss of a normal life as they knew it before this negligent infliction of emotional distress. Consequently, Jason and Ali are entitled to recover from each EBCIPD Defendant, in their individual and official capacities, compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of seventy-five thousand dollars ($75,000.00).

715.   Furthermore, Jason and Ali are entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from each EBCIPD Defendant, in their

individual and official capacities, in an amount in excess of seventy-five thousand dollars ($75,000.00), to punish EBCIPD Defendants for their illegal, reprehensible, unconstitutional, egregiously wrongful, reckless and willful misconduct causing an improper infliction of emotional distress on Jason and Ali as alleged above and to both ensure that EBCIPD Defendants will never repeat this shameful and wanton conduct ever again and also to deter others from engaging in similar conduct in the future.

**COUNT 23:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS: EBCI, CHIEF NEADEAU, ASSISTANT CHIEF TAYLOR, LT. DET. NEADEAU, LT. FERGUSON, SWAT COMMANDER BUTTERY, DET. SGT. RAMIREZ, SGT. SMITH, DET. WOLFE, DET. MCKINNEY, OFCR. MESSER, and OFCR. HARRIS.**
**(in their Official and Individual Capacities)**

716.    The allegations in the Paragraphs above are incorporated by reference.

717.    The conduct of EBCIPD Defendants constitute extreme and outrageous conduct, which was intended to cause, and did cause, Jason and Ali severe emotional distress.

718.    EBCIPD Defendants' conduct was recklessly indifferent to the likelihood that Jason and Ali would suffer severe emotional distress as a result of their conduct, including watching her loved one, Jason, who was unarmed, being shot multiple times and being physically restrained and arrested to prevent her from caring for him; and for Jason, being shot but then knowing how much he needed to comfort Ali because he could hear her crying out in anguish, but they would not let him even see her before taking him away.

719.    As a direct and proximate result of the EBCIPD Defendants' intentional

infliction of emotional distress on Jason and Ali as alleged above, they suffered painful and terrifying, preventable, and totally unnecessary mental anguish and emotional distress from this near-death event while peacefully sleeping in their own home on their own property at 4:57 a.m. They have suffered a complete loss of a normal life as they knew it before this intentional infliction of emotional distress. Consequently, Jason and Ali are entitled to recover from each EBCIPD Defendant, in their individual and official capacities, compensatory, special, and non-compensatory damages as allowed under law in an amount in excess of seventy-five thousand dollars ($75,000.00).

720. Furthermore, Jason and Ali are entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from each EBCIPD Defendant, in their individual and official capacities, in an amount in excess of seventy-five thousand dollars ($75,000.00), to punish EBCIPD Defendants for their illegal, reprehensible, unconstitutional, egregiously wrongful, reckless and willful misconduct causing an improper infliction of emotional distress on Jason and Ali as alleged above and to both ensure that EBCIPD Defendants will never repeat this shameful and wanton conduct ever again and also to deter others from engaging in similar conduct in the future.

## COUNT 24: ACTION ON BOND and N.C. GEN. STAT. § 58-76-1, *et seq.*: OHIO CASUALTY INSURANCE COMPANY, AS SURETY.

721. The allegations in the Paragraphs above are incorporated by reference.

722. Sheriff Smith neglected the duties of his office and committed negligence, gross negligence, and wrongful acts as Sheriff of Cherokee County. The

other CCSD Defendants and EBCIPD Defendants committed negligence, negligence per se, gross negligence, and other wrongful acts described above as employees, agents, or on behalf of the Sheriff of Cherokee County.

723.    Jason and Ali suffered injuries and damage as a proximate result of Defendants' neglect, negligence, negligence per se, gross negligence, and other wrongful acts described above in the scope of their employment by the Sheriff's Department. Consequently, Jason and Ali are entitled to recover damages in an amount in excess of seventy-five thousand dollars ($75,000.00).

## COUNT 25: PUNITIVE DAMAGES: ALL DEFENDANTS.

724.    The allegations in the Paragraphs above are incorporated by reference.

725.    In addition to the negligent and intentional acts described above, Jason and Ali allege that Defendants, including their agents and employees, were aware of the impropriety and illegality of their actions, and knew this attack was wrong either contemporaneously as it occurred or became aware of it shortly afterwards, or in the reasonable exercise of reasonable diligence should have known about it before it happened. Despite this knowledge, they made no effort to provide protection or assistance to Jason and Ali, or take responsibility for harming these victims. Instead, Sheriff Smith defamed and blamed Jason for his own officers and agents illegally shooting at Jason and Ali. As a result, Defendants willfully allowed these victims to suffer the emotional distress and trauma caused by these law enforcement officers who should have upheld the law. At the very least, Defendants ratification after the fact of the shooters' criminal behavior continue to victimize Jason and Ali long after they should have affirmatively acknowledged the harm and wrongfulness. They only

took minimal action when the truth, coming from outside of the chain of command, made them. And even then, they did not drop the obviously false criminal charges against Jason for over 6 more weeks, until they confronted subpoenas from Jason that would have further exposed the truth of their lies and cover up.

726. Defendants, and their agents and employees, by their actions and inactions, participated in or condoned or stood by and watched and ignored, or even proactively tried to cover up, all of the shooters' criminal, unconstitutional misconduct. That shocks the conscious. Jason and Ali are entitled to recover punitive damages for Defendants' willful, wanton, reckless, egregious and unconscionable conduct and gross negligence.

727. The conduct of Defendants, as alleged herein constitutes malicious and willful wanton conduct as more particularly defined by the provisions of N.C. Gen. Stat. §1D-1 *et seq*. and under federal common law.

728. As a direct and proximate result of said conduct, Jason and Ali were injured and, consequently, are entitled to an award of punitive damages from Defendants in an amount to be determined by a Jury.

## PRAYER FOR RELIEF

WHEREFORE, Jason and Ali respectfully pray this Honorable Court that they have and recover judgment against Defendants, jointly and severally, in their individual and official capacities, as follows:

1. For all actual damages, including compensatory, special, and non-compensatory damages, as determined by a Jury, in an amount in excess of seventy-

five thousand dollars ($75,000.00);

2.    For punitive damages in accordance with the law in an amount to be determined by a Jury;

3.    For the costs of this action, including but not limited to, pre-judgment and post-judgment interest charged at the legal rate and attorneys' fees pursuant to 42 U.S.C. § 1988 and as otherwise allowed by law from the time of the filing of this action until paid;

4.    For Jury trial on all issues of fact as allowed by law; and

5.    For any and all further relief as the Court may deem just and proper.

RESPECTFULLY SUBMITTED THIS 20th day of June, 2023.

*/s/ W. Ellis Boyle*
W. Ellis Boyle
N.C. Bar No. 33826
email:docket@wardandsmith.com*
email:weboyle@wardandsmith.com**
For the Firm of
Ward and Smith, P.A.
Post Office Box 33009
Raleigh, NC 27636-3009
Telephone: 919.277.9100
Fax: 919.277.0177
*Attorney for Plaintiffs*


*/s/Zeyland G. McKinney, Jr.*
N.C. Bar No.  11004
email:  zmckinney2@gmail.com
*/s/Franklin S. McKinney*
N.C. Bar No.  47941
email:  fsmckinney1@gmail.com
McKinney Law Firm, P.A.
135 Peachtree Street, Suite 2
Murphy, NC  28906
Telephone:  828.837.9973
Facsimile:  828.835.9947
*Attorney for Plaintiffs*

_/s/Beverly B. Cook_
N.C. Bar No. 26615
email: cooklawfirm@frontier.com
Cook Law Firm
P.O. Box 993
800 Andrews Road
Murphy, NC 28906
Telephone: 828.835.7388
Facsimile: 828.835.3599
_Attorney for Plaintiffs_

*This email address must be used in order to effectuate service under the Federal Rules of Civil Procedure.

** Email address to be used for all communications other than service.